**Signed and Filed: March 15, 2012**

THOMAS E. CARLSON U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 09-31347 TEC |
| PLANT INSULATION COMPANY, a California corporation, | ) Chapter 11 |
| Debtor. | ) **O P I N I O N** |

### INTRODUCTION

Debtor sold, installed, and repaired asbestos-containing products starting in 1937. Plagued by thousands of lawsuits, and facing its insurers' claims that its insurance coverage was exhausted, Debtor filed a chapter 11 petition in this court. Debtor now seeks to confirm a plan that channels all asbestos injury claims to a section 524(g) trust established to benefit asbestos victims. The central feature of the plan is that it encourages insurers to make lump-sum settlement contributions to the trust by protecting settling insurers from claims for equitable contribution asserted by non-settling insurers. Asbestos claimants voted unanimously in favor of the plan, but non-settling insurers unanimously rejected the plan.

-1-

The trust/injunction provisions of section 524(g) of the Bankruptcy Code form the basis of the plan in every asbestos bankruptcy. The present case raises three questions regarding the application of section 524(g) that do not appear to be fully resolved under existing case law. Should the court confirm a plan in which a debtor that ceased doing business ten years ago attempts to satisfy the ongoing-business requirement of section 524(g) by merging with the company to which the debtor sold its operating assets? May an injunction issued under section 524(g) cut off non-settling insurers' equitable contribution claims against settling insurers without providing full compensation for the barred claims? Does the best-interest-of-creditors test require debtor to pay non-settling insurers the full value of their equitable contribution rights, because non-settling insurers would retain those rights in a chapter 7 case? I determine that each of these questions should be answered in favor of the debtor, and that the plan should be confirmed.

This opinion includes all the findings of facts and conclusions of law related to the three issues described above. In determining whether to confirm the plan, the court must make additional findings and conclusions that have little or no precedential significance. To avoid burdening readers not directly involved in the present case, I have placed the findings and conclusions regarding those remaining issues in a separate unpublished memorandum.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 2 of 83

**CONTENTS**

I.   Background
     A.   History of the Debtor ........................... 4
     B.   The Role of Section 524(g)....................... 9
     C.   The Plan
          1.   Summary .................................. 11
          2.   Unsecured Claims ......................... 13
          3.   Asbestos Injury Claims ................... 14
          4.   The Trust Option ......................... 14
          5.   The Tort-System Option.................... 15
          6.   The Merger ............................... 16
          7.   Injunctions
               (a)   Channeling Injunction.............. 18
               (b)   Settling Insurer Injunction ....... 18
               (c)   Asbestos Insurer Injunction ....... 18
          8.   Insurance Settlement Deadline............. 18
     D.   The Vote ..................................... 19
     E.   Objections to Confirmation ................... 20
     F.   The Trial .................................... 21

II.  Analysis
     A.   Good Faith
          1.   The Bad Faith Alleged .................... 23
          2.   Standard for Determining Good Faith ...... 23
          3.   Objectives of Section 524(g)
               (a) Equal Treatment of Present and Future
                   Claims ............................... 24
               (b) Preservation of Going-Concern Value .... 26
               (c) Prompt Payment of Claims .............. 27
          4.   Importance of the Merger ................. 27
          5.   Argument that Bankruptcy Unnecessary ....... 29
          6.   Argument that Plan Does Not Preserve
               Going-Concern Value ...................... 30
          7.   Argument that Insurers Coerced ........... 34
          8.   Argument that Bayside Coerced ............ 35

     B.   Issues Concerning Financial Projections
          1.   Plan Proponents' Evidence ................ 36
          2.   Non-Settling Insurers' Evidence .......... 39
          3.   Findings Regarding Financial Projections ... 40
          4.   Feasibility .............................. 41
          5.   Sufficiency of the Bayside Contribution .... 43
          6.   Good Faith Considerations ................ 45

     C.   Equitable Contribution Claims
          1.   Introduction ............................. 47
          2.   Provisions of Section 524(g) ............. 53
          3.   Constitutional Concerns .................. 56
          4.   Equity Jurisprudence ..................... 56
          5.   Non-Settling Insurers' Evidence .......... 57
          6.   The Plan Proponents' Evidence ............ 59

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 3 of
83

**CONTENTS (Continued)**

C. Equitable Contribution Claims (Continued)
    7. Findings Regarding the Evidence Presented .. 61
    8. Other Arguments of Non-Settling Insurers ... 65
    9. Decision ................................. 66

D. Extension of Deadline for Insurance Settlements
    1. The Terms of the Extension ................ 69
    2. The Non-Settling Insurers' Objections ...... 70
    3. No Unfair Surprise ........................ 71
    4. Benefits of the Extension ................. 72
    5. Confirmation is not Affected by the Number
       of Settlements ............................ 73
    6. Jurisdiction Questions..................... 74
    7. Standards for Future Settlements .......... 75
    8. Additional Disclosure is not Required ...... 78
    9. Proposed Extension Approved ............... 78

E. The "Best-Interest-of-Creditors" Test
    1. Introduction ............................. 79
    2. The Chapter 7 Test Applies only to Claims
       Against the Debtor ........................ 79
    3. Equitable Contribution Claims are not
       Claims Against the Debtor ................. 83

CONCLUSION .......................................... 83

**I**
**BACKGROUND**

**A. History of the Debtor**

Plant Insulation Company (Plant) was incorporated in 1937, and for decades engaged in the business of selling, installing, and repairing asbestos-containing insulation and fireproofing materials. For many years, it was the exclusive Northern California distributor for asbestos-containing products manufactured by Fibreboard Company. Like other asbestos manufacturers and installers, in the late 1970's Plant began to be served with many lawsuits filed by persons who claimed they had suffered injuries as a result of inhaling asbestos fibers from materials sold, installed, or repaired by Plant.

For the next ten years, Plant and its insurers were not required to take an active role in those lawsuits. The actions were

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 4 of
83

generally defended by Fibreboard, which, in settling claims, usually arranged for the plaintiffs to release all claims against Plant. In 1989, Fibreboard ceased to defend and indemnify Plant.

For the next twelve years, Plant was defended by its own insurers. Almost all of the actions against Plant that went to trial resulted in verdicts for the plaintiff. The company had purchased liability coverage from many different insurers over its decades of operation. Between 1991 and 2001, the insurers successively declared that their aggregate policy limits had been exhausted, and they ceased to defend and indemnify Plant. When the last insurer declared exhaustion in 2001, approximately 1,500 asbestos-related claims were pending against Plant.

In 2001, Plant ceased operations in its own name, and transferred its installation and repair business to Bayside Insulation and Construction, Inc. (Bayside). Bayside was a newly formed corporation, all of whose shares were owned by Shahram Ameli. Mr. Ameli had owned 49 percent of the shares of Plant. The other Plant shareholder, Doug Ralston, retired from the business in 2001, and played no role in the ownership or operations of Bayside. Among the Plant assets transferred to Bayside were: all outstanding installation and repair contracts and the related job files, the right to collect accounts receivable outstanding at the time of the transfer, Plant's cost-estimating software, and $150,000 in cash. Plant agreed not to file a bankruptcy for 18 months and to limit its future operations. In return, Bayside agreed to remit to Plant 65 percent of the amount collected on the accounts receivable, and to indemnify Plant with respect to the transferred contracts. After the transfer, Bayside continued to do business with the

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 5 of
83

installation and repair customers that Plant had previously served.

From 2001 to 2006, approximately 4,000 additional asbestos-related lawsuits were filed against Plant, but few were resolved. The insurers having declared exhaustion, and Plant having ceased to operate and having few apparent assets, plaintiffs' counsel generally entered standstill agreements with Plant, while continuing to pursue other defendants that appeared to be more likely sources of recovery.

In 2001, Plant sought assistance from the California Insurance Guarantee Corporation (CIGA), on the basis that some of its insurers had become insolvent. CIGA agreed to provide $35 million for victims of Plant. Distributions from this fund were to be made under a matrix agreed upon by plaintiffs' counsel, CIGA, and Plant. The matrix valued claims according to various factors, including the disease diagnosed in the victim, and the age and work history of the victim. Claimants were required to submit evidence of medical condition and exposure to asbestos fibers caused by Plant. Approximately 4,000 claims were submitted. The administrators of the CIGA plan approved payments to approximately 1,200 claimants, of whom approximately 1,100 actually received payment.

In January 2006, Plant filed an action against its insurers in the San Francisco County Superior Court, seeking declaratory relief as to whether the aggregate limits of their liability policies had truly been exhausted (the Coverage Action).[1] Plant contends that the aggregate policy limit in each of its insurance policies applies only to "products" and "completed operations" claims, and that there is no aggregate limit on claims arising from other "operations." If

---

[1] Plant Insulation Co. v. Fireman's Fund Ins. Co., et al., No. CGC-06-448618.

Plant prevails in the Coverage Action, individual claimants would still have to establish that they had suffered injury as a result of Plant's "operations" to obtain a recovery from the insurers. The Coverage Action is still pending before the Superior Court.[2]

At the time it filed the Coverage Action, Plant also tendered all pending actions to its insurers, most of whom agreed to defend under a reservation of rights. When it became apparent that insurers were once again providing a defense, CIGA ceased funding the matrix-based payment plan.

In September 2006, Plant asbestos claimants formed an informal committee (the Pre-Petition Committee). In April 2007, the Pre-Petition Committee learned of the 2001 transfer of Plant assets to Bayside. In May 2007, members of the Pre-Petition Committee advised the principals of Bayside that the committee considered Bayside to be liable for the debts of Plant under the theory of successor liability, and threatened to sue Bayside on that theory if Bayside did not agree to merge with Plant in a chapter 11 case to be filed by Plant. When Bayside did not agree to cooperate, several successor liability suits were filed against Bayside and then dismissed under a tolling agreement.

A Plant-Bayside merger would be helpful to Plant, because it would help Plant to satisfy the ongoing-business requirement of section 524(g). See pages 27-28, 31-32, below. Despite the efforts of the Pre-Petition Committee, Bayside did not agree to merge with Plant at that time.

In September 2007, Plant reached a settlement with one of its insurers, Sompo Japan Insurance Company of America (Sompo). The

_____

[2] This court has granted relief from stay to permit that action and related cross complaints to proceed.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 7 of 83

Sompo settlement provides for a payment of $5.0 million upon execution of the settlement, and payment of an additional $7.0 million upon entry of a District Court order upholding confirmation of a plan. The plan would have to contain an injunction protecting Sompo from all asbestos personal injury claims, and from equitable contribution claims asserted by other insurance companies.

In February 2009, Plant reached a settlement with a second insurer, United National Insurance Company (UNIC). The settlement requires UNIC to pay $7.5 million upon execution of the settlement agreement, and an additional $8.0 million when the District Court affirms a plan protecting UNIC from all further claims.[3]

Plant filed a petition under chapter 11 of the Bankruptcy Code on May 20, 2009. Promptly thereafter, the United States Trustee appointed a five-member official committee of unsecured creditors (the Committee). The United States Trustee appointed Charles B. Renfrew to serve as the Futures Representative, the fiduciary specified in section 524(g)(4)(B)(i)[4] to represent persons who have been exposed to asbestos fibers but have not yet developed a disease.

In early 2010, Bayside agreed in principle to a plan under which Bayside would merge with Plant. The specific terms of the merger had not yet been agreed upon when Plant, the Committee, and the Futures Representative (collectively, the Plan Proponents) filed a chapter 11 plan and disclosure statement in June 2010. The Plan

---

[3] Plant reached settlements with two additional insurers between the petition date and the conclusion of the confirmation hearing. See page 70 n.20, below.

[4] All statutory references are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

-8-

Proponents and Bayside agreed upon the terms of the Plant-Bayside merger in November 2010.

The version of the plan of reorganization that is under consideration here (the Plan) was filed by the Plan Proponents on May 2, 2011.[5]  The court approved the related disclosure statement on May 3, 2011.

**B.   The Role of Section 524(g)**

Before examining the terms of the Plan, it is appropriate to discuss the provisions of section 524(g) at least briefly, because section 524(g) is the centerpiece of every asbestos-related chapter 11 plan.

Congress enacted section 524(g) to address the unique problems raised in chapter 11 cases in which the debtor faces asbestos personal injury claims.  Such a debtor faces uncertain and potentially huge liabilities.  Unless it can cap its liabilities, the debtor will have trouble obtaining either debt or equity financing, suppliers may decline to ship on credit, and customers may stop buying from fear that the company will not survive to service its products.  The unique challenge in asbestos bankruptcies is that a person exposed to asbestos fibers may not become ill for decades.  Thus, a debtor that has handled asbestos-containing products knows that it will be subjected to many additional personal injury claims in the future, but because of the nature of the disease, it does not know who the claimants will be.  The normal processes of chapter 11 enable the asbestos debtor to deal with all known claims, but the constraints of due process do not permit the

---

[5] Second Amended Plan of Reorganization of Plant Insulation Company, docket no. 1155.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 9 of
83

normal chapter 11 process to be used to discharge the claims of persons not yet ill, who cannot be given notice and who would not know what compensation to seek.

The circumstances that make it difficult to provide the debtor effective relief also make it difficult to afford fair treatment to asbestos injury claimants, especially future claimants. The normal processes of chapter 11 do not require that assets be reserved to pay those persons who will assert claims in the future as a result of past acts of the debtor, but who do not yet exhibit injury and therefore do not have legally cognizable claims on the petition date.[6] Absent special procedures, the chapter 11 process will likely leave insufficient assets to pay those persons who become ill later.

Section 524(g) establishes a means by which the rights of future asbestos claimants are protected, while the debtor and certain third parties can be discharged from all asbestos-related liability. The central mechanisms by which this is achieved are: (a) the creation of a trust that is obligated to pay future claimants the same percentage dividend that it pays present claimants; (b) the appointment of a legal representative for the future claimants; (c) various requirements concerning the funding of the trust; and (d) the issuance of an injunction that supplements the debtor's discharge and protects the debtor and certain third parties from asbestos-related claims.

---

[6] The Bankruptcy Code uses the term "demand" rather than "claim" to define the rights of persons exposed to asbestos who have not yet become ill as of the petition date, and therefore do not have legally cognizable claims as of the petition date. § 524(g)(5). I use the term "future Asbestos Injury Claim" to refer to such rights.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 10 of 83

The statute is available only to a debtor that faces personal injury claims based on its handling of asbestos-containing products. § 524(g)(2)(B)(ii). The debtor must face potential liability from future claimants that is uncertain, but is sufficiently large to threaten the debtor's ability to pay both present and future claims equitably (on an equal basis). Id. The statute permits the court to issue an injunction prohibiting the assertion of asbestos-related claims against third parties (parties other than the debtor), but only if the third party's liability is derivative of (results solely from) the debtor's conduct, and only if the third party stands in a certain relationship to the debtor (such as having provided insurance to the debtor). § 524(g)(4)(A)(ii)(III).

Section 524(g) contains other substantive and procedural protections to ensure that both present and future claimants are treated fairly. First, the plan can be confirmed only if it is accepted by 75 percent of those present claimants that vote. § 524(g)(2)(B)(ii)(IV)(bb). Second, the trust must be funded in whole or part by securities of the debtor, and the trust must be entitled upon certain contingencies to own a majority of the voting shares of the debtor. § 524(g)(2)(B)(i)(II), (III). Third, any debtor or third party to be protected by an injunction issued under section 524(g) must provide benefits to the trust sufficient to make the issuance of that injunctive relief fair and equitable to future claimants. § 524(g)(4)(B)(ii).

**C. The Plan**

1. Summary

The only significant claims against Plant are those of

-11-

individuals who have been injured by exposure to asbestos (the Asbestos Injury Claims) and the claims of Plant's insurers for reimbursement of the amounts they have spent defending and indemnifying Plant (the Insurer Reimbursement Claims).[7] The only significant assets available to pay either type of claim are Plant's insurance policies. The value of those insurance policies exists in two different forms. The value of some of the policies has been reduced to cash through settlements in which the insurer repurchased the policy from Plant. The value of the remainder of the policies exists in its normal form: the duty of the insurer to pay persons injured as a result of insured activities of Plant.

In any asbestos bankruptcy, the key feature of the plan is the section 524(g) trust and injunction. The key feature of the Plan in the present case is the use of 524(g) to encourage insurers to settle their potential liabilities by making lump-sum payments to the Trust. The Plan encourages such settlements by affording those insurers that reach settlements (Settling Insurers) complete protection against all claims brought by all parties, including Asbestos Injury Claims, and Equitable Contribution Claims that could otherwise be asserted against the Settling Insurers by those insurers that do not reach settlements (Non-Settling Insurers). The broad release to be provided Settling Insurers (the Settling Insurer Injunction) creates a strong incentive to settle, because it provides Settling Insurers complete peace from all litigation, and because Non-Settling Insurers could be required to defend and

_____

[7] The Non-Settling Insurers contend they are entitled to reimbursement because the policy limits have been exhausted and they have no further contractual duty to defend or indemnify Plant. As noted earlier, for several years they have been defending Plant under a reservation of rights.

-12-

indemnify without the right to seek contribution from other insurers. It is this risk that has fueled much of the Non-Settling Insurers' opposition to confirmation of the Plan.

The Plan also provides for the merger of Plant into Bayside (the Merger). The Merger is important to the Plan primarily to help the Plan Proponents satisfy the technical requirements for the creation of a section 524(g) trust and injunction. See pages 27-28, 31-32, below.

2.  <u>Unsecured Claims</u>

The Plan provides for partial payment of general unsecured creditors, including Insurer Reimbursement Claims,[8] by transferring ten percent of all available funds (primarily present and future insurance settlement proceeds) to the Unsecured Claims Reserve. This treatment reflects agreement between the Plan Proponents and the Non-Settling Insurers that the maximum amount of the Unsecured Claims is approximately ten percent of the estimated amount of allowed present and future Asbestos Injury Claims, and provides for a similar percentage dividend to be paid to each type of claim. Virtually all of the Unsecured Claims consist of Insurer Reimbursement Claims. Plan Proponents dispute the validity of the Insurer Reimbursement Claims. The Plan ensures that a similar percentage dividend will be paid to Insurance Reimbursement Claims and Asbestos Injury Claims, whatever the outcome of this claims dispute, by providing for the release of that portion of the reserve

---

[8] The Plan, which contains 22 pages of definitions, uses very complex, interconnected terms to define the various types of claims. I have chosen to use terms that are easier to understand (Asbestos Injury Claims, Insurer Reimbursement Claims and Equitable Contribution Claims), and that describe accurately the substance of the Plan, but do not always correspond exactly with the terms used in the Plan.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 13 of 83

equal to the proportion of the Unsecured Claims disallowed or withdrawn.

3. <u>Asbestos Injury Claims</u>

The Plan provides for the payment of present and future Asbestos Injury Claims in two ways: from a trust established under section 524(g) (the Trust); and through actions brought against Plant and Non-Settling Insurers in the tort system.

4. <u>The Trust Option</u>

The Plan transfers to the Trust all cash proceeds in excess of those transferred to the Unsecured Claims Reserve. Any portion of the reserve that is released upon the disallowance or withdrawal of claims also passes to the Trust.

The Trust will distribute its assets in payment of present and future Asbestos Injury Claims according to certain Trust Distribution Procedures (TDP). The TDP have two principal features. First, they enable the administrators of the Trust to determine the amount of compensable damages sustained by a particular claimant without full-scale litigation. The TDP does so through a matrix that takes into account numerous factors, including the disease, age, and work history of the claimant. The claimant is required to submit proof of illness, and of exposure to asbestos caused by Plant. This evidence is evaluated in a manner intended to reduce the delay and cost attendant to litigation in the tort system. Second, the TDP enable the administrators of the Tust to determine what percentage of an allowed claim can be paid to a particular claimant without compromising the Trust's ability to pay the same percentage dividend to all other present and future Asbestos Injury Claims.

-14-

5. <u>The Tort-System Option</u>

The Plan permits the holders of Asbestos Injury Claims to pursue Plant and the Non-Settling Insurers in the tort system in addition to seeking compensation from the Trust. This "open system" is subject to the following terms and limits:

(a) The claimant may sue Plant to determine the liability of Plant for an Asbestos Injury Claim.[9]

(b) Any determination regarding the validity or amount of an Asbestos Injury Claim made under the TDP may not be used to establish the liability of Plant or a Non-Settling Insurer in the tort system. See Plan sections 5.2.8.1 and 5.2.8.2.

(c) If the claimant obtains a judgment against Plant in the tort system, the claimant may bring an action against the Non-Settling Insurers in state court to determine whether the judgment is covered by insurance (a Direct Action). Under the injunctions issued through the Plan, the claimant may not seek to enforce any such judgment against the Settling Insurers, against Reorganized Bayside, or against the officers, directors, or shareholders of Plant or Bayside. See page 18, below.

(d) Any liability of Plant or a Non-Settling Insurer in the tort system is to be reduced by any amount previously paid to the claimant by the Trust (the Trust-Payment Credit).

(e) A claimant may not bring a Direct Action against a Non-Settling Insurer unless the claimant agrees in writing that the Non-Settling Insurer may offset against any amount that the claimant could otherwise recover from the insurer, the value of the Equitable Contribution Claim the Non-Settling Insurer would have had against

[9] Plant must be sued under the name RPI Company. See Plan section 5.2.6.

-15-

the Settling Insurers but for the provisions of the Plan barring the

asserrtion of such rights (the Judgment-Reduction Credit).

> [T]he liability (if any) of the Non-Settling
> Asbestos Insurer to the Asbestos Claimant
> shall be reduced dollar-for-dollar by the
> amount (if any) of the Contribution Claims
> established pursuant to clause (b) hereof;
> and (b) the court hearing the Direct Action
> shall employ such procedure as that court
> determines is appropriate in order to
> determine prior to entry of judgment the
> validity and amount of any Contribution
> Claims (and the corresponding reduction in
> the amount of the Asbestos Claimant's
> recovery) as if, and to the same extent, they
> were asserted against Settling Asbestos
> Insurers.

Third Amendment to Second Amended Plan of Reorganization of Plant

Insulation Company at 4-5.

(f) A claimant who obtains a full recovery in a Direct Action is not

entitled to collect further distributions from the Trust. Any

future distributions from the Trust that the Trust claimant would be

entitled to are instead assigned to the insurer that paid the full

recovery.[10]

6. The Merger

The Plan provides that Bayside will merge into Plant. Upon

completion of the Merger, Plant will change its name to Bayside

Insulation & Construction, Inc. (Reorganized Bayside). The other

material terms of the Merger are as follows.

(a) The Trust will invest $2.0 million in Reorganized Bayside and

receive 40 percent of the common stock of Reorganized Bayside.

---

[10] The requirement that present and future Asbestos Injury
Claims be paid the same percentage of their allowed claims means
that the Trust will have to be very conservative in making
distributions. Thus, it is possible that an individual claimant
will receive a small initial dividend, and additional dividends
later as additional assets come into the Trust or as allowed
asbestos claims prove to be less than first estimated.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 16
of 83

(b) The Trust will receive a warrant to purchase an additional 11 percent of the shares at the same price per share it purchased the initial 40 percent of shares.

(c) The Trust will receive from Reorganized Bayside a promissory note payable to the Trust in the amount of $250,000 (the Note). The Note is secured by the shares of the other shareholders. The Note is due in five years and bears interest at three percent above the San Francisco Federal Reserve Bank discount rate.

(d) Reorganized Bayside will perform all of the duties Plant owes to its insurers under Plant's insurance policies. The Trust will reimburse Reorganized Bayside for the cost of performing those duties.

(e) Shahram Ameli and Ali Badakhshan, the critical employees of Reorganized Bayside, agree to work for ten years subject to limits on their salary and bonuses.

(f) The Trust will make a five-year revolving loan to Reorganized Bayside in a minimum amount of $1.0 million, and in a maximum amount calculated from a percentage of eligible accounts receivable (the Revolving Loan). The Revolving Loan bears interest at three percent above the San Francisco Federal Reserve Bank discount rate.

(g) The Trust will receive the right to compel Reorganized Bayside to purchase the Trust's shares after five years for a price equal to the amount invested by the Trust plus simple interest at ten percent. In lieu of repurchasing the Trust's shares, Reorganized Bayside may convert the Trust's shares to preferred stock bearing an annual cumulative dividend of 10.5 percent.

(h) Reorganized Bayside and the other shareholders will receive an option to repurchase the Trust's shares for a price equal to the

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 17 of 83

amount invested by the Trust plus simple interest at ten percent, provided that the Note and Revolving Loan are paid in full at the same time.

## 7.  The Injunctions

The Plan provides for the issuance of three separate injunctions.

(a) The **Channeling Injunction** requires the holder of an Asbestos Injury Claim to assert that claim only: (i) against the Trust; or (ii) against Plant and Non-Settling Insurers in the tort system under the open-system rules described above.  This injunction protects Reorganized Bayside and the principals of Reorganized Bayside, Shahram Ameli and Ali Badakhshan.

(b) The **Settling Asbestos Insurer Injunction** bars Non-Settling Insurers from asserting Equitable Contribution Claims against Settling Insurers.

(c) The **Asbestos Insurer Injunction** protects both Settling and Non-Settling Insurers from all asbestos-related claims, except: (i) litigation brought by the Trust or Reorganized Bayside against Non-Settling Insurers (i.e. the Coverage Action); (ii) Direct Actions brought in the tort system under the open-system rules described above; and (iii) Equitable Contribution Claims against Non-Settling Insurers.[11]

## 8.  Deadline for Insurance Settlements

The Plan originally provided that only those insurers that settled with Plant by the end of the confirmation hearing would be covered by the Settling Insurer Injunction and protected against Equitable Contribution Claims of Non-Settling Insurers.  Only four

---

[11] Any Equitable Contribution Claims that Settling Insurers may have against Non-Settling Insurers are assigned to the Trust.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 18 of 83

settlements were reached by that deadline.  See pages 49, 70, below.
On January 10, 2012, two days before the final argument that would
end the confirmation hearing, the Plan Proponents amended the Plan
to extend the deadline to 15 days after the District Court affirms
an order confirming the Plan.

**D.  The Vote**

Two classes of claims were entitled to vote: Unsecured Claims,
and Asbestos Injury Claims.  Unsecured Claims (Class 3) consist
almost entirely of the Non-Settling Insurers' claims against the
Debtor Plant for reimbursement of the amounts they have spent
defending and indemnifying Plant (Insurer Reimbursement Claims).
Asbestos Injury Claims (Class 4) consist of the claims of persons
who have already manifested injury as a result of exposure to
asbestos fibers.  Persons who have been exposed to asbestos fibers
but have not yet manifested any injury are not entitled to vote,
because by definition they are unknown.  The rights of these future
claimants are protected by the Futures Representative.  The holders
of Class 1 claims (priority claims) and Class 2 claims (secured
claims) were not entitled to vote and are deemed to accept the Plan,
because their legal rights are not impaired by the Plan.  §§ 1124,
1126(f).  The holders of Class 5 interests (Plant shareholders) were
not entitled to vote and are deemed to reject the Plan, because they
will not receive or retain any property under the Plan.  § 1126(g).
Plant shareholders in fact support confirmation of the Plan.

The result of the vote is easy to summarize.  The Plan was
accepted by Class 4 (Asbestos Injury Claims) and rejected by Class 3
(Unsecured Claims).  The Plan was accepted unanimously by 6,244

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 19
of 83

asbestos injury claimants, who assert claims totaling $1.35 billion. The Plan was unanimously rejected by eight Class 3 Non-Settling Insurers, who assert claims totaling $95.3 million.

Because Class 3 has not accepted the Plan, the court must determine whether the Plan treats Class 3 claims in a manner that is fair and equitable (see § 1129(b)), and must address the other objections to confirmation raised by the Non-Settling Insurers.

**E. Objections to Confirmation**

The Non-Settling Insurers raised the following principal objections to confirmation.

(a) The Plan was not filed in good faith because Plant has no going-concern value to preserve.

(b) The Plan was not filed in good faith because Plant coerced Bayside into the Merger, because the Merger has no economic justification or substance, and because the Merger was arranged solely to enable Plant to satisfy the requirements of section 524(g).

(c) The Plan is not feasible because Bayside has continually lost money and cannot continue to function as a going concern.

(d) Bayside is not contributing to the Trust property of a value sufficient to justify the injunctive relief that Reorganized Bayside will receive under the Plan.

(e) The Plan improperly prohibits Non-Settling Insurers from assuring Equitable Contribution Claims against Settling Insurers without compensating them for those lost rights.

(f) The insurance settlement deadline should not be extended, because to do so would increase the harm Non-Settling Insurers

-20-

suffer from the loss of their Equitable Contribution Claims.

(g) The Plan does not satisfy the best-interest-of-creditors test, because in a chapter 7 liquidation the Non-Settling Insurers would retain their right to assert Equitable Contribution Claims against Settling Insurers, while the Plan does not provide for them to retain that right or pay them the value of that right.

**F.  The Trial**

Although many of the Non-Settling Insurers' objections to confirmation were submitted on the briefs, the parties agreed that several of the objections involved disputed facts that could be resolved only through an evidentiary hearing.

The court held a nine-day trial, during which it received testimony from 30 different witnesses, and admitted into evidence thousands of pages of exhibits.  Many of the witnesses were experts in the following fields: (a) asbestos litigation; (b) economics, accounting, and business valuation; and (c) the insurance industry. The other witnesses were officers and directors of Plant, officers and directors of Bayside, and insurance company employees who have handled claims against Plant.  By agreement of the parties, the direct testimony of all but six of the 30 witnesses was submitted by declaration.  All witnesses were subject to live cross examination. Of the 24 witnesses whose direct testimony was submitted by declaration, ten were subjected to cross examination, and cross examination was waived regarding the remainder.

The evidence introduced at trial covered two broad subjects: (a) the terms of the Plant-Bayside Merger and the financial projections for the Reorganized Bayside; and (b) the effect on the

-21-

Non-Settling Insurers of barring their Equitable Contribution Claims against Settling Insurers.

The evidence regarding the Merger and financial projections related to two separate confirmation issues: (a) whether the Plan is feasible (whether Reorganized Bayside can operate for the foreseeable future as a going concern); and (b) whether Reorganized Bayside and its shareholders provide a contribution to the Trust sufficient to justify the injunctive relief they receive under the Plan.

The evidence regarding the effect of the Plan on the Non-Settling Insurers' Equitable Contribution Claims largely focused upon the following three topics. First, the evidence addressed the percentage of insurers' expenses incurred in cases dismissed without any payment to plaintiff. In such cases, the insurers' expenses are limited to costs of defense, and the Judgment-Reduction and Trust-Payment Credits[12] provide no benefit. Second, the evidence addressed the percentage of insurers' expenses incurred in cases settled with a payment to the plaintiff, and whether the Judgment-Reduction and Trust-Payment Credits will be reflected in future settlements and provide any real benefit to Non-Settling Insurers. Finally, the evidence addressed the extent to which payments by the Trust, the Judgment-Reduction Credit, and the Trust-Payment Credit will reduce the number of actions the Non-Settling Insurers will be called upon to defend in the tort system.

---

[12] The Judgment-Reduction and Trust-Payment Credits are explained on pages 15-16, above.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 22 of 83

**II**
**ANALYSIS**

**A.  Whether the Plan was Proposed in Good Faith**

1.  <u>The Bad Faith Alleged</u>

The Non-Settling Insurers assert broadly and strenuously that the Plan cannot be confirmed because it was not proposed in good faith.  Non-Settling insurers argue first that the bankruptcy filing was *not necessary*, because insurers were defending asbestos claims asserted against Plant.  Non-Settling Insurers argue that the Plan achieves an *improper effect*, because it does not preserve the going-concern value of an operating debtor.  Non-Settling Insurers argue that the Plan has an *improper purpose*: to coerce insurers to settle coverage disputes.  Non-Settling Insurers argue finally that the Plan was proposed by *improper means*, because Plant and the Committee induced Bayside to merge with Plant by promising to make investments in Bayside not justified by any likely return (the improper carrot), and by asserting unfounded successor liability claims against Bayside (the improper stick).

2.  <u>The Standard for Determining Good Faith</u>

The good-faith requirement is set forth in section 1129(a), which provides in relevant part:

> The court shall confirm a plan only if all of the
> following requirements are met:
> ...
> (3) The plan has been proposed in good faith and not
> by any means forbidden by law.

In the Ninth Circuit, a court determines whether a chapter 11 plan is proposed in good faith under the following principles: (a) "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the [Bankruptcy]

-23-

Code." <u>In re Sylmar Plaza, L.P.</u>, 314 F.3d 1070, 1074 (9th Cir. 2002).

(b) The court is not to apply any ***per se*** rule, but is to consider the totality of the circumstances on a case-by-case basis. <u>Id.</u> at 1074-75; <u>see also</u> <u>In re Tucker</u>, 989 F.2d 328, 330 (9th Cir. 1993) (similar test re good faith of chapter 13 plan).

(c) A plan is not proposed in bad faith merely because it is structured in a way designed to invoke the benefits of some provision of the Bankruptcy Code. "'[T]he fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith'." <u>Sylmar Plaza</u>, 314 F.3d at 1075 quoting (<u>In re PPI Enters., Inc.</u>, 228 B.R. 339, 347 (Bankr. D. Del. 1998)).

3. <u>Objectives and Purposes of the Bankruptcy Code</u>

Congress addressed through section 524(g) the unique problems of chapter 11 cases involving asbestos personal injury claims. For the reasons set forth below, I conclude that Congress had three purposes in enacting section 524(g): equal treatment of present and future asbestos claimants; preservation of going-concern value; and prompt payment of meritorious asbestos claims.

*(a) Equal treatment of present and future claims*

The central purpose of section 524(g) is the equal treatment of present and future asbestos claims. This policy is enunciated clearly in both the language and legislative history of the statute.

The language of section 524(g) reflects the policy of equal treatment of present and future asbestos claims in at least three places.

(a) Subparagraph 524(g)(2)(B)(ii) specifies that an injunction can

-24-

be issued only where the debtor faces present and future asbestos claims and where "pursuit of [future claims] outside the procedures prescribed by [the chapter 11 plan] is likely to threaten the plan's purpose to deal equitably with [present] claims and future demands." (b) Subparagraph 524(g)(4)(B)(i) requires the court to appoint a representative to protect the interests of future claimants. (c) Subparagraph 524(g)(2)(B)(ii)(V) requires the trust to operate through mechanisms that "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."

The legislative history also indicates that the primary purpose of section 524(g) is to provide fair treatment of future asbestos claimants. The first paragraph of the only committee report states:

> This section adds a new subsection (g) to section 524 of the Code, establishing a procedure for dealing in a chapter 11 reorganization proceeding with future personal injury claims against the debtor based on exposure to asbestos-containing products.

H.R. Rep. No. 103-835 at 40 (1994). After noting that the procedure adopted in the statute was modeled on the procedure adopted in the Johns-Manville bankruptcy, the committee report states, "[f]rom the beginning, a central element of the [Johns-Manville] case was how to deal with future claimants. . . ." Id. The committee report then expressly recites the equal-treatment policy as the means adopted to deal with future claims.

> In order for future claimants to be bound by a trust/injunction, section [524(g)] requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner.

-25-

1 *Id.* at 41.

2 *(b) Going-concern value*

3     Preservation of going-concern value is a second policy behind

4 section 524(g), although it is not enunciated as clearly as the

5 equal-treatment policy in either the language of the statute or its

6 legislative history.

7     The statutory language attaches importance to preservation of

8 going-concern value by suggesting that the 524(g) injunction may be

9 unavailable to a corporate debtor that does not operate a business

10 post-confirmation. The statute achieves this possible limitation in

11 two ways. First, section 524(g)(1)(A) states that an injunction

12 issued under that section is to "supplement" the discharge received

13 by the debtor. Section 1141(d)(3) specifies that a corporate debtor

14 is entitled to receive a discharge only if it operates a business

15 post-confirmation. Second, section 524(g) states that the trust is

16 to be funded by securities of the debtor and by the obligation of

17 the debtor "to make future payments, including dividends."

18 § 524(g)(2)(B)(i)(II). A debtor will generally be able to pay

19 dividends only if it operates a business.

20     The legislative history also suggests that section 524(g) is

21 designed to preserve for the benefit of asbestos claimants whatever

22 going-concern value exists.

23         [T]he Committee also recognizes that the interests of
future claimants are ill-served if Johns-Manville and

24         other asbestos companies are forced into liquidation and
lose their ability to generate stock value and profits

25         that can be used to satisfy claims.

26 *Id.* at 40-41. At the same time, the committee report suggests that

27 section 524(g) may be invoked where no going-concern value exists,

28 by stating "[t]he asbestos trust/injunction mechanism established in

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 26
of 83

the bill is available for use by any asbestos company facing a
similarly overwhelming liability." Id. at 41.

*(c) Prompt payment of asbestos claims*

A recent decision of the Ninth Circuit recognizes a third
policy objective in section 524(g): the prompt payment of asbestos
personal injury claimants. Cont'l Ins. Co. v. Thorpe Insulation Co.
(In re Thorpe Insulation Co.), ___ F.3d ____ (9th Cir. 2012). In
Thorpe, the bankruptcy court had refused to enforce an arbitration
agreement. The Ninth Circuit noted that a bankruptcy judge must
enforce an arbitration agreement unless to do so would conflict with
a federal statutory policy. The court of appeals concluded that the
bankruptcy court did not err in Thorpe, because arbitration would
entail delay that would undermine the policy favoring prompt payment
of asbestos victims that is embodied in section 524(g).

> In the § 524(g) context, delay not only disrupts a
> debtor's efforts to reorganize, but also affects the
> rights of countless asbestos claimant creditors, for
> whose benefit in part § 524(g) was enacted. . . .
> . . . There was no error in the bankruptcy court
> concluding that such a claim must be resolved by a
> bankruptcy court, not an arbitrator. Moreover,
> centralizing the dispute in this case had heightened
> importance because the bankruptcy court found a need to
> expedite resolution of Continental's claim—to allow
> payments to Thorpe's creditors "as soon as possible". . .

Id. at *860-61 (citations and footnotes omitted).

4. The Importance of the Merger

The Merger of Plant and Bayside is important because it creates
a Reorganized Debtor that has an ongoing business and is thereby
more clearly eligible to claim the benefits of a section 524(g)
injunction. A corporate debtor that does not operate a business
post-confirmation may not be able to obtain a section 524(g)
injunction. See pages 31-32, below. Debtor Plant, which ceased

-27-

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 27
of 83

1  operations in 2001, needs to acquire or start an operating business
2  to be certain to be eligible to claim the benefits of section
3  524(g).

4      The principal beneficiaries of the Merger are the present and
5  future asbestos claimants, who will benefit in the following manner
6  from the establishment of the Trust and the issuance of an
7  injunction under section 524(g).

8  (a) Equal treatment of present and future claimants is advanced
9  though the establishment of a section 524(g) trust.  As noted above,
10 such a trust is required to adopt procedures designed to ensure, as
11 far as is possible, that present and future Asbestos Injury Claims
12 are treated in an equal manner.  § 524(g)(2)(B)(ii)(V).

13 (b) Without the establishment of some trust for present and
14 future claimants, it is unlikely that present and future claimants
15 will be paid on an equal basis.  The tort system operates on a
16 first-come-first-served basis.  Unless all assets available to pay
17 claims are placed in trust, it is likely that those assets will be
18 used up paying the claims of persons who manifest disease early,
19 leaving no means of paying the claims of persons who manifest
20 disease only later.

21 (c) A trust established under section 524(g) offers substantial
22 advantages over a trust not established under that law.  Section
23 524(g) authorizes the bankruptcy court to issue an injunction
24 protecting certain parties who contribute assets to the trust,
25 greatly facilitating the creation of a substantial trust *res* from
26 which present and future claims can be paid.  In the present case,
27 the key benefit derived from section 524(g) is the ability to
28 protect the Settling Insurers by protecting them from: (i) Equitable

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 28
of 83

Contribution Claims that would otherwise be asserted against them by the Non-Settling Insurers; and (ii) Asbestos Injury Claims. These protections increase the settlement payments the Settling Insurers are willing to make to the Trust. See page 49, below.

5. <u>The Argument that Plant's Bankruptcy was Unnecessary</u>

The Non-Settling Insurers argue that Plant acted in bad faith in filing both its chapter 11 petition and the Plan, because prior to the filing of the petition, the Non-Settling Insurers were defending asbestos claims asserted against Plant, and were making payments to settle those claims where appropriate. This argument is wholly without merit.

Whether a plan or a petition is filed in good faith depends upon whether it advances the objectives and purposes of the Bankruptcy Code. <u>Sylmar Plaza</u>, 314 F.3d at 1074. The principal purpose of section 524(g) is the equal treatment of present and future Asbestos Injury Claims. See pages 24-26, above. Plant's chapter 11 petition and Plan were filed in good faith if they further that statutory objective.

The defense provided to Plant pre-petition by the Non-Settling Insurers does not provide for equal treatment of present and future Asbestos Injury Claims. It is undisputed that Plant has no significant assets other than its insurance policies. It is undisputed that each of the Non-Settling Insurers had notified Plant prior to the petition date that Plant's coverage has been exhausted, that each of the insurers was defending Plant under a reservation of rights, and that each of the insurers would stop defending Plant and stop paying claims if it prevailed in the Coverage Action. Even Plant does not contend that there is remaining coverage for all

-29-

1 asbestos claimants, but only that there is remaining coverage for
2 persons injured through hazards other than "product hazards" and
3 "completed operations hazards."  Thus, even if Plant prevails in the
4 Coverage Action, some persons exposed to asbestos through activities
5 of Plant would not have access to insurance to pay their claims.
6 The policy of section 524(g) is to pay all meritorious claims on a
7 equal basis; it makes no distinction between insured claims and
8 claims that are not insured.  The section 524(g) trust proposed in
9 the Plan provides for payment of all asbestos personal injury claims
10 on a fully equal basis.  Leaving claimants in the tort system, where
11 it is undisputed that neither the insurance policies, or other
12 assets of Plant are sufficient to pay all claims in full, does not
13 provide for equal treatment of all present and future asbestos
14 claims.[13]

15 6. <u>The Argument That Plan Does Not Preserve Going-Concern Value</u>

16      The Non-Settling Insurers argue that the Plan does not reach a
17 result consistent with the objectives and purposes of the Bankruptcy
18 Code, because the primary policy goal of chapter 11 reorganization
19 is to preserve the going-concern value of the debtor.  The Plan in
20 this case does not further that goal, because Plant ceased
21 operations years ago and has no going-concern value to preserve.
22 This argument is not persuasive.

23      Proper use of Chapter 11 is not limited to cases in which the
24 debtor preserves going-concern value.  The Bankruptcy Code expressly
25 authorizes the confirmation of a liquidating plan in a chapter 11

26

27      [13] The Plan cannot achieve fully equal treatment of present and
28 future claimants, because not all of the insurers have settled and
not all of the available assets have been put into the Trust.  The
Plan achieves equality of treatment to the extent that the Plan
Proponents have it within their power to do so.

-30-

case.  §§ 1123(a)(5)(D), 1141(d)(3)(A).  A liquidating plan furthers
other policies embodied in the Bankruptcy Code: the orderly
disposition of assets to maximize value, and the equal treatment of
claims of similar priority.  In re Integrated Telecom Express, Inc.,
384 F.3d 108, 120 n.4 (3rd Cir. 2004).  The decisions upholding
liquidating plans indicate that a plan need not satisfy all of the
goals of chapter 11 to be in good faith.

The more pertinent question is whether the proper use of
*section 524(g)* is limited to cases in which there is going-concern
value to preserve.  Congress appears to have had three goals in mind
in enacting section 525(g): equal treatment of present and future
asbestos claims; preservation of going-concern value; and prompt
payment of meritorious asbestos claims.  See pages 24-27, above.
There is nothing in the statute, legislative history, or case law
that indicates that Congress intended section 524(g) to be used only
in those situations where the debtor is operating a business *before*
the plan is confirmed, and has going-concern value to preserve.

Section 524(g) may require the reorganized debtor to operate a
business *after* confirmation of the plan.  The statute does not state
this requirement expressly.  Any ongoing-business requirement is the
logical result of two provisions of the statute that nominally
address other matters.  Section 524(g) states that a trust
established under its provisions must "be funded in whole or in part
by the securities of 1 or more debtors involved in such plan and by
the obligation of such debtor or debtors to make future payments,
including dividends."  § 524(g)(2)(B)(i)(II).  At least one court
has suggested in dictum that this provision requires the debtor to
operate a business post-confirmation, because post-confirmation

-31-

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 31
of 83

operations are the only source from which the required dividends could be paid.  <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190, 248 (3rd Cir. 2004).   Section 524(g) also states that any injunction issued under its provisions is designed to "supplement" the discharge provided the debtor.  At least one court has concluded that this provision requires the debtor to operate post-confirmation, because section 1141(d) denies discharge to a corporate debtor that does not conduct business operations post-confirmation.  <u>See</u> <u>In re Western Asbestos Co.</u>, 313 B.R. 832, 853-54 (Bankr. N.D. Cal. 2003)

Every debtor seeking to use section 524(g) must satisfy all of the formal requirements of that statute, including any ongoing-business requirement.[14]  There may be limits on the manner in which a debtor satisfies the ongoing-business requirement.  There may be instances in which the post-confirmation business of the reorganized debtor is so insubstantial or so devoid of connection to the pre-petition circumstances of the debtor that the purposes of section 524(g) are not served.  It is not necessary to decide that question here, because this is not such a case.

The Merger, through which Debtor Plant satisfies the ongoing-business requirement, restores to Plant the business that Plant historically operated and in which Plant incurred the asbestos liabilities that lie at the heart of this case.  In substance, the Merger turns back the clock and unwinds the 2001 transfer of Plant's assets to Bayside.  That result is not inappropriate, in light of

---

[14]  The proposition that a debtor may invoke section 524(g) only if the debtor conducts business post-confirmation has been criticized.  <u>See</u> Sander L. Esserman & David J. Parsons, <u>The Case for Broad Access to 11 U.S.C. § 524(g) in Light of the Third Circuit's Ongoing Business Requirement Dicta in Combustion Engineering</u>, 62 N.Y.U. Ann. Surv. Am. L. 187 (2006).  In the present case, this court assumes without deciding that the ongoing business requirement applies.

the fact that Bayside was formed from remnants of Plant, by a
shareholder of Plant, at a time Plant was inundated with asbestos
claims.  Plant's creditors have at least a colorable claim that
Bayside is a legal successor of Plant.  The business that the
reorganized debtor will operate post-confirmation is the business
that, but for a questionable transaction, Debtor might have
continued to operate to the present day.  The effect of bringing
that business into the reorganized debtor is to ensure that
creditors of Plant have access to an appropriate share of whatever
value and profits that business achieves.  I determine that the
Plant-Bayside Merger is an appropriate means to satisfy any ongoing-
business requirement of section 524(g).

     I conclude that it is inappropriate to add to the express
requirements of section 524(g) the additional requirement that a
plan be confirmed only if it preserves pre-petition going-concern
value.  In so concluding, I rely upon the following considerations.
(a) The statutory language, legislative history, and case law
recognize two legislative purposes in addition to preservation of
going-concern value: equal treatment of present and future asbestos
claims; and prompt payment of meritorious asbestos claims.
Moreover, the equal-treatment goal is stated more explicitly in both
the statutory language and legislative history than the goal of
preserving going-concern value.  See pages 24-27, above.
(b) The goals of equal treatment and prompt payment can be advanced
by the creation of a trust and the issuance of injunctive relief
under section 524(g) in cases in which there is no going-concern
value to preserve.  See pages 28-29, above.
(c) Nothing in the statutory language or legislative history

-33-

suggests that the statute is to be invoked only where there is going-concern value to preserve. The legislative history suggests just the opposite. The sole committee report states "the asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability." H.R. Rep. No. 103-835 at 41.

(d) Preservation of going-concern value is not necessary for confirmation of a chapter 11 plan outside the context of section 524(g). See pages 30-31, above.

I determine that the Plan satisfies any ongoing-business requirements of section 524(g), and that the Plan was proposed in good faith for the purpose of distributing the assets of Debtor Plant equally and promptly among present and future Asbestos Injury Claimants.

7. <u>The Argument that Plan Intended to Coerce Insurers to Settle</u>

The Non-settling Insurers argue that a principal purpose of the Plan is to place unreasonable pressure on insurers to settle the Coverage Action. The Plan does this, they contend, by protecting Settling Insurers from all Asbestos Injury Claims, and from all Equitable Contribution claims of Non-Settling Insurers. As additional insurers settle, they argue, the insured risk will be increasingly concentrated among fewer and fewer insurers, placing increasing pressure on insurers to avoid being among the last not to settle.

This argument raises a serious question, but it is not a question of good faith. That the Plan encourages settlement with insurers is consistent with the principal purpose of section 524(g), because such settlements liquidate the assets of Plant and place

-34-

1  them into the Trust, which will distribute those assets to present
2  and future asbestos claimants on an equal basis.  See pages 24-29,
3  above.

4       The more serious question is whether section 524(g), the
5  Constitution, and principles of equity permit this court to enjoin
6  Equitable Contribution Claims on the terms provided in the Plan.
7  Those questions are discussed in Part II C, below.

8  8.  Argument that Bayside was Coerced into the Merger

9       The Non-Settling Insurers next argue that the Plan was
10 negotiated in bad faith, because Bayside did not freely agree to
11 merge with Plant, but did so only as a result of threats made by the
12 Committee.  As noted above, the Merger between Plant and Bayside is
13 very important to the Plan, because Plant had ceased operations, and
14 this court may not be able to issue a section 524(g) injunction
15 unless the reorganized debtor by operates a business post-
16 confirmation.  See pages 31-32, above.  When Bayside did not
17 immediately agree to merge with Plant, the insurers argue, the
18 Committee filed frivolous successor liability actions against
19 Bayside and threatened to sue the principals of Bayside.  This
20 argument is wholly without merit.

21      The successor liability suits against Bayside were not
22 frivolous.  The evidence introduced at trial established that: (a)
23 Plant was besieged with asbestos lawsuits in 2001; (b) in that year
24 Plant transferred to Bayside the assets related to Plant's
25 installation and repair business (including all existing contracts
26 and accounts receivable); (c) Bayside was a newly formed company
27 whose sole shareholder had been an officer and principal shareholder
28 of Plant; and (d) a substantial part of Bayside's business activity

-35-

thereafter consisted of serving Plant's old customers.  California
courts have imposed successor liability on the transferee
corporation in similar circumstances.  <u>Kaminsky v. Western MacArthur</u>
<u>Co.</u>, 175 Cal. App. 3d 445 (1985).

That the Plan Proponents used non-frivolous successor liability
actions to induce Bayside to participate in the Plan does not mean
that the Plan was filed in bad faith.  One of the objectives of
section 524(g) is to require a company that exposed persons to
asbestos to make a suitable contribution to the payment of victims
as a condition to receiving protection under a channeling
injunction.  See § 524(g)(2)(B)(i)(II), (III).  Bayside has
sufficient connection to Plant's historical business that the
Merger of Bayside into Plant as the reorganized debtor furthers this
statutory goal.

That the Committee threatened to sue the principals of Bayside
also does not indicate that the Plan was filed in bad faith.  There
was a colorable basis to sue Bayside.  It is possible that there may
have been a colorable basis to sue the principals of Bayside on the
theory that Bayside's corporate veil should not be respected.  In
any event, the Committee did not sue the principals.

I find that the Plan Proponents acted in good faith in the way
they negotiated with Bayside and its principals.

**B.  Issues Concerning Financial Projections**

1.  <u>Plan Proponents' Argument and Evidence</u>

The Plan Proponents argue that the investment and loans the
Trust is to provide Reorganized Bayside will enable it to expand its
business and dramatically increase its gross receipts and profits.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 36
of 83

As a result, the value of the interest in Reorganized Bayside that the Trust will receive (40 percent of the shares plus a warrant to purchase 11 percent more at the same price) substantially exceeds the $2.0 million paid for that interest. In addition, the loans the Trust is to make to Reorganized Bayside are likely to be repaid in full and will have a discounted value near their face amount.

To support these arguments, the Plan Proponents introduced the evidence of two experts (Edward McDonough and Paul Weber) who testified as follows.

(a) Officers of Bayside prepared five-year income projections for Reorganized Bayside, which take into account the investment and loans to be provided by the Trust under the Plan (the Projections).

(b) The Projections state that Reorganized Bayside's gross receipts and income will increase dramatically as a result of the investment and loans. Gross receipts are projected to rise almost 250 percent, from $10.2 million in 2011 (the last year before the Merger) to $25.0 million in 2016. Pre-tax income is projected to increase more than 15 fold, from $100,000 in 2011 to $1.58 million in 2016.

(c) The Projections are based upon the assumption that Reorganized Bayside will maintain a gross profit margin of 18 percent throughout the five-year period, and that its overhead expenses will grow only slightly despite the expansion of its operations.

(d) The favorable Projections were based in part upon the assumption that Bayside has a large "backlog" of work, either contracted for or informally requested by customers, that will provide Reorganized Bayside substantial revenues in future years.

(e) Bayside was formed in 2001, suffered a significant loss in 2003, and since then has essentially broken even, earning modest profits

-37-

some years and suffering small losses other years.

(f) Bayside's receipts and profits were reduced by the economic downturn that began in 2008, and likely will improve as the economy rebounds.

(g) The principal obstacles to Reorganized Bayside's growth are: (i) its inability to borrow money (because of a large IRS lien and lack of net worth); and (ii) its inability to become bonded and bid on larger projects.

(h) The Projections are credible, because the investment and loans to be provided to Reorganized Bayside under the Plan will remove the existing obstacles to its growth. The investment will be sufficient to pay off the IRS lien and bring accounts payable reasonably current. The Revolving Loan and the $250,000 Term Loan will provide sufficient working capital to enable Reorganized Bayside to expand its operations.

(i) Bolstered financially by the $2.0 million equity investment, the Revolving Loan, and the $250,000 Term Loan, Reorganized Bayside will be able to operate as a going concern and make a profit indefinitely, and will not be likely to need further financial reorganization.

(j) Properly discounted for minority interest and lack of marketability, the 40 percent of Reorganized Bayside shares to be held by the Trust will have a value of $2.15 million. The warrants to purchase an additional 11 percent of shares will have a value of $577,000. The $250,000 Term Loan will have a current discounted value to the Trust of $239,000. The rights to be received by the Trust under the Plan will thus exceed the amounts to be paid to acquire those rights.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 38 of 83

2. <u>Non-Settling Insurers' Evidence</u>

     The Non-Settling Insurers introduced the testimony of four experts (Neil Beaton, Michael Murphy, Steven Cuneo, and Brad Hall) who testified that Reorganized Bayside will not earn the gross revenue and profits set forth in the Projections.

(a) Reorganized Bayside cannot significantly increase its gross revenues by increasing its market share. The insulation installation and repair industry in the Bay Area is highly competitive, and the evidence does not show that Reorganized Bayside will be able to capture a significantly larger share of that market simply by being better capitalized.

(b) Overall demand in the market in which Reorganized Bayside competes will not expand significantly during the period covered in the Projections. The construction industry in the Bay Area is recovering very slowly from the recent economic downturn.

(c) The "backlog" of waiting jobs upon which the Projections rely includes few projects for which contracts have been signed, and largely represents work that Reorganized Bayside merely hopes to obtain.

(d) The $250,000 Term Loan and $1.0 million Revolving Loan do not provide working capital sufficient to enable Reorganized Bayside to expand its gross receipts by 250 percent in the next five years.

(e) The Projections erroneously exclude the operations of UST Testing Services, Inc. (UST). UST is a corporation that was formed by Bayside's shareholders to perform lower-value, non-union work for one of Bayside's largest customers. UST has continually suffered losses that Bayside has covered. Reorganized Bayside must continue to support UST, because Bayside is contractually bound to provide

-39-

1  the services in question.

2  (f) Bayside's historical gross profit margin is less than that used
3  in the Projections.

4  (g) Reorganized Bayside is not likely to be able to expand its gross
5  revenues by 250 percent with the minimal increases in general
6  overhead expenses assumed in the Projections.

7      The Non-Settling Insurers' experts testified that Bayside is a
8  "struggling entity," and that even with the investment and loans to
9  be provided by the Trust, Reorganized Bayside will not be
10 sufficiently profitable to be able to operate as a going concern for
11 five years or more.

12     The Non-Settling Insurers' experts testified that Mr. McDonough
13 assigned too high a valuation to the 40 percent of Reorganized
14 Bayside shares that the Trust is to acquire for its $2.0 million
15 investment.  The McDonough valuation is too high, because it is
16 based on projected profits that are too high, too favorable a
17 capitalization rate, and too small a minority-interest discount.
18 According to the Non-Settling Insurers' experts, the shares acquired
19 by the Trust have no value at all.

20 3.  <u>Findings Regarding Financial Projections and Value</u>

21     Upon consideration of the evidence presented by the Plan
22 Proponents and by the Non-Settling Insurers, the court makes the
23 following findings of fact regarding Reorganized Bayside's future
24 operations, and the value of the rights acquired by the Trust.

25     It is unlikely that Reorganized Bayside's gross receipts and
26 profits will grow nearly as fast as shown in the Projections.  This
27 is so for the following reasons.

28 (a) Reorganized Bayside cannot dramatically increase its market

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 40
of 83

share.  I credit the testimony that the insulation installation and repair industry in the Bay Area is highly competitive, and the Plan Proponents have not shown that Bayside can significantly increase its market share simply by improving its financial condition.

(b) Reorganized Bayside cannot dramatically increase its gross revenues without increasing its market share.  I credit the testimony that demand in the industry in which Reorganized Bayside competes will increase slowly during the time period covered by the Projections.

(c) Close examination of the "backlog" of waiting jobs indicates that Bayside does not have signed contracts or firm expectations regarding a large percentage of the jobs in question.

(d) It is unlikely that Reorganized Bayside can achieve the profit margins set forth in the Projections.  I credit the testimony that Reorganized Bayside cannot expand its operations to the extent projected without a significant increase in its general overhead expenses.

(e) UST is likely to remain a continuing drain on Reorganized Bayside's resources.  The evidence indicates that UST will continue to lose money.  Reorganized Bayside will be required to cover UST's losses, because Bayside is obligated by contract to provide the services that it uses UST to perform.

4.  <u>Feasibility</u>

That Reorganized Bayside is not likely to meet the Projections does not necessarily mean that it is unlikely to survive as an operating business, and that the Plan does not satisfy the feasibility requirement of section 1129(a)(11).

Section 1129(a)(11) states that the court should confirm a plan

-41-

only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor . . ." To satisfy this standard, it is not necessary to establish with certainty that the reorganized company will succeed; it is sufficient to show only that it is more likely than not that the company will succeed. _In re Acequia, Inc._, 787 F.2d. 1352, 1364 (9th Cir. 1986); _Computer Task Grp., Inc. v. Brotby (In re Brotby)_, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003).

For the following reasons, I find that it is more likely than not that Reorganized Bayside will succeed, and that confirmation of the Plan will be not followed by the liquidation or further financial reorganization of Reorganized Bayside.

(a) Bayside has survived as a going concern for ten years, and has been able to operate on a break-even basis over the past seven years.

(b) Bayside has thus far survived the greatest economic downturn since the Great Depression.

(c) Bayside has survived despite a lack of working capital, the existence of a $2 million IRS lien, and the threat of asbestos litigation.

(d) The Merger and the Channeling Injunction will strengthen Reorganized Bayside in several ways. The $2 million investment by the Trust will enable Reorganized Bayside to retire the IRS lien, and become reasonably current with its suppliers.[15] The Revolving Loan will provide working capital, and enable Reorganized Bayside to

---

[15] The IRS agreed to reduce the $2.0 million lien to approximately $1.2 million in return for immediate payment.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 42 of 83

remain reasonably current with its suppliers. The Channeling
Injunction will remove any threat of asbestos suits.

(e) All of the expert witnesses expect general economic conditions
to improve at least somewhat in the coming years.

5. <u>Sufficiency of the Bayside Contribution to the Trust</u>

The Plan may be confirmed only if the value contributed by
Bayside and its principals is equal to the protections they receive
under the Plan and injunctions. § 524(g)(4)(B)(ii).

The value of the Channeling Injunction to Bayside and its
principles is negligible. Bayside may very well have successor
liability for Asbestos Injury Claims, but Bayside has no insurance
coverage for such claims and, without the capital infusion to be
provided under the Merger, has no significant assets that could be
used to pay any significant judgment entered against it. As a
result, asbestos claimants would never bother to sue Bayside, except
to encourage it to cooperate in a chapter 11 plan. Asbestos
claimants would never bother to sue the principals of Bayside,
because the facts do not suggest any basis upon which to disregard
Bayside's corporate form. If this court declines to confirm the
Plan on the basis that the Merger is improper, asbestos claimants
would not pursue Bayside or its principals.

Because the Channeling Injunction has no meaningful value to
Bayside and its principals, Bayside and those principals do not have
to contribute much value to the Trust to make a contribution
equivalent to the protection they receive.

Because Reorganized Bayside is not likely to achieve the
profits set forth in the Projections, the pure investment value of
the shareholder interest the Trust will acquire under the Merger is

-43-

probably less than the amount that the estate will invest in Reorganized Bayside. While I cannot determine the exact value of the shares that the Trust will acquire, I determine that their value is closer to $500,000 than to the $2.0 million that the estate will invest. I determine that the warrants the Trust will acquire will have negligible current value. In sum, it appears that in conventional financial terms, the estate probably overpaid for the shares of Reorganized Bayside.

The willingness of Bayside and its principals to participate in the Merger nonetheless has a direct monetary value to the Trust of at least $36.6 million. This is so for the following reasons. (a) The Merger enables the reorganized debtor to satisfy the ongoing-business requirement of section 524(g). Without the Merger, it might be impossible to confirm a plan providing for the creation of a trust and the issuance of injunctive relief under section 524(g). Creation of the Trust and issuance of the three injunctions specified in the Plan provide the Trust and its beneficiaries the monetary benefits described immediately below. (b) Upon entry of an order by the District Court confirming the Plan, the Trust will receive an additional $36.6 million from the four Settling Insurers. See page 49, below. (c) Confirmation of the Plan will encourage additional insurers to settle. See page 72, below. Any settlement payments received would be deposited into the Trust for distribution to present and future asbestos claimants. (d) The size of potential future insurance settlement payments is very large. All parties agree that Sompo, UNIC, and Arrowood represent approximately 11 percent of all available insurance

-44-

coverage.[16]   Assuming the Plan is confirmed and that the
confirmation order is upheld on appeal, the total settlement
payments received from Sompo, UNIC, and Arrowood will total $57.5
million.   See page 49, below.   Calculated at the same settlement-
payment to percent-of-coverage ratio present in these three
settlements, the potential settlement value of the remaining
insurance coverage is in the neighborhood of $465 million.[17]
($57.5/11% = X/89%.   X = $465).

6.   <u>Good Faith Considerations Regarding the Merger Terms</u>

     The Non-Settling Insurers' argue that the terms of the Merger
between Bayside and Plant show that the Plan was filed in bad faith.
Bayside and its principals may properly receive protection under the
Channeling Injunction only if they make an appropriate financial
contribution to the Trust.   The Plan stands that requirement on its
head, the insurers argue, because the Merger effects a net transfer
of wealth from the Trust to Bayside, rather than a contribution from
Bayside to the Trust.   To induce Bayside to merge with Plant, the
insurers argue, the Plan Proponents cause Plant to transfer assets
to Bayside that exceed the value of the contributions that Bayside
and its principals will make to the Trust.

     I find that the Plan was proposed in good faith, despite the
fact that the Trust, in narrow terms, probably overpaid for the

---

[16] Percentage of "insurance coverage" does not mean the number
of settling insurance *companies* as a percentage of all insurance
*companies*, but instead means the number of *years* of coverage
represented by the settling insurers as a percentage of the number
of *years* of coverage provided by all insurers.   <u>Armstrong World
Indus.</u>, 45 Cal. App. 4th at 52.

[17] The settlement with Mt. McKinley is not included in this
calculation, because there was no evidence or agreement among the
parties as to the percentage of insurance coverage represented by
Mt. McKinley.

-45-

shares of Reorganized Bayside.  In making this finding, I rely upon
the following considerations.

(a) Whether the Plan has been proposed in good faith depends upon
whether it achieves a result consistent with the purposes of the
Bankruptcy Code.  Sylmar Plaza, 314 F.3d at 1074.

(b) It would have been difficult for the Plan Proponents to confirm
a plan utilizing the provisions of section 524(g) without the
Merger, because of the ongoing-business requirement of section
524(g).  See pages 31-32, above.

(c) The Merger was a legitimate means to satisfy the ongoing-
business requirement.  See pages 32-33, above.

(d) Confirmation of the Plan furthers the statutory goals of equal
and prompt payment of present and future Asbestos Injury Claims.
See pages 24-29, above.

(e) It is not possible for the Plan Proponents or this court to know
the exact value of the shares of Reorganized Bayside.

(f) The evidence indicates that the Plan Proponents engaged in
arm's-length negotiations with Bayside and its principals with
respect to the amount the Trust would invest in Reorganized Bayside
as part of the Merger.

(g) The direct financial benefits to the Trust from confirmation of
the Plan greatly exceed any amount by which the Trust overpaid for
the shares of Reorganized Bayside.  See page 49, below.

(h) The present Asbestos Injury Claimants and the Futures
Representative unanimously support the Plan and the Merger terms.
Present and future claimants bear 90 percent of the cost of any
overpayment, because 90 percent of any reduction in the amount
invested in Reorganized Bayside would go into the Trust.  See Plan

-46-

sections 1.112, 1.118, 1.120.  Thus, while the Non-Settling Insurers have standing to contest the use of the estate assets to fund the Merger, the creditors most directly affected unanimously support the use of estate assets for that purpose.

**C.  Treatment of Equitable Contribution Claims**

1.  <u>Introduction</u>

The Non-Settling Insurers argue that the Plan cannot be confirmed and the Settling Insurer Injunction may not be issued, because the Non-Settling Insurers are deprived without compensation of their right to assert their Equitable Contribution Claims against the Settling Insurers.  As explained below, I determine that the bar against the assertion of Equitable Contribution Claims against the Settling Insurers is necessary to the success of the Plan, and is consistent with the Bankruptcy Code, the Constitution, and principles of equity.

The parties agree that the Non-Settling Insurer's Equitable Contribution Claims are governed by California law.

Asbestos claims present unique problems for courts and insurers.  Injury from inhalation of asbestos fibers generally does not mature into illness for 20 to 40 years after exposure.  As a result, many individuals were exposed to asbestos fibers for many years before the dangers of asbestos became generally known.  Over those same years a company manufacturing, distributing, or installing asbestos may have purchased liability coverage from several different insurers.

California courts have dealt with the insurance coverage issues raised in asbestos injury cases in the following way.  Because

-47-

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 47
of 83

injury to the body continues even after exposure to asbestos fibers ceases, coverage is triggered on every policy issued during or after the time of the first exposure caused by the policy holder. _Armstrong World Indus. v. Aetna Cas. & Sur. Co._, 45 Cal. App. 4th 1, 59-62 (1996). This means that several insurers can be called upon to defend and indemnify with respect to a single claim. _Id._ at 50. An injured person can pursue any insurer who is obligated to defend, and need not join all insurers with possible liability. _Id._ at 52. Each insurer whose coverage is triggered is liable up to the limits of the policy issued by that insurer. _Id._ at 50. The practical result of these rulings is that one insurer may be called upon to bear a disproportionate share of the total cost of defense and indemnification. _Stonelight Tile, Inc. v. Cal. Ins. Guar. Ass'n_, 150 Cal. App. 4th 19, 37 (2007); _Armstrong World Indus._, 45 Cal. App. 4th at 52.

California courts have dealt with the potential hardship to particular insurers that can result from the rules described above, by recognizing the right of one insurer to seek equitable contribution from another insurer. Where more than one insurer is liable, an insurer that has paid more than its fair share of defense and indemnity costs may recover from other insurers that could be held responsible for the same claim. _Fireman's Fund Ins. Co. v. Maryland Cas. Co._, 65 Cal. App. 4th 1279, 1293 (1998). Fair share is generally determined by considering the number of years each insurer covered and the monetary limits in each insurer's policy. _Id._ at 1294. Primary insurers can exert rights of contribution only against other primary insurers; excess insurers can exert rights of contribution only against other excess insurers. _Id._ at 1294 n.4, 1300.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 48 of 83

California law provides settling insurers no means to free
themselves from the equitable contribution claims of other insurers.
The good-faith-settlement provisions of California Civil Code
section 877.6, which allow a settling tort defendant to obtain
protection against contribution claims of other tort defendants, do
not to apply to equitable contribution claims among insurers.
Hartford Accident & Indem. Co. v. Superior Court, 29 Cal. App. 4th
435, 440-41 (1995).

The Plan bars the assertion of Equitable Contribution Claims
against insurers who reach settlements that are approved by the
court.

The provisions of the Plan create a strong incentive to settle,
by providing a mechanism by which insurers who settle can fix their
total liability, and can obtain complete repose from all Equitable
Contribution Claims and all Asbestos Injury Claims.

Four of Plant's insurers have reached settlements that have
been approved by the court: Sompo, UNIC, Arrowood, and Mt. McKinley.
Under each of these settlements, the amount to be paid by the
Settling Insurer increases substantially if a plan shielding it from
Equitable Contribution Claims is confirmed by this court and the
confirmation order is upheld by the District Court.

| AMOUNT DUE | | | |
|---|---|---|---|
| Insurer | Upon Settlement | Upon Confirmation | When Confirmation Order Final |
| Sompo | $5 million | | $7 million |
| UNIC | $7.5 million | $5.5 million | $2.5 million |
| Arrowood | $12 million | $8 million | $10 million |
| Mt. McKinley | $.5 million | | $3.625 million |

-49-

The additional amounts to be paid when confirmation of the Plan is affirmed do not represent the value of the bar against Equitable Contribution Claims alone. The Plan also protects Settling Insurers against present and future Asbestos Injury Claims. Neither the Plan Proponents nor the Non-Settling Insurers have attempted to isolate the value of the bar against Equitable Contribution Claims.

The Non-Settling Insurers contend that the Plan may not deprive them of their contribution rights without compensating them fully for those lost rights. The Non-Settling Insurers brought a motion for summary judgment in which they contended that the Plan effected a taking of property without just compensation in violation of the Fifth Amendment of the Constitution. This court denied that motion on the basis that the Non-Settling Insurer's contribution rights do not rise to the level of a property interest, and that Congress can provide for the discharge of unsecured claims without compensation.

The Non-Settling Insurers brought a second motion for summary judgment, asserting that the Plan is not fair and equitable in its treatment of the Non-Settling Insurers Equitable Contribution Claims. The court granted that motion in part, requiring the Plan to be amended to allow the Non-Settling Insurers to recover the value of their equitable contribution rights through judgment-reduction provisions. The court reasoned as follows.

(a) To encourage settlement, American law frequently affords a settling defendant protection against the equitable contribution claims of co-defendants, but generally conditions that protection on some type of protection for the non-settling defendant.

(b) Section 524(g) permits the court to enjoin the assertion of Equitable Contribution Claims against Settling Insurers.

See pages 53-54, below.

(c) Section 524(g) neither specifies the protection that is to be provided to parties whose contribution claims are barred, nor does it state that no protections need be provided to such parties.

(d) The broad and general terms of section 524(g) suggest that Congress intended to leave it to the discretion of the court to fashion appropriate safeguards for parties whose contribution claims are enjoined, not that Congress made a decision that such claims should be enjoined without any compensation or other protection.

(e) One device sometimes used to protect non-settling defendants is to examine whether the settling defendant has made a settlement payment sufficiently large to justify protection against equitable contribution claims. This is the approach employed in the "good faith settlement" provisions of California Civil Code section 877.6. That statute by its own terms does not apply to contribution claims among insurers. Hartford, 29 Cal. App. 4th at 440-41. Nor does the section 877.6 model work well in the circumstances of this case. An adequate settlement payment provides protection to the non-settling defendants only if that payment reduces the judgment the other defendants are called upon to pay. In this bankruptcy case, insurance settlement payments are not being used solely to reduce the claims that the Non-Settling Insurers could be called upon to pay. Part of the settlement proceeds will be used to pay costs of administration, and part of those proceeds could be used to pay claims not covered by insurance.

(f) A second device sometimes used to protect non-settling defendants is to permit them to reduce any amount otherwise due the plaintiff by the proportionate share of liability of the settling defendant. This is the approach adopted by the Ninth Circuit in

-51-

federal securities litigation.  <u>Franklin v. Kaypro Corp.</u>, 884 F.2d 1222, 1231 (9th Cir. 1989).

(g) The Plan proponents should be required to amend the Plan to provide for judgment reduction to offset the Non-Settling Insurers loss of equitable contribution rights, because doing so would not take money from the Trust and would not interfere with the statutory objectives of section 524(g), and because without such protection the Plan could potentially impose substantial and unreasonable hardships on Non-Settling Insurers.

The court determined that a judgment-reduction provision was ***necessary***, but the court was not asked to determine whether it was ***sufficient*** to provide appropriate protection to the Non-Settling Insurers.  That issue was reserved for the confirmation hearing.

Following the court's order on the Non-Settling Insurers' second motion for summary judgment, the Plan Proponents amended the Plan to add the Judgment-Reduction Credit and the Trust-Payment Credit.  The Judgment-Reduction Credit permits a Non-Settling Insurer to deduct from the amount otherwise due a plaintiff an amount equal to the Equitable Contribution Claim that the Non-Settling Insurer has against Settling Insurers as a result of the plaintiff's action.[18]  See pages 15-16, above.  The Trust-Payment Credit permits a Non-Settling Insurer to deduct from the amount otherwise due a plaintiff the amount the Trust has paid to that plaintiff.  See page 15, above.

The Non-Settling Insurers argue that even with the Judgment-Reduction and Trust-Payment Credits, the Plan is not fair and equitable.  They contend that the Judgment-Reduction and Trust-

---

[18] The Judgment-Reduction Credit would be calculated by the state court in the Direct Action against the Non-Settling Insurers.

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 52 of 83

Payment Credits afford Non-Settling Insurers only a small portion of the value of their lost equitable contribution rights.  They contend that the Plan would be fair and equitable only if Non-Settling Insurers were permitted to assert against the Trust the equitable contribution rights they can no longer assert against Settling Insurers, and if all such claims were paid a 100-percent dividend.  The Non-Settling Insurers refer to this alternative treatment as the Trust Backstop.

Plan Proponents respond with three arguments in the alternative.  They first argue that Non-Settling Insurers are not entitled to compensation for their barred Equitable Contribution Claims.  They next argue that the Plan effectively provides Non-Settling Insurers reasonably equivalent compensation for those barred claims.  The Plan Proponents argue finally that the Trust Backstop, the compensation mechanism proposed by the Non-Settling Insurers, would overcompensate those insurers and would impair the Trust's ability to pay Asbestos Injury Claims.

2.  <u>Provisions of Section 524(g) Affecting Contribution Claims</u>

An injunction issued under section 524(g) may bar Equitable Contribution Claims among insurers.  That section provides in relevant part:

> An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or *indirectly* collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i)....

§ 524(g)(1)(B) (emphasis added).  Insurers' Equitable Contribution Claims come within this statutory language, because they arise from payment of Asbestos Injury Claims (the type of claim to be paid by

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 53 of 83

1  the Trust), and because the assertion of Equitable Contribution
2  Claims against other insurers is an indirect means of recovering
3  those payments (they enable the insurer to recover from another
4  insurer payments made on Asbestos Injury Claims).  <u>In re Western</u>
5  <u>Asbestos Co.</u>, 313 B.R. 832, 856 (Bankr. N.D. Cal. 2003).

6      Insurers' Equitable Contribution Claims may be barred even
7  though they are asserted against non-debtor parties.  Subsection
8  524(g) expressly authorizes the court to protect third parties who
9  provided insurance to the debtor.

10        Notwithstanding the provisions of section 524(e), such an
          injunction may bar any action directed against a third
11        party ... alleged to be directly or indirectly liable for
          the conduct of, claims against, or demands on the debtor
12        to the extent such alleged liability of such third party
          arises by reason of--
13        ...
          (III) the third party's provision of insurance to the
14        debtor...

15  § 524(g)(4)(A)(ii).

16      The protection of Settling Insurers from Equitable Contribution
17  Claims is a necessary part of the Plan and the Injunction, because
18  it substantially furthers the Congressional purposes behind section
19  524(g).  Two of the goals of section 524(g) are the equal treatment
20  of present and future Asbestos Injury Claims, and the prompt payment
21  of those claims.  See pages 24-27, above .  These legislative goals
22  can be put into effect only to the extent liquid assets are promptly
23  put into the section 524(g) trust, because it is only such a trust
24  that will reliably make distributions to asbestos victims in a
25  manner consistent with those goals.  See page 28, above. Protecting
26  Settling Insurers from Equitable Contribution Claims encourages them
27  to pay lump-sum settlements to the trust, by providing them
28  certainty regarding total liability and complete repose from further

-54-

litigation. See page 12, above. Settlement with insurers is the only means by which the objectives of section 524(g) can be advanced in the present case.

Section 524(g) does not require Non-Settling Insurers to be compensated for lost Equitable Contribution Claims. In only one place does section 524(g) address the amount that must be paid either by a party receiving protection, or to the a party whose claims are cut off. Section 524(g)(4)(B)(ii) states that the court may issue an injunction protecting a debtor or third party only if the injunction "is fair and equitable with respect to [future claimants], in light of the benefits provided, or to be provided, **to such trust** on behalf of such debtor or debtors or such third party." (emphasis added). In directing the court to view the third-party injunction only with respect to its fairness to future asbestos claimants, the statute suggests that compensation need not be provided to the party enjoined.

Section 524(g) also does not require that Non-Settling Insurers be allowed to assert Equitable Contribution Claims against the trust. <u>Western Asbestos</u>, 313 B.R. at 856. Equitable contribution claims can be enjoined because of their relationship to claims against the Debtor, but they constitute claims against the Settling Insurers, not claims against the Debtor. <u>Fireman's Fund</u>, 65 Cal. App. 4th at 1293. The statute states clearly that the trust is to assume only the liabilities of the Debtor.

> [T]he injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--
> (I) is to assume the liabilities of a **debtor** ... for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

§ 524(g)(2)(B)(i) (emphasis added).

-55-

3.   Constitutional Concerns

Nor does the Constitution require that Non-Settling Insurers receive compensation for the Equitable Contribution Claims enjoined.  Equitable Contribution Claims against the Settling Insurers are not claims that rise to the level of an enforceable interest in specific property protected under the Takings Clause of the Fifth Amendment.  The power of Congress to establish uniform laws of bankruptcy includes the power to impair the obligation of contracts, rights under final judgments, and other legal rights and expectations that do not rise to the level of an enforceable interest in specific property.  Hanover Nat'l Bank v. Moyses, 186 U.S. 181 (1902); accord United States v. Security Indus. Bank, 459 U.S. 70, 80 (1982).  Permitting the bankruptcy court to enjoin Equitable Contribution Claims against the Settling Insurers is within Congress's power to provide for the discharge of unsecured claims in bankruptcy with or without compensation.

4.   Equity Jurisprudence

This court nonetheless required the Plan Proponents to amend the Plan to include some protection to the Non-Settling Insurers to lessen the impact of the loss of their contribution rights.  The court did so, not because such protection was required under section 524(g) or the Constitution, but because a court should always impose conditions necessary to avoid unnecessary hardship when issuing an injunction.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 32 (2008); In re Federal-Mogul Global, Inc., 411 B.R. 148, 167 (Bankr. D. Del. 2008).

It is in this context that the court weighs the evidence regarding the efficacy of the Judgment-Reduction and the Trust-

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 56 of 83

Payment Credits in replacing the Non-Settling Insurers' Equitable Contribution Claims. The Non-Settling Insurers need not be compensated in full, but the court should attempt to fashion conditions that mitigate the greatest hardships of the injunction. At the same time, the court should not impose conditions that would undermine the purposes of section 524(g).

5. <u>Non-Settling Insurers' Evidence</u>

The Non-Settling Insurers introduced evidence that equitable contribution rights are valuable rights that insurers generally enforce, and that the enforcement of such rights is generally cost-effective and usually accomplished without litigation.

The Non-Settling Insurers introduced the testimony of three economic experts (Charles Mullin, George Priest, and Gustavo Bamberger), who testified that Judgement-Reduction and Trust-Payment Credits are not nearly as valuable as the contribution rights lost under the Plan.

(a) The insurers' experts acknowledged that the Judgment-Reduction and Trust-Payment Credits fully compensate for lost contribution rights with respect to those claims that go to trial and result in a large recovery for the plaintiff. In such circumstances, there is a sufficient amount due the plaintiff against which to assert those credits. Only a very small percentage of claims go to trial, however, and those that do account for only ten percent of the total defense and indemnity payments that have been made to date by Non-Settling Insurers in connection with Plant.

(b) The insurers' experts testified that the Judgment-Reduction and Trust-Payment Credits will not likely provide any significant benefit to Non-Settling Insurers with respect to claims that are

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 57 of 83

settled before trial. This is so, because it is not likely that settlement amounts will be reduced to take account of the credits the insurers could assert if the claim went to trial. Indemnity payments and defense costs incurred in cases settled before trial account for 40 percent of the total defense and indemnity expenditures that the Non-Settling Insurers have incurred in connection with Plant.

(c) The insurers' experts testified that the Judgment-Reduction and Trust-Payment Credits will produce no benefit whatsoever with respect to claims that are dismissed without any payment to the claimant. This is so because there is no amount due the claimant against which the credits can be asserted. Indemnity payments and defense costs incurred in claims dismissed without payment account for 50 percent of the total defense and indemnity expenditures that the Non-Settling Insurers have incurred in connection with Plant. The Non-Settling Insurers use the term Orphan Defense Costs to refer to those expenditures that cannot be recovered via the Judgment-Reduction or Trust-Payment Credits.

(d) The insurers' experts testified that the Trust-Payment Credit will provide little benefit to Non-Settling Insurers, because the payments made by the Trust will pay only a small percentage dividend on each claim. As a result, Trust payments (i) will not dissuade claimants from pursuing claims in the tort system; and (ii) will provide a small Trust-Payment Credit and only in those cases that go to trial. Payments by the Trust will be small, because few insurers have settled, because a large portion of the settlement proceeds received have been expended on costs of administration, and because Trust assets will be used to pay claims that are not covered by

Case: 09-31347   Doc# 2048   Filed: 03/15/12   Entered: 03/16/12 09:12:10   Page 58 of 83

insurance.

(e) The insurers' experts testified that Non-Settling Insurers would be compensated fully with respect to their contribution rights only if the Plan included the Trust Backstop, under which equitable contribution claims could be asserted against the Trust and paid in full. They note that such protection was provided to the non-settling insurers in the plan confirmed in the Thorpe Insulation case.

6. The Plan Proponents' Evidence

The Plan Proponents introduced evidence that the right of insurers to seek equitable contribution from other insurers is not a valuable right, that insurers often do not enforce that right, and that it is very expensive and not always cost-effective for insurers to enforce that right.

The Plan Proponents introduced the testimony of three attorneys who are experts in the history and practice of asbestos litigation (Alan Brayton, Stephen Snyder, and David McClain). These experts testified that the Judgement-Reduction and Trust-Payment Credits, and other features of the Plan will provide Non-Settling Insurers benefits fully equal to the contribution rights that the Plan precludes them from asserting against Settling Insurers.

(a) The Plan Proponents' experts testified that the Judgment-Reduction Credit will provide an effective means for Non-Settling Insurers to realize the value of their contribution rights in cases settled without trial. The process of settling asbestos claims is a very rational one in which both sides are represented by expert counsel, who take account of the likely amount the plaintiff would be awarded if the case went to trial. The Plan Proponents' experts

-59-

stated that the Non-Settling Insurers' right to assert the value of their lost contribution rights as an offset is one of those factors regarding the likely outcome of trial that the parties will take into account in reaching a settlement. Thus, the Plan Proponents' experts testified, there are not likely to be significant Orphan Defense Costs in claims that are resolved by settlement.

(b) The Plan Proponents' experts testified that the Non-Settling Insurers' experts overstated the amount of Orphan Defense Costs likely to be incurred in the future in cases that are dismissed without settlement or trial. The data from 2006-2009, upon which the Non-Settling Insurers' experts relied, show an unusually high proportion of dismissals that is not likely to be repeated in the future.

(c) The Plan Proponents' experts testified that past and future Orphan Defense Cost will be fully offset by a savings resulting from a reduction in the number of claims asserted in the tort system. This reduction in tort-system claims will occur as a result of the combined effect of the following:

 (i) The Trust will make payments sufficiently large to cause some claimants to perceive that they no longer need to pursue claims in the tort system to achieve a sufficient recovery; and

 (ii) The existence of the Judgment-Reduction and Trust-Payment Credits will reduce the size of the net recovery that a plaintiff can recover in the tort system, and cause some claimants to perceive that it is no longer cost-effective to pursue claims in the tort system.

(d) The Plan Proponents' experts testified that the Trust Backstop would overcompensate the Non-Settling Insurers. This would be so,

-60-

because the Non-Settling Insurers would recover the full value of their Equitable Contribution Claims through the Trust Backstop, and at the same time enjoy the additional savings that will result from a reduction in the number of claims asserted in the tort system.

7.   Findings Regarding the Evidence Presented

The court makes the following findings of fact regarding the evidence introduced by Plan Proponents and Non-Settling Insurers regarding the contribution issues.

(a) Insurers' equitable contribution rights are valuable, and insurers generally enforce those rights.  With respect to this question, I find the evidence introduced by the Non-Settling Insurers to be persuasive and the evidence introduced by the Plan Proponents not to be persuasive.

(b) The Judgment-Reduction and Trust-Payment Credits will have the following effects in restoring *directly* to the Non-Settling Insurers the value of their lost contribution rights.

(i)   The Judgment-Reduction and Trust-Payment Credits will be almost completely effective in restoring to Non-Settling Insurers the value of their lost contribution rights in cases tried to judgment in the tort system.  On this question, witnesses for both the Non-Settling Insurers and the Plan Proponents agree.

(ii) The Judgment-Reduction and Trust-Payment Credits will be largely effective in restoring to Non-Settling Insurers the value of their lost contribution rights in cases brought in the tort system and settled before trial.  The process of settling asbestos claims is a very rational one in which both sides are represented by expert counsel who take account of the likely

-61-

amount the claimant would be awarded if the case went to trial. The credits that the Non-Settling Insurers would be able to assert are among the factors regarding the likely outcome of trial that the parties would take into account in reaching a settlement. With respect to this question, I find the evidence introduced by the Plan Proponents to be persuasive and the evidence introduced by the Non-Settling Insurers not to be persuasive.

(iii) The Judgment-Reduction and Trust-Payment Credits will be wholly ineffective in restoring *directly* to the Non-Settling Insurers the value of their lost contribution rights in those cases brought in the tort system and dismissed without any payment to the claimant. On this question, witnesses for both the Non-Settling Insurers and the Plan Proponents agree.

(c) The Judgment-Reduction and Trust-Payment Credits will be substantially effective in *indirectly* restoring to the Non-Settling Insurers the value of their lost contribution rights, including those arising in cases brought in the tort system and dismissed without payment to the claimant. This is so because the Judgment-Reduction and Trust-Payment Credits will substantially reduce the number of claims brought in the tort system that the Non-Settling Insurers are called upon to defend. On this question, I credit the evidence submitted by the Plan Proponents, and do not credit the evidence submitted by the Non-Settling Insurers.

(d) Although barring Equitable Contribution Claims against Settling Insurers has the effect of concentrating defense and indemnity costs on Non-Settling Insurers, little such concentration has occurred in this case, because so few insurers have settled. Equitable

-62-

Contribution Claims arise only to the extent an insurer has paid a disproportionate share of expenses, and little disproportion results from the elimination of contribution claims against insurers bearing only a small proportion of the total risk. The Non-Settling Insurers could be required to bear a significantly disproportionate share of defense and indemnity costs only if Settling Insurers represent a significant proportion of the total risk. That has not happened in the present case. As of the date of this opinion, the Plan Proponents have settled with only four insurers, who collectively represent only about 11 percent of the total risk. See page 49, above, and page 70, below.

(e) If additional insurers settle, the direct and indirect benefits of the Judgment-Reduction and Trust-Payment Credits will increase to offset the increased concentration of risk on Non-Settling Insurers. Additional settlements will lead to larger payments to claimants by the Trust, and an increase in the value of the Trust-Payment Credit. Furthermore, any increase in the value of the barred Equitable Contribution Claims increases the amount of the Judgment-Reduction Credit. By causing increases in payments made by the Trust, in the Judgment-Reduction Credit, and in the Trust-Payment Credit, additional settlements will reduce the number of claims brought in the tort system that the Non-Settling Insurers are called upon to defend. In sum, Non-Settling Insurers will receive substantial compensation for their Equitable Contribution Claims whether Settling Insurers are few or many. With respect to this question, I find the evidence introduced by the Plan Proponents to be persuasive and the evidence introduced by the Non-Settling Insurers not to be persuasive.

-63-

(f) The Trust Backstop would overcompensate the Non-Settling Insurers. The Trust Backstop would pay Non-Settling Insurers a 100-percent dividend on their Equitable Contribution Claims, when no one has suggested that Asbestos Injury Claims will be paid in full, and when the Non-Settling Insurers cite no provision of the Bankruptcy Code that affords their claims priority over Asbestos Injury Claims. (g) The Trust Backstop would interfere with the operation of section 524(g) in a way that the Judgment-Reduction Credit does not. The statutory objectives of equal treatment of present and future claimants, and prompt payment without the expense of trial, are reliably achieved only through payment of claims by a section 524(g) trust. Any provision which takes money away from the Trust interferes with those statutory objectives, and should be imposed only where required by the statute or the Constitution. The Trust Backstop would grant Non-Settling Insurer's claims against the Trust that would have priority over the claims of present and future asbestos claimants and would thereby substantially diminish the ability of the Trust to pay Asbestos Injury Claims. Moreover, the Trust Backstop would cause a substantial delay in payment of Asbestos Injury Claims, because the Non-Settling Insurers' Equitable Contribution Claims cannot be determined at this time, and the Trust would be required to maintain large reserves to ensure their eventual payment in full. The Judgment-Reduction Credit, in contrast, compensates Non-Settling Insurers by reducing the amount claimants can recover in the tort system and by reducing the number of claims brought in the tort system, and does not reduce or delay payments made through the Trust.

-64-

8.  <u>Other Arguments of Non-Settling Insurers</u>

The Non-Settling Insurers argue that it is unfair to bar their contribution claims because the Trust will pay claims irrespective of whether they are covered by insurance.  This will reduce the benefit Non-Settling Insurers receive from payments made by Settling Insurers.  It is true that the Trust will pay claims solely on the basis of their merit, and not according to whether they are covered by insurance.  It is also true that using funds received from Settling Insurers to pay uninsured claims increases the size of the contribution claims lost by the Non-Settling Insurers.  But this harm is outweighed by other considerations.  First, the purpose of section 524(g) is to pay all claimants on a equal basis.  Second, as explained above, section 524(g) does not require that insurers be compensated for lost contribution claims.  In these circumstances, the policy of equal treatment outweighs the marginal harm done to the Non-Settling Insurers.

The Non-Settling Insurers argue that the Judgment-Reduction and Trust-Payment Credits may be illusory, because claimants who bring tort actions may urge the state courts to ignore those Credits. This argument is based entirely on the speculation that claimants will violate the Plan they have voted for, and that state courts will ignore the terms of the Plan and the Supremacy Clause.

The Non-Settling Insurers argue that the Trust will adopt a lax claims review process that will cause persons who have weak claims to overestimate the strength of their claims, and that this will harm the Non-Settling Insurers by encouraging persons to file frivolous claims in the tort system that the Non-Settling Insurers will be called upon to defend.  In support of this argument, the

-65-

1  insurers cite data regarding payments made under the CIGA matrix,
2  which data purport to show that a very high percentage of claims
3  filed were allowed and paid.  This argument is wholly unpersuasive
4  for several reasons.  First, the insurers' data was rebutted by the
5  Plan Proponents, and I do not credit the insurers' data.  Second,
6  the insurers made no effort to show that the claims paid under the
7  CIGA matrix were not meritorious.  Third, the insurers ignore the
8  incentives that bear upon the administration of the Trust: that the
9  Trust has limited assets, and the allowance of any non-meritorious
10 claim will reduce the amount that the Trust can pay to meritorious
11 claims.

12      The Non-Settling Insurers complain that the Plan permits
13 claimants to obtain payment from the Trust and then seek additional
14 recovery in the tort system (with a credit for any amount paid by
15 the Trust).  The insurers assert that this "open system" is
16 "unprecedented."  The argument is unpersuasive.  First, the insurers
17 have cited no statute or decision stating that an "open system" is
18 inappropriate.  Second, claimants should not be forced to choose
19 between the equality-of-treatment benefits of a section 524(g) trust
20 and pursing all available insurance coverage.  Few insurers have
21 settled in this case.  It is only tort-system actions by claimants
22 (and settlements later achieved because of the threat of such
23 actions) that will produce any significant recovery for claimants.

24 9.  <u>Decision</u>

25      Upon consideration of the findings and conclusions set forth
26 above, and of the factors set forth in subparagraphs (a)-(l) below,
27 I determine that the provisions of the Plan protecting Settling
28 Insurers from Equitable Contribution Claims are consistent with

-66-

section 524(g), with the Constitution, and with principles of
equity, and that there exists no alternative way to fulfill the
goals of section 524(g) with less harm to Non-Settling Insurers.

(a) Protecting Settling Insurers from Equitable Contribution Claims
substantially furthers the purposes of section 524(g). Two purposes
of that statute are to treat present and future asbestos claims
equally and to resolve and pay those claims quickly. See pages 24-
27, above. In the present case, these statutory goals can be
achieved only through settlements that turn the debtor's insurance
coverage into cash that can be distributed by a section 524(g)
trust. See pages 28-29, above. Protecting Settling Insurers
against Equitable Contribution Claims encourages insurers to settle
by allowing them to fix their total liability and to avoid all
future litigation.

(b) Although they do have value, the Non-Settling Insurers'
claims for equitable contribution do not constitute an expectation
sufficiently specific and well-protected to rise to the level of a
property right, but instead are recognized only in equity.

(c) Neither the Bankruptcy Code nor the Constitution require Non-
Settling Insurers to be compensated for the loss of their right to
seek equitable contribution from Settling Insurers. See pages 55-
56, above.

(d) Neither the Non-Settling Insurers nor the Plan Proponents are
able to quantify with any certainty the effect on Non-Settling
Insurers of the provisions of the Plan protecting Settling Insurers
from Equitable Contribution Claims.

(e) The Judgment-Reduction Credit eliminates the harshest
consequences of barring Equitable Contribution Claims against

Case: 09-31347    Doc# 2048    Filed: 03/15/12    Entered: 03/16/12 09:12:10    Page 67
of 83

Settling Insurers.  The worst situation that could befall the Non-Settling Insurers is a series of verdicts or settlements that result in large payments to plaintiffs.  In such circumstances, the Judgment-Reduction Credit provides the Non-Settling Insurers a practical and effective way to enjoy the value of their contribution rights.

(f) The Judgment-Reduction Credit functions much like the mechanism adopted for protecting non-settling defendants in federal securities litigation.  See Kaypro, 884 F.2d at 1231.  Under Kaypro, a non-settling defendant may reduce any judgment rendered against it by a proportion equal to the proportion of fault attributable to the settling defendants.[19]  Id.

(g) It is worthy of note that the Kaypro mechanism exhibits two of the "flaws" the Non-Settling Insurers complain of here: (a) a non-settling defendant who prevails at trial has no means of recovering defense costs; and (b) a non-settling defendant is required to litigate by proxy the share of the judgment properly attributable to the settling defendant.  That this well-recognized method of protecting non-settling defendants is not perfect suggests that courts do not demand perfection in this setting.

(h) Although barring Equitable Contribution Claims against Settling Insurers has the effect of concentrating defense and indemnity costs on Non-Settling Insurers, little such concentration has occurred in

---

[19] To calculate the lost equitable contribution rights that result from a particular action, the Non-Settling insurers would need to know: (a) their share of coverage (which can be calculated from years of coverage and policy limits); (b) the defense and indemnity costs they incurred in that particular action (which they would know); (c) the defense costs incurred by Settling Insurers in that particular action (which can be obtained by discovery); and (d) the indemnity costs incurred by Settling Insurers in that particular action (for which one would have to use a proxy, such as the amount paid by the Trust to the claimant).

-68-

1   this case, because so few insurers have settled.  See page 70,
2   below.

3   (i) If additional insurers settle in the future, defense and
4   indemnity expenses incurred will be shared among fewer Non-Settling
5   Insurers, but the amount of expenses to be shared will decrease,
6   because additional settlements will lead to a reduction in the
7   number of claims brought in the tort system.  See page 63, above.

8   (j) The Plan Proponents should not be required to include the Trust
9   Backstop requested by the Non-Settling Insurers, because it would
10  overcompensate Non-Settling Insurers, and would interfere with the
11  equal and prompt payment of present and future asbestos injury
12  claims.  See page 64, above.

13  (k) Plan Proponents have met their burden of proving that the
14  provisions of the Plan protecting Settling Insurers from Equitable
15  Contribution Claims are necessary to the Plan, are fair and
16  equitable, and are consistent with both the specific provisions and
17  general purposes of the Bankruptcy Code.

18  (l) Non-Settling Insurers have not met their burden of
19  showing that the application of the Bankruptcy Code to bar the Non-
20  Settling Insurers from asserting Equitable Contribution Claims
21  against the Settling Insurers violates the Constitution.

22

23  **D.   Extension of Deadline for Insurance Settlements**

24  1.   <u>The Terms of Extension</u>

25       The Plan originally provided that only those insurers that
26  settled by the conclusion of the confirmation hearing would receive
27  the benefit of the Settling Insurer Injunction.  Only four insurers
28  settled by that deadline.  After the close of evidence, and two days

-69-

before the final argument regarding confirmation, the Plan Proponents filed an amendment to the Plan that extends the deadline for insurance settlements to 15 days after entry of an order by the district court (a) confirming the Plan, or (b) affirming on appeal an order of this court confirming the Plan. Any insurer that settles within this extended deadline will receive the protection of the Settling Insurer Injunction.

2. The Non-Settling Insurers' Objections

Three Non-Settling Insurers filed objections to the proposed extension of the Insurance Settlement Deadline. They argue first that increasing the number of Settling Insurers would increase the concentration of risk among the remaining Non-Settling Insurers, increasing the value of the Equitable Contribution Claims that are being taken from them, and thereby rendering the Plan even more unfair than it was previously. The Non-Settling Insurers next argue that each party presented its case regarding confirmation on the basis that there were only three Settling Insurers[20] that collectively represent only 11 percent of the insurance risk, and that permitting additional insurers to claim the benefits of the Settling Insurer Injunction would constitute unfair surprise and would not be supported by the existing record. The Non-Settling Insurers argue finally that extending injunctive relief to insurers that settle in the future will require this court to made additional findings related to the confirmation of the Plan, and that this

---

[20] Arrowood settled after the petition date and before the beginning of the confirmation hearing. Debtor reached a settlement with a fourth insurer, Mt. McKinley Insurance Company, after the evidence closed and before this opinion was issued. No objections were filed and the Mt. McKinley settlement was approved in an order entered on February 22, 2012.

-70-

court will lose jurisdiction to do so while the order confirming the Plan is subject to appeal.

3.  No Unfair Surprise

The extension of the Insurance Settlement Deadline creates no unfair surprise, because the Non-Settling Insurers did not rely upon the original deadline.

Under the original settlement deadline, the Non-Settling Insurers had to complete their presentation of evidence without knowing how many insurers would settle. The original settlement deadline was the conclusion of the confirmation hearing, a time at which all the evidence would already have been introduced, and long after all trial planning would have been completed. The Non-Settling Insurers cannot legitimately complain that they have been deprived of knowing how many insurers settled in presenting their case, because they lacked such knowledge under the original settlement deadline, and because they did not object to the original deadline.

The evidence that the Non-Settling Insurers introduced at the confirmation trial did not focus upon the number or percentage of insurers that had settled, but instead focused upon: (i) the portion of costs Non-Settling Insurers had incurred in actions that had been dismissed; (ii) whether the Judgment-Reduction and Trust-Payment Credits would provide any real benefit in cases settled without trial; and (iii) whether those credits together with the payments made by the Trust would reduce the number of actions filed in the tort system. The Non-Settling Insurers mentioned the fact that only 11 percent of the insurance coverage had settled, but they did so only to argue that the credits they could assert and the payments

-71-

the Trust could make would not deter claimants from filing in the tort system (a criticism of the Plan that would actually be ameliorated if more insurers settle).

4. <u>Benefits of the Extension</u>

Post-confirmation insurance settlements advance the purposes of section 524(g). Because Plant has no assets other than its insurance policies, insurance settlements are the only means by which the Trust can be funded. It is only the Trust that will satisfy the aims of section 524(g) by making distributions promptly and on an equal basis to present and future asbestos claimants. The alternative, suing Plant and its insurers in the tort system, is slower and operates on a first-come-first-served basis that is likely to provide more benefit to present claimants than to future claimants.

Extension of the insurance settlement deadline is likely to produce additional settlements, because it affords insurers an opportunity to settle after they acquire new information important to their decision making. Extension of the deadline permits the Non-Settling Insurers to take into account that this court has confirmed the Plan and that the district court has affirmed that ruling. These events increase the incentive to settle, because they increase the likelihood: (a) that Settling Insurers will be protected from all Equitable Contribution Claims and Asbestos Injury Claims (the carrot); and (b) that Non-Settling Insurers will be required to defend and indemnify all insured claims without the ability to seek equitable contribution from Settling Insurers (the stick).

-72-

5.  <u>Confirmation is not Affected by the Number of Settlements</u>

Confirmation of the Plan is not affected either by uncertainty as to how many insurers will settle, or by an increase in the number of insurers likely to settle.  An increase in the number of settlements does not **unreasonably** increase the burden on Non-Settling Insurers, for the reasons set forth below.

(a) Additional insurance settlements would provide substantial benefits to the Trust and its beneficiaries.  See pages 28-30, above.

(b) The Non-Settling Insurers' objections to the loss of their Equitable Contribution Claims are supported primarily by considerations of equity, rather than statutory or Constitutional rights.  See pages 55-56, above.

(c) It is far from certain that additional insurance settlements would materially increase the burden on Non-Settling Insurers.  The increase in concentration of risk brought about by an additional insurance settlement is offset by the following three factors. First, additional insurance settlements increase the value of the Non-Settling Insurers' Judgment-Reduction rights, because by their very nature such rights increase by the amount of the contribution rights lost as the result of additional insurer settlements. Second, additional insurer settlements enable the Trust to make larger payments, which increase the Trust-Payment Credit.  Third, the increases in Trust payments, the Judgment-Reduction Credit, and the Trust-Payment Credit resulting from additional insurer settlements will reduce the number of claims filed in the tort system.  See page 63, above.

(d) The benefits to the beneficiaries of the Trust of extending the

-73-

1  insurance settlement deadline outweigh the burdens such an extension
2  imposes on Non-Settling Insurers.

3  6.  <u>This Court Will Have Jurisdiction to Make Necessary Findings</u>

4      The extension of the insurance settlement deadline does not
5  require this court to re-evaluate whether the Plan should be
6  confirmed each time an additional insurance settlement is brought
7  before this court.  This is so, because the Plan adopts a **structure**
8  under which all insurance settlements approved by the court will
9  receive the injunctive protection specified in the Plan.  The Plan
10 also adopts a **process** for determining whether a post-confirmation
11 insurance settlement should be approved.  Whether the Plan should be
12 confirmed turns upon whether **that structure** and **that process** are
13 appropriate no matter how many insurers settle.

14     The approval of particular future insurance settlements is as
15 separate from confirmation of the Plan as is the resolution of
16 disputed claims.  Chapter 11 plans frequently specify what
17 percentage dividend will be paid to a given class of claims and
18 leave it to separate claims litigation to determine whether a
19 particular claim should be allowed.  In this case, the Plan
20 specifies the treatment of approved insurance settlements, and
21 leaves it to separate proceedings to determine whether a particular
22 insurance settlement should be approved.  I note that the Non-
23 Settling Insurers honored this distinction in how they presented
24 their case at the confirmation trial; they attacked the structure of
25 the Plan, but did not question whether the insurers who had
26 previously settled were qualified to be treated as Settling Insurers
27 under the Plan.

28

-74-

The features of the structure and process that this court must review include the following: the terms of the injunction protecting Settling Insurers; the Judgment-Reduction and Trust-Payment Credits; the failure of the Plan to include the Trust Backstop; and the standard specified for approving additional settlements.

The propriety of the structure of the Plan as it concerns Settling Insurers has been discussed at length elsewhere. The Plan properly protects Settling Insurers against Asbestos Injury Claims and against Equitable Contribution Claims asserted by Non-Settling Insurers. See pages 53-54, above. The compensation provided to Non-Settling Insurers by the Judgment-Reduction and Trust-Payment Credits are sufficient and the Trust Backup is not required. See pages 61-64, above. The sufficiency of these safeguards is not materially affected by how many insurers settle. See pages 62-63.

7. <u>Standards for Incorporating Future Settlements</u>

The standard for approval of future insurance settlements ensures that every settlement approved by the court satisfies the requirements of section 524(g).

Under section 524(g), the injunctive protection provided to a third party must be "fair and equitable with respect to [future claimants] in light of the benefits provided, or to be provided, to such trust on behalf of . . . such third party." § 524(g)(4)(B)(ii). In substance, this language means that there must be some reasonable equivalence between the protection afforded the third party and the benefits provided to the trust by the third party.[21]

---

[21] The other requirements for injunctive relief under section 524(g) are satisfied. First, the Plan identifies the parties to receive protection (Settling Insurers) "as part of an identifiable group." § 524(g)(4)(A)(ii). Second, the debtor's insurers are

-75-

The Plan provides for the necessary showing of reasonable equivalence by requiring that any post-confirmation insurance settlement be approved by the court.

In requiring post-confirmation insurance settlements to be approved by the court, the Plan incorporates Rule 9019 and the case law interpreting that rule. This is so, because Rule 9019 provides the standard for determining the reasonableness of settlements in bankruptcy cases generally, and because section 524(g) does not indicate that any other standard is to apply in evaluating settlements under that section.

The case law under Rule 9019 requires a showing of reasonable equivalence between the value received by the estate and the rights given up by the estate.

> [T]he value of the settlement must be reasonably equivalent to the value of the claims surrendered. This reasonable equivalence standard is met if the settlement falls within the reasonable range of possible litigation outcomes. Because litigation outcomes cannot be predicted with mathematical precision, only if a settlement falls below the low end of possible litigation outcomes will it fail the reasonable equivalence standard.

In re Doctors Hosp. of Hyde Park, Inc., 474 F.3d 421, 426 (7th Cir. 2007)(citations omitted).[22]

---

among the third parties that may be provided injunctive relief. § 524(g)(4)(A)(ii)(III). Third, the claims to be enjoined are indirect efforts to collect asbestos injury claims against the debtor. § 524(g)(1)(B); Western Asbestos, 313 B.R. at 856.

[22] In addition to considering whether the settlement is reasonably equivalent to the claims released, the court must also consider: (1) any difficulties to be encountered regarding collection; (2) the expense, inconvenience and delay involved in litigating the dispute; and (3) "the paramount interest of the creditors and a proper deference to their reasonable views in the premises." Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th. Cir. 1986).

-76-

The Non-Settling Insurers contend that the Rule 9019 standard is too lenient a test to use as a basis to cut off their Equitable Contribution Claims. This argument is unpersuasive for two reasons. First, section 524(g) does not state that any standard other than Rule 9019 is to apply in evaluating whether a settlement provides a reasonable exchange. Second, California courts have adopted a test comparable to the Rule 9019 test for determining whether a settlement payment is sufficient to justify a bar against equitable contribution rights. The California Supreme Court articulated the following standard for determining whether a settlement is in good faith under section 877.6 of the California Civil Code.

> "[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." The party asserting the lack of good faith, who has the burden of proof on that issue should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute.

Tech-Bilt, Inc. v. Woodward-Clyde & Assoc., 38 Cal. 3d 488, 499-500 (1985)(citations omitted). The Rule 9019 standard is actually more exacting than the section 877.6 standard, because under Rule 9019 the party proposing the settlement has the burden of proof, while under section 877.6 the party opposing the settlement has the burden of proof. Compare, A & C Properties, 784 F.2d at 1381. (burden of proof under Rule 9019 on party proposing settlement) with Tech-Bilt, 38 Cal. 3d at 499 (section 877.6(d) places burden of proof on party opposing settlement).

The standard for approval of settlements adopted in Tech-Bilt is not directly controlling, because section 877.6 is limited in its scope and applies only to contribution claims among joint

-77-

tortfeasors, not contribution claims among insurers.  <u>Hartford</u>, 29
Cal. App. 4th at 440-41.  <u>Tech-Bilt</u> does show that California law,
the law under which the Non-Settling Insurers' equitable
contribution rights arise, does not impose an exacting standard for
approving settlements that cut off equitable contribution claims.

## 8.  Additional Disclosure is not Required

The proposed extension of the insurance settlement deadline
does not require additional disclosure or an opportunity for
creditors to change their votes.  It is entirely clear how all
creditors would vote regarding the proposed amendment to the Plan.
The Non-Settling Insurers have already voted against the Plan, and
the extension of the insurance settlement deadline only makes the
Plan more unpalatable to them (as evidenced by the objections
filed).  The asbestos claimants would undoubtedly continue to vote
for the Plan, because insurance settlements are the only real source
from which Trust payments can be made, and the extension furthers
such settlements.

## 9.  Extension Approved

The Fourth Amendment to the Plan is approved and made part of
the confirmed Plan.  All terms of the confirmed Plan, including the
Settling Insurer Injunction, will apply to all insurance settlements
approved by this court within the extended insurance settlement
deadline.  In determining whether to approve any insurance
settlement submitted after the date of this opinion, the court will
review the proposed settlement, and resolve any objections thereto,
under Rule 9019 and the case law interpreting that Rule.

-78-

**E.    The "Best-Interest-of-Creditors" Test**

1.   <u>Introduction</u>

The Non-Settling Insurers contend that the Plan cannot be confirmed, because it does not meet the best-interest-of-creditors test.  That test provides that a chapter 11 plan may be confirmed only if every impaired creditor who does not accept the plan "will receive or retain" under the plan as much as that creditor would "receive or retain" if the debtor were liquidated under chapter 7. § 1129(a)(7).  The Non-Settling Insurers correctly note that they are impaired creditors who have not accepted the Plan, and that in a chapter 7 liquidation they would retain their Equitable Contribution Claims against the Settling Insurers, because 524(g) applies only in chapter 11 cases.

The Chapter 7 test does not apply to the Non-Settling Insurers' Equitable Contribution Claims, however, because that test applies only to claims against the debtor, and the Non-Settling Insurers' Equitable Contribution Claims are not claims against Debtor Plant.

The claims that the Non-Settling Insurers do have against Debtor Plant, their claims for reimbursement of amounts spent defending and indemnifying Plant, are provided for in the Plan and will receive a dividend larger than they would receive through a Chapter 7 liquidation.

2.   <u>The Chapter 7 Test Applies Only to Claims Against the Debtor</u>

Section 1129(a)(7)(A) provides that the court may confirm a Chapter 11 plan only if each holder of a "claim" has accepted the plan or

> will receive or retain under the plan **on account of such claim** or interest property of a value, as of the effective date of the plan, that is not less than the amount that

-79-

such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

(emphasis added).

The term "claim" is defined elsewhere in the Bankruptcy Code to refer to the liability **of the debtor.** Section 101(10) defines "creditor" to mean an "entity that has a claim **against the debtor** that arose at the time of or before the order for relief concerning the debtor". § 101(10)(A) (emphasis added).[23]

Construing the term "claim" to refer only to a liability of the debtor is consistent with the overall content and structure of the Bankruptcy Code. Except as provided in section 524(g), the Bankruptcy Code does not purport to affect the liabilities of third parties.[24] Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[25] It is worthy of note that section 1129(a)(7) was enacted before section 524(g), and therefore did not contemplate a plan barring the enforcement of claims against third parties. Thus, the most natural interpretation of section 1129(a)(7) is that it addresses only the amount the dissenting creditor would receive or retain on its claim against the **debtor**, because that was the only question section 1129(a)(7)

---

[23] The creditors specified in the text of section 101(10)(B) and (C), which is not quoted above, are also creditors who hold claims against the debtor or the debtor's bankruptcy estate.

[24] The co-debtor stay imposed in chapter 13 cases is only a temporary stay that protects a co-debtor only if debtor received the consideration that gave rise to the debt, only if debtor's chapter 13 plan provides for full payment of the debt, and only so long as debtor remains in chapter 13 and continues to pay the debt.

[25] Section 524(e) contains one exception, which provides that the debtor's spouse's interest in certain community property is protected by a discharge.

-80-

logically could address at the time it was enacted.  Section
1129(a)(7) has not been amended since section 524(g) was enacted.

Nothing in the language of section 524(g) suggests that section
1129(a)(7) should be construed to preserve rights other than those
against the debtor.  Section 524(g) addresses the consideration that
must be provided by the third party to be protected, but does not
require that any of that consideration be paid to the party whose
claims are barred.  Specifically, section 524(g) states that the
court may issue an injunction protecting a third party only if that
protection "is fair and equitable *with respect to the persons that
might subsequently assert [future claims]*, in light of the benefits
provided, or to be provided, to such trust one behalf of . . . such
third party."  § 524(g)(4)(B)(ii).  That section 524(g) addresses
the consideration that must be provided to the trust, but does not
require that the specified consideration be paid to the party to be
enjoined, suggests that Congress did not intend that the enjoined
party be entitled to receive any type of **direct** compensation.[26]

The court decisions that the Non-Settling Insurers rely upon do
not support their argument that the Chapter 7 test applies to their
claims against the Settling Insurers, because each of those
decisions involved claims against the debtor.

---

[26] A party whose rights against a third party are cut off under
section 524(g) receives an indirect benefit from the required
contribution made by that third party.  In the present case, for
instance, payments from Settling Insurers will enable the Trust to
make payments that will reduce the number of claims asserted in the
tort system and, through the Judgment-Reduction Trust-Payment
Credits, will reduce the liability of the Non-Settling Insurers in
those Direct Actions that are brought against them in the tort
system.  See pages 61-63, above.

-81-

The Non-Settling Insurers rely primarily upon <u>In re Quigley Co., Inc</u>., 437 B.R. 102 (Bankr. S.D.N.Y. 2010). In <u>Quigley</u>, the debtor sought to confirm a plan that barred the assertion of asbestos injury claims against its parent corporation. The court found that the claims asserted against the parent (Pfizer) were in substance claims against the debtor (Quigley). "[T]he plaintiffs in these lawsuits sued Pfizer, Quigley's wealthy parent, for injuries resulting from Quigley's alleged misconduct relating to the manufacture and sale of Insulag or one of Quigley's other asbestos-containing products." <u>Id.</u> at 112. "[Quigley] represented that virtually all of the claims against Pfizer were based on Quigley products, and only 'some minuscule portion . . . may be based upon exposure to Pfizer products.'" <u>Id.</u> at 134 n. 43 (record citations omitted). In determining that the plan did not satisfy the Chapter 7 test, the court relied expressly on the fact that the claims to be released were claims against the debtor on which Pfizer was a co-obligor. <u>Id.</u> at 145-46.

The other decisions cited by the Non-Settling Insurers also fail to support the proposition that the Chapter 7 test applies to liabilities that could never be asserted against the debtor. Two decisions concerned the plan's failure to pay claims that were clearly claims against the debtor. <u>Mercury Capital Corp. v. Milford Conn. Assocs., LP</u>, 354 B.R. 1, 8-9 (D. Conn. 2006); <u>In re Union Meeting Partners</u>, 165 B.R. 553, 573-76 (Bankr. E.D. Pa. 1994). Two cases involved plans in which the debtor provided for full payment of the non-settling insurers' equitable contribution claims, but there was no decision by the court holding that such treatment was required under section 1129(a)(7). <u>In re ASARCO, LLC</u>, 420 B.R. 314

-82-

1  (S.D. Tex. 2009); <u>In re Thorpe Insulation Co.</u>, C.D. Cal. No. 2:07-
2  bk-19271.

3  3.  <u>Equitable Contribution Claims are not Claims Against the Debtor</u>

4       The Non-Settling Insurers' Equitable Contribution Claims are
5  claims against other insurers, not claims against Debtor Plant.
6  <u>Fireman's Fund</u>, 65 Cal. App. 4th at 1293.  Outside of bankruptcy,
7  those claims could not be asserted against the Debtor.  The Non-
8  Settling Insurers do not contend otherwise.  Because the Equitable
9  Contribution Claims are not claims against Debtor Plant, and because
10 the Chapter 7 test applies only to claims against the debtor,
11 section 1129(a)(7) does not require that the Non-Settling Insurers
12 be permitted to retain or be paid the full value of those claims.

13

14 **CONCLUSION**

15      Counsel for the Plan Proponents shall, after consulting
16 opposing counsel, prepare a proposed form of order that is
17 consistent with this opinion and with the unpublished additional
18 findings and conclusions entered separately.

19                    **\*\*END OF OPINION\*\***

20

21

22

23

24

25

26

27

28