

**Signed and Filed: March 15, 2012**

**THOMAS E. CARLSON U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 09-31347 TEC |
| | Chapter 11 |
| PLANT INSULATION COMPANY, a California corporation, | |
| | **ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW RE PLAN CONFIRMATION** |
| Debtor. | |

**A.     JURISDICTION AND RELATED MATTERS**

1.     This court has subject-matter jurisdiction over this Chapter 11 case and all proceedings therein under 28 U.S.C. § 1334.

2.     The confirmation hearing is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3.     Venue in the Northern District of California is proper under 28 U.S.C. § 1408.

4.     There is no right to a jury trial on any issue decided in connection with plan confirmation.

5.     The Bankruptcy Court, as provided in Article 9 of the Plan, retains jurisdiction over the matters set forth therein.

6.     To the extent that any finding is presented as a conclusion, it should be deemed a finding and is hereby adopted as such.  To the extent that any conclusion is presented as a finding, it

should be deemed a conclusion and is hereby adopted as such.

**B.      THE 2001 PLANT/BAYSIDE TRANSACTION AND TERM SHEET**

7.      In 2001, Plant transferred all assets associated with its insulation contracting business to Bayside, a newly-formed corporation with no existing business then owned solely by Shahram Ameli.  Prior to the time of this transfer in May 2001, Mr. Ameli was President of Plant and held 40 of the 82 outstanding shares of voting stock of Plant.  In May 2001, Plant, which was recognized by its officers to be insolvent at the time:

- Turned over all of its insulation contracting jobs and job files to Bayside;

- Conveyed to Bayside the right to collect all of its insulation contracting business accounts receivable;

- Transferred its estimating software license to Bayside, and Bayside was allowed to copy all estimating data;

- Agreed that it would not dissolve or file bankruptcy for 18 months; and

- Agreed that after the conveyance of assets and contracts to Bayside, its operations would be "limited".

The Committee and the Futures Representative contend that this demonstrates that Bayside was a continuation of, and successor to, Plant.

8.      The 2001 asset transfer was part of a settlement of disputes between Mr. Ameli, who wanted to continue Plant's insulation business, and Plant's other significant owner, Doug Ralston, who wanted to wind it down.  Mr. Ameli had been running Plant's active business operations with Mr. Badakhshan.  Plant assigned contracts relating to its insulation contracting business to Bayside and paid Bayside $150,000 to indemnify it against any liability on those contracts, though these contracts were largely profitable.  Bayside was to collect outstanding Plant accounts receivable and retain 35 percent of the amounts collected.

9.      Mr. Ameli started Bayside to continue relationships with Plant's customers that he and Mr. Badakhshan had developed prior to starting their new company.  Bayside completed the active Plant contracts, other than those that were virtually complete at the time of the 2001 transfer to Bayside.  There was evidence that a customer of Plant viewed Bayside as a successor to Plant.

10.     In late April 2007, counsel for asbestos claimants and counsel for a pre-petition committee that had been formed to represent their interests (the Pre-Petition Committee) first learned of the facts concerning the transfer of Plant assets to Bayside.  Shortly thereafter, the Pre-Petition Committee took the position that Bayside was a successor in interest to Plant and therefore responsible for its asbestos liabilities.  Counsel for the asbestos claimants and the Pre-Petition Committee were familiar, as of 2007, with several other instances in which companies with substantial asbestos liabilities arising from prior operations transferred assets to other entities, and the recipients of the transfers were thereafter successfully sued as successors to the asbestos liabilities.

11.     Bayside was sued prior to May 20, 2009 by several of Plant's asbestos victims based on its alleged successor liability.  Bayside negotiated a "standstill" agreement with the plaintiffs, which stays those lawsuits and tolls any applicable statutes of limitation, and it negotiated a post-petition tolling agreement with the Debtor and other Plan Proponents.  A number of these lawsuits are still pending.

12.     Bayside negotiated with the Plan Proponents in numerous meetings from March 2009 until November 2010.  Bayside principals were put on notice that they would be sued personally on Plant's asbestos liabilities.  These negotiations culminated in the settlement embodied in the Bayside-Plant merger.

**C.      THE FILING OF THIS CASE AND EVENTS WITHIN CHAPTER 11**

13.     On May 20, 2009 (the Petition Date), Plant filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Plant has remained in possession of its property and continues to operate and manage its affairs as a debtor in possession.

14.     Plant is a proper debtor under 11 U.S.C. § 109.

15.     On the Petition Date, all Plant shares were, and presently are, owned by The Plant Insulation Trust.  The University of California, San Francisco Pulmonary and Critical Care Division is the sole beneficiary.  David J. Gordon is the sole trustee.

16.     On May 2, 2011, the Plan Proponents filed their Second Amended Disclosure Statement for the Chapter 11 Plan of Reorganization of Plant Insulation Company and Second Amended

Case: 09-31347   Doc# 2052   Filed: 03/15/12   Entered: 03/16/12 14:24:34   Page 3 of 32

Plan of Reorganization of Plant Insulation Company and related exhibits. On May 3, 2011, the court entered an order approving certain revisions to the Disclosure Statement and the Original Disclosure Statement Order and establishing a deadline for voting on the Plan. The Plan Proponents solicited votes on the Plan in accordance with the Plan, Disclosure Statement, and Disclosure Statement Order.

17. On October 18, 2011, the Plan Proponents amended the Plan by filing the Third Amendment to the Second Amended Plan. As a result of the Third Amendment, the Proponents filed a motion seeking approval of: (a) a supplemental disclosure regarding the Plan with respect to the Third Amendment; (b) resolicitation procedures; and (c) proposed form of elections to allow certain creditors to change their previous acceptance of the Plan, which the court approved on October 27, 2011. After resolicitation, no party elected to modify its vote to accept or reject the Plan.

18. The Plan Proponents (and their respective officers, directors, shareholders, attorneys, agents, advisers, and employees) have: (a) solicited acceptances or rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code; and (b) participated in the offer and issuance of any security under the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, accordingly, are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation or acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**D. COMPLIANCE WITH SECTION 1129**

19. Notice of the confirmation hearing and the proposed issuance of the Injunctions was due, proper, timely, and adequate. The Plan Proponents have complied in all material respects with Bankruptcy Rules 2002 and 3017. All parties in interest have had an opportunity to appear and be heard at the Confirmation Hearing. The Plan complies with the applicable provisions of the Bankruptcy Code.

20. The Plan adequately and properly classifies all claims and interests required to be classified and thus satisfies the requirements of sections 1122 and 1123(a)(1). The Plan specifies

the impaired and unimpaired classes of claims and interests under the Plan. Under the Plan, Classes 3, 4, and 5 are impaired. Classes 1 and 2 are not impaired. The Plan adequately specifies the treatment of each impaired Class and thus satisfies the requirements of sections 1123(a)(2) and (3).

21.     The Plan provides the same treatment for each claim in a particular class by providing creditors in Classes 1, 2, 3, and 5 with the same percentage payment as all other creditors in such classes. Because the same opportunities are provided, the Plan satisfies the requirements of section 1123(a)(4).

22.     The Plan contains adequate means for its implementation and satisfies the requirements of section 1123(a)(5). Among other things, the Plan provides for the: (a) establishment of the Trust; (b) appointment of the disbursing agent; (c) consummation of the Bayside-Plant merger; and (d) issuance of the Injunctions.

23.     In accordance with sections 1123(a)(5)(B) and 1123(b)(3)(B), the Plan provides for the establishment of the Trust, the transfer of the Trust Assets to the Trust, the Trust's assumption of Asbestos Related Claims, and the transfer of Asbestos Insurance Settlement Rights to the Trust.

24.     In accordance with section 1123(a)(5)(B), the Plan provides for the appointment of the disbursing agent to, among other things: establish accounts for the reserves, ensure that funds are paid to the reserves by the Trust, adopt procedures for making distributions from the applicable reserves, settle, resolve, object to and litigate disputed claims, adjust the Unsecured Claims Percentage, and transfer funds from the reserves to the Trust in accordance with the provisions of the Plan.

25.     In accordance with section 1123(a)(5)(C), the Plan provides for the consummation of the merger of Bayside into Plant.

26.     The Reorganized Debtor's Charter shall be deemed amended to prohibit the issuance of nonvoting securities, satisfying section 1123(a)(6).

27.     The provisions of the Plan regarding selection of officers, directors, and trustees comply with section 1123(a)(7), as they are consistent with the interests of creditors, equity holders, and public policy. The officers and directors of the Reorganized Debtor will be Messrs. Ameli and

Badakhshan, who are well-qualified to serve.

28.     The Plan contains other provisions for implementation that are permissible under section 1123(b).  All such provisions are consistent with the provisions of the Bankruptcy Code and are thus permissible under section 1123(b)(6).

29.     Asbestos claimants can properly submit ballots, without filing proofs of claim, via a master ballot process through counsel with demonstrated authority to act.  The master ballot procedure is commonly utilized in asbestos bankruptcy cases.  The voting procedures complied with all applicable requirements and all objections regarding the use of master ballots are overruled.

30.     The Plan Proponents have complied with all requirements concerning solicitation of acceptances and rejections.  The court approved the Disclosure Statement by an order dated February 1, 2011, as revised by an order dated May 3, 2011.

31.     Classes 1 and 2 are unimpaired.  Holders of claims in those Classes are conclusively presumed to have accepted the Plan.  See 11 U.S.C. § 1126(f).  Under section 1126(g), Class 5 was not entitled to vote because the Plan does not contemplate any distribution to that class.  Only Classes 3 and 4 were entitled to vote pursuant to section 1126(a).  The Proponents solicited acceptances of the Plan from Classes 3 and 4 in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and in good faith, as that term is used in section 1125(e).  After the court approved a Supplemental Disclosure Statement regarding certain revisions that were made to the Plan, the Proponents transmitted the court-approved Supplemental Disclosure Statement to, and resolicited the votes of, certain claimants in accordance with the court's order.

32.     Class 4 accepted the Plan by 100 percent in number and 100 percent in amount.  After resolicitation of the Plan following the Third Amendment to the Plan, none of the creditors that had previously voted to accept the Plan elected to change their vote.

33.     The Plan Proponents have complied with all requirements governing notice of the confirmation hearing.

34.     For the reasons set forth in the accompanying opinion, the Plan was proposed in good

faith and not by any means forbidden by law. The court expressly overrules all objections to good faith asserted by the Non-Settling Insurers.

35.     There is no requirement that a debtor involve its insurers in the formulation of a plan under section 524(g).

36.     The court finds that the negotiations with Bayside that resulted in the Bayside Term Sheet and the settlement of successor liability and alter ego claims against Bayside and its owners were arm's-length negotiations conducted through competent counsel.

37.     The court concludes that the Plan was not proposed by any means forbidden by law within the meaning of section 1129(a)(3). The court concludes that this provision of the Bankruptcy Code is intended to prevent a plan proponent from proposing a plan by illegal means, such as by fraud, or by bribing parties entitled to vote on the Plan. No evidence of any such illegality was offered.

38.     The Non-Settling Insurers have asserted that the Plan was proposed in violation of section 1129(a)(3), because they allege it modifies contractual rights under their insurance policies. The Non-Settling Insurers identified three areas in which they allege the Plan violates insurance policy rights: (a) the policyholder's "duty of cooperation"; (b) anti-assignment clauses of the policies; and (c) provisions allegedly requiring policyholder assistance in enforcing rights of contribution or subrogation among insurers. The court overrules these objections.

39.     The general objection that the Plan cannot be confirmed because it modifies an insurer's contractual rights *vis-a-vis* the policyholder is not well-taken. Section 1129(a)(3) does not mean that a bankruptcy cannot modify state law rights. Section 1129(a)(3) does not require that a plan of reorganization leave all state law rights of a Debtor's insurers unaffected and no case law so interprets it. There is no legal requirement that a plan of reorganization be "insurance neutral" to be confirmed.

40.     The Non-Settling Insurers assert that the Plan threatens future breach of the cooperation clauses in their insurance policies and is designed to impair their ability to defend claims against Plant in the tort system. The Plan does not require or foster any breach of a cooperation clause. The Non-Settling Insurers failed to prove that the Reorganized Debtor is likely to breach any

policy obligation or that the Plan impairs the ability of any insurer to defend claims against Plant in the tort system.  To the extent that a future breach of an obligation to cooperate is alleged to have occurred, the Non-Settling Insurers will have the same state law rights and remedies that they enjoyed pre-petition.

41.     The Plan specifically obligates the Reorganized Debtor (directly or by contract) to perform any cooperation obligations imposed by the policies.  Uncontradicted evidence established that the persons who have cooperated with the insurers in the past are willing to do so in the future.  The process established by the Plan requires the Reorganized Debtor to set forth prior to the Effective Date how the Plant Insurer Cooperation Obligations will be performed and will permit the insurers to have input into such process.

42.     The Plan does not increase the chance of an inappropriate future waiver of attorney-client privilege.  The Non-Settling Insurers presented no credible evidence that any person will be motivated to waive any privilege in which any insurer has an interest.  After the Effective Date, the only resources of the Reorganized Debtor available to pay tort claims will be Plant's insurance policies.  Inappropriate disclosure of privileged material could void coverage under state law.

43.     The treatment of the Asbestos Insurance Policies under the Plan does not violate the anti-assignment clauses of the policies.  The Plan does not assign the Asbestos Insurance Policies to the Trust; the policies are expressly retained by the Reorganized Debtor, which remains the insured under each of the policies at issue.  The court concludes that any transfers authorized by the Plan in accordance with section 1123(a)(5)(B) do not violate any anti-assignment clause of the Asbestos Insurance Policies and are, in fact, entirely appropriate in light of the court's appointment of the Trust as estate representative under section 1123(b)(3)(B) for purposes of pursuing Asbestos Insurance Litigation.

44.     ACE objected to the determination by this court of any insurance coverage issues.  Nevertheless, ACE and the other Non-Settling Insurers have now tendered for decision the question whether certain language in their policies requires the cooperation of the insured in pursuing inter-insurer contribution claims, as distinct from an obligation to cooperate with regard

to pursuing claims against co-defendants in tort litigation when such parties might have a legal obligation to contribute to a shared or joint legal liability. The court declines to decide this issue. This court finds only that the Non-Settling Insurers failed to prove that the Plan or associated injunctions modify or impair any policy-based duty of cooperation as respects inter-insurer contribution claims and all such objections are overruled.

45. The Plan satisfies the requirements of section 1129(a)(4). All amounts to be paid by the Debtor for services or expenses in this case have either been disclosed and approved as reasonable or will be disclosed and subject to the approval of the court following confirmation of the Plan.

46. Payment of certain Bayside fees and expenses by the Reorganized Debtor is appropriate in light of the merger agreement and the costs that Bayside has incurred. Those fees and expenses will be subject to a separate review for reasonableness. See Plan § 5.6.2.

47. The only professional fees arguably to be made "in connection with" this case that are not and will not be subject to approval by this court are the fees of attorneys representing plaintiffs in connection with tort claims against the Reorganized Debtor and in connection with claims against the Trust. Those fees are negotiated between claimants and their counsel. The fees are to be paid by claimants, not by the Debtor, the Reorganized Debtor, or the Trust, and are not subject to section 1129(a)(4). The court overrules all insurer objections predicated on the payment of such fees.

48. The Non-Settling Insures argue that section 2.6 of the Plan provides Kazan, McClain, Lyons, Greenwood & Harley, PLC (Kazan McClain) and Brayton Purcell LLP (Brayton Purcell) an impermissible success fee for professional services rendered, because Kazan McClain and Brayton Purcell were not employed as professionals for the Official Committee under sections 327, 328, and 1103, because section 503(b) is the only applicable provision of the Bankruptcy Code that authorizes payment for professional services rendered by professionals not approved by the court, and because Kazan McClain and Brayton Purcell, as representatives of individual members of the Official Committee, are not entitled to compensation for professional services rendered under section 503(b)(4).

- 9 -

49.     The Plan Proponents argue that section 2.6 of the Plan is authorized by section 1129(a)(4), because all fees are reviewed by the bankruptcy court for reasonableness, because Kazan McClain and Brayton Purcell are compensated on a contingency fee basis, and any payment on account of their professional services would have corresponded in a larger monetary benefit to the estate, and because section 2.6 was approved by the real parties in interest, the asbestos creditors.

50.     The Non-Settling Insurers' objection to section 2.6 of the Plan is sustained for the reasons set forth below.

(a)  The Plan Proponents describe the work to be performed by Kazan McClain and Brayton Purcell under section 2.6 as professional services, and section 2.6 seeks to compensate Kazan McClain and Brayton Purcell for professional services rendered during the chapter 11 case, from April 1, 2011 through the Effective Date of the Plan.

(b)  It is not appropriate to compensate Kazan McClain and Brayton Purcell as counsel for the Committee or the bankruptcy estate, because Kazan McClain and Brayton Purcell were never appointed by the court under sections 327, 328, and 1103, because the Committee has employed two law firms, Sheppard Mullin Richter & Hampton LLP and Caplin & Drysdale, Chartered (Caplin & Drysdale) as general counsel, because Caplin & Drysdale was retained for its expertise in insurance related matters, and because the Committee never filed an application justifying the need to employ Kazan McClain and Brayton Purcell as additional counsel.  The court also notes that Debtor has retained Morgan, Lewis & Bockius LLP and Synder Miller & Orton, LLP as special insurance counsel.

(c)  It is not appropriate to compensate Kazan McClain and Brayton Purcell as representatives of members of the Committee, because Kazan McClain and Brayton Purcell represent individual members of a committee appointed under section 1102, because members of an official committee are entitled to reimbursement for actual and necessary expenses, but are not entitled to compensation for services rendered, and because counsel for individual members of an official committee are not entitled to compensation under section 503.  See § 503(b)(3)(F), (b)(4).

(d)  It is not appropriate to compensate Kazan McClain and Brayton Purcell under section 1129(a)(4) in this case for two reasons.  First, Federal Rule of Bankruptcy Procedure 2014

requires the Committee to make a showing of necessity to employ counsel. There is no evidence that the professional services to be rendered by Kazan McClain and Brayton Purcell are necessary. Second, the legitimate purpose of section 1129(a)(4) is to provide for court review of professionals whose fees are not otherwise subject to regulation under the Bankruptcy Code, not to serve as a means to escape the restrictions of sections 327-330 and 503.

> Section 1129(a)(4) requires that the bankruptcy court exercise substantive control over fees and costs related to confirmation and the chapter 11 case. Most of these costs will be the subject of other bankruptcy sections. All professionals employed by the estate, for example, must have their employment approved and fees reviewed. But in some cases, there will be fees and costs to parties not already subject to these provisions.

7 Collier on Bankruptcy ¶ 1129.02[4] (16th ed. 2011).

 (e)  The court finds In re Adelphia Communications, Corp., 441 B.R. 6 (Bankr. S.D.N.Y. 2010) to be legally and factually distinguishable from this case. The facts of that case justified the result, because the committees in that case were unofficial committees not appointed under section 1102, because unofficial committees *cannot* employ counsel under sections 327, 328, and 1103, and because counsel for unofficial committees *can* receive compensation for professional services rendered under sections 503(b)(3)(D) and (b)(4). The present case is very different, because the Official Committee in this case had the opportunity to employ the attorneys it needed under section 327, 328, and 1103, did employ two different law firms, and did not seek to have Kazan McClain and Brayton Purcell appointed.

51.     Section 2.6 of the Plan should be stricken. No additional disclosure is necessary, because the change will not affect the amount any claim holder will receive.

52.     The Plan satisfies the requirements of section 1129(a)(5). Mr. Ameli and Mr. Badakhshan will serve as officers and directors of the Reorganized Debtor. The Plan discloses their identities and affiliations as current officers and directors of Bayside. These appointments are in the best interest of creditors. These individuals are well positioned to efficiently operate the business of the Reorganized Debtor and thus maximize the Trust's investment in the Reorganized Debtor.

53.     The Plan does not provide for any changes in rates that require regulatory approval. Section 1129(a)(6) is inapplicable.

54.     The Plan is in the best interest of creditors as required by section 1129(a)(7), commonly

referred to as the best-interest-of-creditors test, which requires that each holder of a claim or interest in an impaired class under the Plan shall either accept the Plan or shall receive or retain property under the Plan equal to or greater than that which such holder would receive or retain on account of such creditor's claim in a liquidation under chapter 7. For the reasons stated in the accompanying opinion, the best-interest-of-creditors test applies only to non-accepting claim and interest holders in Classes 3 and 5.

55.     The Plan satisfies the best-interest-of-creditors test with respect to Class 5 because the sole holder of Class 5 interests receives nothing under the Plan, but would likewise receive nothing in a chapter 7 liquidation and has consented to its treatment under the Plan.

56.     The Plan satisfies the best-interest-of-creditors test with respect to non-accepting Class 3 creditors. Class 3 will be compensated under the Plan from the Unsecured Claims Reserve, funded with the Unsecured Claims Percentage of Plant's assets, certain unpaid settlement funds accounts, and the net proceeds of certain future settlements. The primary source of funding for Class 3 creditors will be amounts received from Settling Insurers. The court finds that promised payments by the Settling Insurers are larger than they would have been in a chapter 7 liquidation. Future settlements, if any, will more likely than not be larger than they would have been had Plant liquidated under chapter 7. Larger settlements mean more funds available for the Unsecured Claims Reserve and also for distribution to Class 3.

57.     Approved settlements with Sompo, UNIC, Arrowood, and Mt. McKinley condition the receipt of a substantial portion of the settlement proceeds on confirmation of a plan that includes section 524(g) protections for those insurers. If a plan with section 524(g) protections is confirmed, payments to be received under the terms of these four settlements would result in allowed claims in Class 3 receiving larger percentage recoveries than if no plan was confirmed or if a plan was confirmed without section 524(g) protections.

58.     If this case had been brought under chapter 7, Plant would not have been able to obtain as much money as has been paid and promised in the settlements achieved to date. The court finds that insurers will more likely than not pay more in connection with insurance policy settlements if they are able to obtain the benefits of a section 524(g) injunction protecting them from the

assertion of claims by the Debtor's creditors.

59.     The court finds that the best-interest-of-creditors test of section 1129(a)(7) is satisfied with respect to all creditors.

60.     The Non-Settling Insurers have argued that the Plan fails the best-interest-of-creditors test because the Plan enjoins Equitable Contribution Claims against Settling Insurers and Bayside. The court concludes these objections are irrelevant under section 1129(a)(7). For the reasons stated in the accompanying opinion, the court concludes that it must consider only the value of the property that each dissenting creditor would receive or retain on account of his or her claim against the *debtor* in a chapter 7 liquidation.

61.     Based on the evidence presented, the court finds as a factual matter that the Non-Settling Insurers will receive at least as much under the Plan as they would receive in a liquidation under chapter 7, and that they failed to prove they would receive more from third parties in a liquidation under chapter 7.

62.     Conversion of this case to chapter 7 would also likely be accompanied by additional costs and further delay in the distribution of property of the estate, thereby diluting the amounts presently available for distribution to Class 3 creditors under the Plan.

63.     Section 1129(a)(8) requires that each impaired class accept the Plan. A class accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan, counting only those claims whose holders actually vote on the Plan. See 11 U.S.C. § 1126(c).

64.     Class 1 (Priority Employee Claims) and Class 2 (Miscellaneous Secured Claims) are unimpaired and, pursuant to section 1126(f), are deemed to have accepted the Plan. Solicitation of acceptances with respect to such Classes was not required.

65.     Class 4 (Asbestos Injury Claims and Asbestos Indirect Claims) is impaired under the Plan, was given adequate opportunity to vote to accept or reject the Plan, and voted to accept the Plan by 100 percent in number and 100 percent in amount.

66.     The Plan does not contemplate any distribution to the impaired holders of Interests in Class 5. Accordingly, pursuant to section 1126(g), Class 5 is deemed to have rejected the Plan.

Case: 09-31347   Doc# 2052   Filed: 03/15/12   Entered: 03/16/12 14:24:34   Page 13 of 32

Class 3 (Unsecured Claims) is impaired and has voted to reject the Plan. Although the requirements of section 1129(a)(8) are not satisfied regarding Class 3 and Class 5, the Plan may be confirmed pursuant to section 1129(b), as the Plan does not discriminate unfairly and is fair and equitable with respect to both classes, as described below.

67.     In accordance with section 1129(a)(9)(A), the Plan provides for the payment of all allowed administrative claims in full in cash on the Effective Date.

68.     Claims entitled to priority under sections 507(a)(4) and (a)(5) are classified as Class 1 (Priority Employee Claims). Currently, there are no Class 1 claims. There are also no claims entitled to priority under sections 507(a)(1), (a)(6), (a)(7), (a)(9) or (a)(10). If Class 1 claims are filed late and allowed, the Plan provides, in accordance with section 1129(a)(9)(B), for payment in full in cash.

69.     There are no tax claims entitled to priority under section 507(a)(8). If any such claims are filed late and allowed, the Plan provides, in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D), for payment in full in cash on the Effective Date or through deferred quarterly cash payments with interest.

70.     The Plan has been accepted by at least one class of impaired claims entitled to vote on the Plan (Class 4) (determined without including any acceptance of the Plan by any insider).

71.     For the reasons stated in the accompanying opinion, the court finds that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

72.     The Plan provides that all fees payable pursuant to 28 U.S.C. § 1930 that are due prior to the Effective Date will be paid in full by the Debtor in cash prior to or on the Effective Date. Fees payable under 28 U.S.C. § 1930 that are due after the Effective Date are to be timely paid by the disbursing agent pursuant to the Plan.

73.     The Debtor has no existing obligations to pay "retiree benefits" within the meaning of section 1114. Section 1129(a)(13) is inapplicable.

74.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) apply to individual debtors or non-profit entities, and thus are not applicable here.

75. A plan may be confirmed pursuant to the "cramdown" provisions of section 1129(b) even though the requirements of section 1129(a)(8) are not satisfied.

76. The Plan satisfies the "cramdown" requirements of section 1129(b) with respect to Class 5, which is impaired and will not receive any distribution under the Plan, and Class 3, which is impaired and has voted to reject the Plan. Section 1129(b) provides that, if all the requirements of section 1129(a) are satisfied (with the exception of section 1129(a)(8)), a plan may be confirmed over the vote of an impaired rejecting class as long as the plan "does not discriminate unfairly" and is "fair and equitable" with respect to impaired, non-consenting classes.

77. Section 1129(b)(1) prohibits only discrimination that is "unfair". See In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 656 (9th Cir. 1997). The Plan does not discriminate unfairly between Class 3 and Class 4 because the separate classification and treatment of Class 3 and Class 4 is required by section 524(g)(2)(B)(ii)(IV), which requires the creation of a "separate class or classes of the claimants whose claims are to be addressed by a trust". The Asbestos Injury Claims (in Class 4) are channeled to the Trust under the Plan, and thus are required to be separately classified from other unsecured claims. See Plan Exhibit A (Channeling Injunction).

78. Moreover, to maintain equitable treatment between Class 3 and Class 4, the Plan utilizes the concept of the Unsecured Claims Percentage and provides for the division of the Debtor's cash and other assets between the Unsecured Claims Reserve (for the benefit of holders of Class 3 Claims) and the Trust (for the benefit of holders of Class 4 Claims). The Unsecured Claims Percentage was negotiated between, and agreed to by, the Plan Proponents and the insurers in Class 3, and thus reflects the parties' agreement that any discrimination between Class 3 and Class 4 is fair. The Non-Settling Insurers do not contend otherwise. For these reasons, the Plan does not discriminate unfairly between Class 3 and Class 4.

79. The Plan also does not discriminate unfairly against Class 5, which consists of legally distinct equity interests that were properly classified in their own class.

80. Section 1129(b) applies to determine whether there is unfair discrimination "with respect to each class of claims or interests" and thus only applies to Classes 1 through 5 of the Plan. The

objections of the Non-Settling Insurers with respect to unfair discrimination relate solely to the Plan's treatment of their Equitable Contribution Claims against third parties. Such claims are not classified under the Plan because they are not claims against the Debtor. The unfair discrimination standard of section 1129(b) does not extend to claims against non-Debtor parties.

81.     Section 1129(b)(2)(B) provides that a determination of whether a plan is "fair and equitable" with respect to a class of unsecured claims includes whether "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property" (this requirement is commonly known as the absolute priority rule).

82.     The Plan satisfies section 1129(b)(2)(B) and is thus fair and equitable with respect to Class 5 because: (a) no claims or interests are junior to the Interests in Class 5, and therefore no claim or interest junior to the Interests in Class 5 will receive or retain any property under the Plan; and (b) the holders of Class 5 interests have consented to their treatment under the Plan.

83.     The Plan satisfies section 1129(b)(2)(B) and is thus fair and equitable with respect to Class 3 because: (a) Class 5, the only class junior to Class 3, does not receive or retain any property under the Plan; and (b) holders of claims in Class 1 and Class 2, which are senior to Class 3 claims, will not receive property worth more than the Allowed Amount of their Claims.

84.     The absolute priority rule prohibits a class that is legally junior in priority to a non-consenting senior class from receiving any recovery, unless the senior class has been paid in full. Contrary to the Non-Settling Insurers' assertions, the absolute priority rule does not apply to prevent the current holders of Bayside's equity interests from retaining property under the Plan. This is so, because Plant, not Bayside, is the debtor in this case, and Plant, not Bayside, is therefore the entity that the absolute priority rule applies to. See 11 U.S.C. § 1129(b)(2)(B)(ii). Under the Plan, the current equity holders of Bayside will receive 60 percent of the stock in the Reorganized Debtor. This 60 percent interest is not provided on account of any interest of Mr. Ameli or Mr. Badakhshan to the Debtor, because they do not currently hold any interest in the Debtor. Mr. Ameli and Mr. Badakhshan will receive the 60 percent equity interest in the Reorganized Debtor solely on account of the merger transaction under the Plan by which Bayside

(which is currently owned 100 percent by Mr. Ameli and Mr. Badakhshan) will be merged into Plant. Asbestos plaintiffs have asserted that Bayside is the alter ego of Plant. The court was not required to determine whether or not an alter ego relationship exists under state law. The equityholders, management, and boards of Plant and Bayside have been separate. Accordingly, the court concludes that section 1129(b)(2)(B) does not apply so as to limit what property can be granted to the current owners of Bayside.

85.     The objection that the Plan is not "fair and equitable" because it purports to extinguish Equitable Contribution Claims without just compensation is not cognizable under section 1129(b). The fair and equitable requirement of section 1129(b) applies with respect to a class of claims against the debtor and thus does not apply to contribution claims against third parties. Because the statute requires consideration of what a "holder of a claim of such class receive[s] or retain[s] *on account of such claim*," (emphasis added), it does not extend to consideration of what holders of claims against the Debtor might receive or retain with respect to <u>other</u> claims they might have against <u>other</u> entities. To the extent that any fair and equitable requirement applies, the court finds that the Plan treats Equitable Contribution Claims fairly and equitably.

86.     The Plan is the only plan that has been filed in this case. The requirements of section 1129(c) are satisfied.

87.     The principal purpose of the Plan is not the avoidance of taxes or application of section 5 of the Securities Act.

**E.      THE DEBTOR IS ENTITLED TO A DISCHARGE UNDER SECTION 1141(d)**

88.     Section 1141 provides for a discharge unless: (a) the plan provides for the liquidation of all or substantially all of the property of the estate; (b) the debtor does not engage in business after consummation of the plan; <u>and</u> (c) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7.

89.     The Debtor is entitled to a discharge because the Reorganized Debtor will engage in business after consummation of the Plan. It is likely that the Reorganized Debtor will be able to continue as an operating business in the insulation contracting industry indefinitely after the Effective Date.

## F.  COMPLIANCE WITH SECTION 524(g)

90.     The Plan complies with all requirements of section 524(g).  The Plan Proponents have met their burden of establishing all elements for relief under section 524(g).

91.     Pursuant to sections 524(g)(1)(B) and 524(g)(4)(A)(ii), the Plan provides for the court to enjoin claims by Non-Settling Insurers against Settling Insurers, including those arising under state law for equitable contribution, subrogation, and indemnity (Equitable Contribution Claims). The Non-Settling Insurers have asserted that the proposed injunctions are improper unless they include both: (a) a judgment-reduction provision so that Non-Settling Insurers are required only to pay their "fair share" of any judgments entered against them; and (b) a Trust Backstop so that the Trust pays the Non-Settling Insurers any costs they incur and can prove would have been the responsibility of Settling Insurers that are not satisfied through judgment reduction.  For the reasons stated in the accompanying opinion, the court concludes that the Plan is fair and equitable in its treatment of insurer Equitable Contribution Claims enjoined under section 524(g).

92.     The court finds it appropriate that the Channeling Injunction and the Settling Asbestos Insurer Injunction issue in connection with the confirmation of the Plan.

93.     The establishment of the Trust is in accordance with section 524(g).  The Trust is: (a) approved by the Bankruptcy Court and is subject to its continuing jurisdiction; (b) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising out of a tort, breach of contract, or violation of law; (c) a trust under applicable state law; and (d) is a "Qualified Settlement Fund" as provided under the Internal Revenue Code.

94.     The Injunctions being issued satisfy the requirements of section 524(g).  On the Effective Date, the Injunctions shall be deemed issued, entered, valid, and enforceable according to their terms and shall supplement the discharge of the Debtor to the fullest extent permissible by sections 524(g) and 105(a) of the Bankruptcy Code.  The Injunctions shall be permanent and irrevocable and may only be modified by the District Court to the extent permitted under sections 524(g)(2)(A), 524(g)(3)(A)(i), and 524(g)(6).  Each of the Protected Parties is entitled to the

Case: 09-31347   Doc# 2052   Filed: 03/15/12   Entered: 03/16/12 14:24:34   Page 18 of 32

protection of the Channeling Injunction under section 524(g). The Settling Insurers are entitled to the protections of the Settling Asbestos Insurer Injunction under section 524(g).

95. The transfer by the Debtor of its Asbestos Insurance Settlement Rights to the Trust, and the vesting of the Asbestos Insurance Settlement Rights in and for the benefit of the Trust, pursuant to section 5.5.1 of the Plan, are valid and enforceable. The Trust shall assume responsibility for, and be bound by, all obligations of the Debtor under any Asbestos Insurance Settlement and any other settlement agreement with an Asbestos Insurer.

96. As of the Petition Date, the Debtor was named as a defendant in over 6,000 pending asbestos cases. Section 524(g)(2)(B)(i)(I) requires the Trust to assume Plant's liabilities for "damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products". Under the Plan, the Trust does so. The Trust is established to pay Asbestos Injury Claims, Asbestos Indirect Claims, and Asbestos Injury Demands.

97. The fact that the Plan permits Asbestos Claimants to pursue Asbestos Related Claims in the tort system does not negate compliance with section 524(g)(2)(B)(i)(I). The right to pursue Asbestos Related Claims in the tort system is in addition to an Asbestos Claimant's right to recover from the Trust. Sections 5.2.6 and 5.2.7 of the Plan, which govern the right to pursue tort claims, do not offend section 524(g)(2)(B)(i)(I).

98. If Asbestos Claimants were not permitted to pursue Non-Settling Insurers, in addition to receiving a recovery from the Trust, Non-Settling Insurers would effectively receive a release of all liability under their policies. The Non-Settling Insurers have elected to make no contribution to the Trust that would make them eligible for section 524(g) protection (and the Trust cannot sue the Non-Settling Insurers under the April 2011 Stipulation). Sections 5.2.6 and 5.2.7 therefore are appropriate and consistent because they eliminate a potential windfall to the Non-Settling Insurers.

99. Section 524(g)(2)(B)(i)(II) requires the Trust "to be funded in whole or in part by the securities of [the debtor] . . . and by the obligation of such debtor . . . to make future payments, including dividends". The Plan satisfies this requirement in several ways.

100. First, the Trust will be funded by a $250,000 Reorganized Debtor Note and the payments

owed by the Reorganized Debtor to the Trust under that note during the five-year term of the Note. See 11 U.S.C. § 101(49) (indicating that the Reorganized Debtor Note is a "security" for purposes of section 524(g)(2)(B)(i)(II)).

101.    Second, the Trust will be funded by the Reorganized Debtor's contribution of 40 percent of its stock. Section 524(g)(2)(B)(i)(II) refers to "future payments, including dividends". The court concludes that the payment of a dividend is not required. The word "including" is not limiting. See 11 U.S.C. § 102(3); see also In re Western Asbestos Co., 313 B.R. 832, 851 (Bankr. N.D. Cal. 2003) ("If a chapter 11 debtor can satisfy its obligation to fund the Trust with a security by funding the Trust with a note, it makes no sense to read 11 U.S.C. § 524(g)(2)(B)(i)(II) as requiring the payment to be in the form of a dividend."). The Reorganized Debtor may nonetheless be sufficiently successful to issue dividends to its equity holders, including the Trust.

102.    Third, the Trust will be funded by securities in the form of the Reorganized Debtor Warrant, which will permit the purchase of additional equity interests in the Reorganized Debtor at an agreed-upon price.

103.    The Plan satisfies section 524(g)(2)(B)(i)(III), which requires that the Trust "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of" the Reorganized Debtor, in two ways.

104.    First, the Reorganized Debtor Warrant allows the Trust to purchase shares in the Reorganized Debtor such that the Trust would own 51 percent of the outstanding shares. The Trust is not required to own a majority of the Reorganized Debtor's stock; it must merely be able to do so under "specified contingencies". The Plan provides for the possibility that the Trust will own 51 percent of the stock of the Reorganized Debtor. Section 524(g)(2)(B)(i)(III) is satisfied by the Reorganized Debtor Warrant.

105.    Second, section 524(g)(2)(B)(i)(III) is satisfied because the obligations of the Reorganized Debtor under the Reorganized Debtor Note are secured by the Reorganized Debtor Stock Pledge Agreement. Mr. Ameli and Mr. Badakhshan have pledged shares in the Reorganized Debtor sufficient to give the Trust ownership of 51 percent of the shares. In the event of a default under the Reorganized Debtor Note, the Trust could foreclose on the pledged shares, giving the Trust a

majority of the shares of the Reorganized Debtor.

106. The Non-Settling Insurers have asserted that this foreclosure right is illusory, arguing that if the Reorganized Debtor defaults under the Reorganized Debtor Note, the shares likely will have little or no value. There is no statutory requirement that the Reorganized Debtor continue to have certain value into the future. The court concludes that this objection is not legally cognizable. Furthermore, it is possible for a default to occur even while the shares remain valuable. The Reorganized Debtor Note includes certain events of default that are unrelated to the financial condition of the Reorganized Debtor. Even if a default were to occur for economic reasons, it could be the result of a lack of liquidity of the Reorganized Debtor and might not be indicative in any way of insolvency or lack of value in the Reorganized Debtor Shares. The objection that the possibility the Trust can own 51 percent of the Reorganized Debtor is "illusory" is factually incorrect.

107. The Plan satisfies section 524(g)(2)(B)(i)(IV), which requires the Trust to "use its assets or income to pay claims and [future claims]". The stated purpose of the Plan is to "liquidate, resolve, and pay Asbestos Related Claims in accordance with the TDP". The TDP provide that the Trust "shall make payments to holders of . . . claims . . . promptly as funds become available and as claims are liquidated". The fact that the Trust is making investments in Bayside does not mean that the Trust is not using its assets to pay claims. Any 524(g) trust can be expected to invest in some security or investment vehicle. There can be no guarantee that trust investments will generate positive returns. There is no legal requirement that positive returns be achieved. The Trust will likely be motivated to liquidate its investment in Bayside at some point. Any returns from the Bayside investment will go to pay Asbestos Related Claims or expenses of the Trust. The Bayside investment is consistent with section 524(g)(2)(B)(i)(IV).

108. Section 524(g)(2)(B)(ii)(I) requires the court to determine that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction". The court finds that Plant is likely to face a substantial number of additional Asbestos Related Claims in the Future.

109. Section 524(g)(2)(B)(ii)(II) requires the court to find that "the actual amounts, numbers,

and timing of such future demands cannot be determined". It is accepted that asbestos-related injury and disease begin at or near the time of each exposure to asbestos and can be latent for decades before disease is diagnosed. See, *e.g.*, Armstrong World Indus. v. Aetna Cas. & Surety Co., 45 Cal. App. 4th 1 (1996); Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034 (D.C. Cir. 1981); Ins. Co. of N. Am. v. Forty-Eight Insulations, 633 F.2d 122 (6th Cir. 1980). No party presented any evidence that the actual amounts, numbers, and timing of future demands can be determined at this time; at best, the total number and amount of such demands can be estimated. Thus, the court finds that the requirements of section 524(g)(2)(B)(ii)(II) have been met.

110. Section 524(g)(2)(B)(ii)(III) requires the court to find that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands". The pursuit of future claims outside the procedures prescribed by the Plan would threaten the Plan's equitable treatment of claims. Plant itself has no resources with which to pay claims. Plant might be able to settle with insurers absent the Plan, but there would be no mechanism for proceeds of settlements with the Settling Insurers to be distributed equitably among all Asbestos Claimants. Settlement proceeds would likely be subjected to a first-come, first-served run on the bank. Future claimants would be at an increased risk of receiving nothing.

111. Section 524(g)(2)(B)(ii)(IV) is satisfied. The Plan and Disclosure Statement clearly identify the terms of the Injunctions and a separate class of claimants whose claims are channeled to the Trust. Because Class 4 claimants voted unanimously in favor of the Plan, and did not elect to change their votes after being given an opportunity to do so, the 75 percent voting requirement is satisfied.

112. The Plan complies with section 524(g)(2)(B)(ii)(V), which requires the court to conclude that "the trust will operate through mechanisms . . . that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner".

113. The court overrules all objections and assertions that the TDP and matrix are improper. The Non-Settling Insurers contended that asbestos plaintiffs' counsel pursued a strategy to

"creat[e] a trust pursuant to § 524(g) . . . that would resolve and pay claims in the same liberal manner as they were paid under the CIGA Matrix".  Insurers' § 1129(a) Brief at 8:1-3.  But by the parties' April 2011 Stipulation, the Non-Settling Insurers and the Plan Proponents agreed not to litigate issues involving the TDP and matrix in the confirmation proceeding.  The Plan Proponents were permitted to offer minimal evidence in support of the findings required by section 524(g) with respect to the TDP matrix, so as long as they also agreed that the evidence they submitted was not binding on any insurers.  Paragraph 6(a) of the stipulation then provided, in relevant part, that the Non-Settling Insurers would not:

> in their objections to confirmation of the Plan, or otherwise in the Chapter 11 Case, make any objection that the Plan should not be confirmed because of (i) the terms of the TDP and/or the Case Valuation Matrix or the values set forth therein, or any references to such documents in the Disclosure Statement and Plan, including (but not limited to): (A) that such documents are unreasonable, inappropriate, unfair, or inequitable to the Insurers in any way; (B) that the medical evidence criteria set forth therein are improper; (C) that the "base case values," "Average Values," and other amounts ascribe inaccurate values to certain disease categories or claims; (D) that any site list is inaccurate; (ii) the assertion that the TDP and/or the Case Valuation Matrix were determined, negotiated, prepared, or drafted with a lack of good faith (specifically including for purposes of section 1129(a)(3) of the Bankruptcy Code) or in an otherwise inappropriate or collusive manner . . .

April 2011 Stipulation [Dkt. No. 1153].  Insurer arguments with respect to the TDP and the matrix are inappropriate and are barred by the April 2011 Stipulation.

114.    The court finds that the TDP and related procedures for paying Trust claims fairly approximate tort system outcomes and are closely modeled on procedures in other judicially-approved and operating 524(g) trusts, including the Western, Thorpe Insulation, and J. T. Thorpe trusts.

115.    Section 524(g)(4)(A) authorizes enjoining claims against third parties if certain requirements are met.  The protected third party must be "identifiable from the terms of such injunction (by name or as part of an identifiable group)".  11 U.S.C. § 524(g)(4)(A)(ii).  This requirement is satisfied as to Mr. Ameli and Mr. Badakhshan, who are identified by name as "Protected Parties" with respect to the Channeling Injunction.  Likewise, the existing Settling Insurers are expressly identified on Exhibit D to the Plan with respect to the Settling Asbestos Insurer Injunction.  Any future Settling Insurers are readily identifiable as part of an identifiable

group, because all future insurance settlements must be approved by the court.

116.    A third party protected by an injunction must be "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor". 11 U.S.C. § 524(g)(4)(A)(ii). The Committee and certain individual asbestos claimants have alleged that Mr. Ameli and Mr. Badakhshan may be personally liable for the asbestos claims against Plant. The Settling Insurers are alleged to be responsible to cover Plant's asbestos liabilities.

117.    In order to qualify for injunctive protection, Mr. Ameli and Mr. Badakhshan must be alleged to be directly or indirectly liable on asbestos claims arising out of Plant's conduct. 524(g)(4)(A)(ii). Such allegations have been made. The statutory requirement is met. They were involved "in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party," 11 U.S.C. § 524(g)(4)(A)(ii)(IV), with respect to the 2001 transaction between Plant and Bayside. They had "involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director, or employee of the debtor or a related party". 11 U.S.C. § 524(g)(4)(A)(ii)(II). The court finds that their role in the management of Plant before the 2001 transaction provides a colorable basis for asserting that they have liability to Plant's asbestos claimants.

118.    Bayside need not qualify for protection under the express terms of the statute, because the Reorganized Debtor, not Bayside, is the entity protected by the Injunctions. See Plan § 1.88 (defining the Reorganized Debtor as the "Protected Party"). In any event, Bayside would qualify under section 524(g)(4)(A)(ii)(IV) as a third party involved in a transaction that changed the corporate structure and affected the financial condition of Plant.

119.    The Non-Settling Insurers contend that weakness in the claims against Bayside, Mr. Ameli, and Mr. Badakhshan bars protection by the Injunctions. The statute requires only that a party be "alleged to be directly or indirectly liable". 11 U.S.C. § 524(g)(4)(A)(ii).

120.    Section 524(g)(4)(B) requires appointment of a futures representative and a finding that the injunctions are fair and equitable to the future claimants "in light of the benefits provided, or to be provided," to the Trust on behalf of the Protected Parties.

121.    The Honorable Charles B. Renfrew (Ret.) has been appointed as the Futures

Representative, and therefore section 524(g)(4)(B)(i) is satisfied.

122.    The Futures Representative is held to a high standard and is deemed to owe a fiduciary

duty to act in the best interests of future asbestos claimants.  See In re Combustion Eng'g, Inc.,

391 F.3d 190, 237 (3d Cir. 2004); Western Asbestos, 416 B.R. at 676.  In determining whether

the Injunctions are fair and equitable to future claimants, the court concludes that it should give

significant weight to the views of the Futures Representative.

123.    Mr. Renfrew has been appointed futures representative in three other asbestos-related

bankruptcy cases in which plans have been confirmed, and thus, he has the experience and

knowledge necessary to fulfill his fiduciary duties as Futures Representative.  The court has

reviewed Mr. Renfrew's declaration in support of confirmation of the Plan and finds that he

thoroughly investigated and considered relevant facts and information in reaching his opinion that

the Injunctions are fair and equitable to future claimants.  The court gives considerable weight to

his view that the Plan is "fair and equitable" to future claimants.

124.    The court has considered all relevant evidence, including Mr. Renfrew's views, and finds

that the contributions made by: (a) the Reorganized Debtor; (b) Mr. Ameli and Mr. Badakhshan;

and (c) the Settling Insurers, justify the issuance of the Injunctions for their benefit.

125.    The Debtor will contribute significant assets to the Trust, which will be funded primarily

from proceeds of settlements with insurers.  The settlements with Sompo, UNIC, Arrowood, and

Mt. McKinley collectively brought over $24 million into the Debtor's estate.  Post-confirmation,

these insurers will pay an additional $36 million to the Trust (from which certain fees, expenses,

and other items will be deducted).  The Debtor is contributing Asbestos Insurance Settlement

Rights, notably the rights to any future settlements with insurers, to the Trust.  These

contributions will benefit future claimants entitled to recover from the Trust.  The contributions of

Debtor assets justify inclusion of the Reorganized Debtor as a protected party.

126.    The court concludes that Bayside need not satisfy the standard set forth in section

524(g)(4)(B)(ii), because it is not a "Protected Party" under the Plan.  See Plan § 1.88.  If

Bayside were held to section 524(g)(4)(B)(ii) requirements, the court finds that it would be

appropriate to consider the total contributions to be made by the Reorganized Debtor, the entity protected by the Plan. Applying this standard, the court has considered the contributions made by Plant to the Trust along with those made by Bayside to determine whether the aggregate contribution being made is sufficient to warrant section 524(g) protection for the Reorganized Debtor.

127.    Based upon the facts and law, the court finds that the successor liability and alter ego theories above are at least colorable, and that the assertion of lawsuits against Bayside was in good faith and not a "sham".

128.    The court finds that it is fair and equitable to the future claimants to extend the benefits of the Channeling Injunction to Mr. Ameli and Mr. Badakhshan.

129.    They have agreed to sell to the Trust a significant minority stake in their business, and under the circumstance provided in the Warrant have agreed to sell a controlling interest. They have thus surrendered effective control of a business that they have managed and owned for the past ten years.

130.    They will pledge their stock in accordance with the Reorganized Debtor Stock Pledge Agreement to secure the Reorganized Debtor Note. This allows the Trust to foreclose on the Reorganized Debtor Note and take a controlling 51 percent interest in the Reorganized Debtor if there is a default under the Reorganized Debtor Note.

131.    They have agreed to work as President and Vice President of the Reorganized Debtor for a period of at least five years with potential extensions up to ten years. This is a significant contribution. The success of the Reorganized Debtor and its ability to produce revenue are substantially dependent on their specialized knowledge and experience. Their continued role in the Reorganized Debtor will significantly increase the probability that the Reorganized Debtor is successful, which will directly benefit the Trust through its stock ownership.

132.    If their shares in the Reorganized Debtor are purchased under the Shareholders' Agreement, Mr. Ameli and Mr. Badakhshan will be subject to a three-year non-compete clause. This will provide them an incentive to continue to work in pursuit of the Reorganized Debtor's success and not seek alternative business opportunities.

133.    Because they are the sole owners of Bayside, the court concludes that contributions made to the Trust by Bayside (most notably providing the Reorganized Debtor with an ongoing operating business) are properly deemed to be made "on behalf of" Mr. Ameli and Mr. Badakhshan under section 524(g)(4)(B)(ii).

134.    Because the allegations of asbestos related liability against Mr. Ameli and Mr. Badakhshan in their personal capacity are of little value, the court concludes that only a relatively small contribution is necessary to support their protection under section 524(g).

135.    The court credits the judgment of the Futures Representative that Mr. Ameli and Mr. Badakhshan will make a sufficient contribution to the Trust such that they are entitled to protection under the Channeling Injunction.

136.    The court finds that the contributions of the four Settling Insurers are significant and justify the issuance of the Settling Asbestos Insurer Injunction for their benefit.  The court has considered all relevant evidence in determining that the contributions by the Settling Insurers are fair and equitable to future claimants for purposes of section 524(g)(4)(B)(ii).  The opinion of the Futures Representative that the Injunctions are fair and equitable to future claimants is persuasive. Mr. Renfrew has concluded that the benefits provided, and to be provided, by the Settling Insurers are fair and equitable to future claimants.

137.    The adequacy of the Settling Insurers' contributions is supported by the arm's-length negotiations leading to the settlements.  When the court approved each of the Debtor's settlements with the Settling Insurers, it concluded that the settlements were in the best interest of the estate.  Plant's President and CEO submitted a declaration in support of each settlement, describing the arm's-length nature of the settlement negotiations and explaining the Debtor's need for a cash infusion.

138.    No party in interest has objected to confirmation of the Plan based on the sufficiency of the contributions made by the Settling Insurers.  No party objected to the adequacy of the settlement amounts when they were originally submitted to this court for approval.

139.    Upon consideration of all relevant credible evidence, the court finds that the Settling Asbestos Insurer Injunction is "fair and equitable" to future claimants.

140. In addition to the specific findings set forth above, the court concludes that the provisions of section 524(g) are generally designed to protect the interests of holders of asbestos injury claims, both present and future. The provisions of section 524(g) set forth the legislature's approach in balancing the interests of chapter 11 debtors and such claimants. While third party rights are protected, these provisions were not enacted in an effort to protect such third parties.

141. The court concludes that the Non-Settling Insurers have the right to be heard with respect to the Plan's proposed treatment of their Contribution Claims, which the court finds is part of the section 524(g) analysis here. However, to the extent that any Non-Settling Insurer is contesting the Plan's compliance with the other provisions of section 524(g), the court finds that the lack of any direct impact of these provisions on Insurers' rights is material to the court's consideration of the objections made. See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 643-44 (2d Cir. 1988); In re A.P.I. Inc., 331 B.R. 828, 857 (D. Minn. 2005), *aff'd sub nom by* OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 WL 1473004 (D. Minn. May 25, 2006); In re Quigley Co., 391 B.R. at 701-02.

## G. THE PLAN EFFECTS A REASONABLE SETTLEMENT BETWEEN PLANT, BAYSIDE, MR. AMELI, AND MR. BADAKHSHAN

142. The Plan incorporates a settlement of various claims between and among Plant, its creditors, Bayside, and Messrs. Ameli and Badakhshan. The Plan embodies a settlement of these claims that must be approved under the Bankruptcy Code.

143. Under Bankruptcy Rule 9019, the court must find that the proposed settlement was negotiated in good faith and is reasonable, fair, and equitable. The court must conclude that the settlement falls above "the lowest point in the range of reasonableness." See In re Pac. Gas & Elec. Co., 304 B.R. 395, 416-17 (Bankr. N.D. Cal. 2004). The court finds that Bayside and the Proponents engaged in extended, arm's-length negotiations in formulating the terms of the agreement.

144. Four primary factors apply when analyzing a settlement under Rule 9019: (a) the probability of success in the litigation; (b) the difficulties in collection; (c) the complexity, expense, and potential delay of the litigation; and (d) the paramount interest of creditors. In re

A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986); Pac. Gas, 304 B.R. at 417.

145.    The court finds that success in litigation against Bayside, Mr. Ameli, and Mr. Badakhshan
is uncertain.  The court further finds that litigation over successor liability and similar issues
would be complex and expensive.  The court finds that avoidance of the expense of litigation
weighs in favor of settlement.  Finally, the court finds that the consideration of the paramount
interest of creditors strongly favors settlement in this case.  Present claimants have expressed their
views on the Bayside transaction by a unanimous Class 4 vote in favor of the Plan in this case.
The Futures Representative also favors the Plant-Bayside settlement.  In fact, both the Committee
and the Futures Representative, as Plan Proponents, were directly and extensively involved in the
negotiations that led to the settlement embodied in the Plan.  These factors lead the court to
conclude that the paramount interests of creditors are served by the settlement.  Thus, on balance,
the court finds that each of the governing A & C Properties factors strongly favors the settlement
reflected in the Plan, and that the settlement falls well within the range of reasonableness.

## H.    SECTION 8.6.1 IS AN APPROPRIATE POST-PETITION EXCULPATION PROVISION

146.    The court approves the exculpation clause set forth in section 8.6.1 of the Plan as
appropriate.  That provision protects the Debtor, the Reorganized Debtor, the Committee, the
Futures Representative, the Settling Insurers, David Gordon, the Flintkote Company, and each of
their respective agents from certain claims and causes of action.  The provision is appropriately-
tailored.  It contains customary and appropriate carveouts for gross negligence and willful
misconduct.  See In re Friedman's, Inc., 356 B.R. 758, 763-64 (Bankr. S.D. Ga. 2005).

147.    The court has presided over this chapter 11 case since its commencement.  This has given
the court substantial opportunities to consider the conduct of all of the parties that would be
exculpated under section 8.6.1 of the Plan.  The court has had the opportunity at numerous
hearings to observe management and counsel to Plant, the Committee, counsel to the Committee,
the Futures Representative, and counsel to the Futures Representative.  This court has found
nothing that would indicate that their conduct since the Petition Date has been inappropriate or
wrongful such that they should not benefit from the exculpation clause of section 8.6.1.

148.    The Non-Settling Insurers have objected to the exculpation clause. The Non-Settling Insurers contend that section 8.6.1 cannot be approved because it contradicts section 524(e) of the Bankruptcy Code and is inconsistent with the Ninth Circuit rulings in In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995), and In re American Hardwoods Inc., 885 F.2d 621 (9th Cir. 1989). The court concludes that where an exculpation clause is limited to post-petition conduct relating to conduct occurring within a bankruptcy case, neither section 524(e) of the Bankruptcy Code nor the Ninth Circuit law cited by the Non-Settling Insurers is relevant because those limits apply to third-party releases of claims based on prepetition conduct. A post-petition exculpation clause may be approved where it is limited to the Debtor, the Committee, the Futures Representative, and certain third parties and their respective agents, as long as it contains an exception for bad faith, gross negligence, and willful misconduct. See In re Western Asbestos Co., 313 B.R. 832, 846-47 (Bankr. N.D. Cal. 2003); In re Lighthouse Lodge, LLC, 2010 WL 4053984, at *6-9 (Bankr. N.D. Cal. Oct. 14, 2010). Section 8.6.1 complies with this standard and is approved. See In re Birting Fisheries, Inc., 300 B.R. 489, 504 (B.A.P. 9th Cir. 2003).

## I.    MEDICARE REPORTING REQUIREMENTS

149.    As a result of the settlements between Plant and Arrowood, Sompo, UNIC, and Mt. McKinley, the court finds that the Settling Insurers have satisfied their obligations with respect to all Asbestos Related Claims. The Settling Insurers will not themselves be making any distributions to asbestos claimants or any determinations related thereto. Any payments will be made by the Trust or by Non-Settling Insurers. Thus, the Settling Insurers shall not be subject to any reporting requirements and obligations under the Medicare, Medicaid, and SCHIP Extension Act of 2007, 42 U.S.C. § 1395y, et. seq.

## J.    ISSUANCE OF ASBESTOS INSURER INJUNCTION

150.    The court finds that the issuance of the Asbestos Insurer Injunction is appropriate and warranted as an exercise of this court's equitable powers under section 105. The terms of this Injunction protect Non-Settling Insurers from California law direct action lawsuits. The Injunction can be lifted by the Trust pursuant to section 5.2.7 of the Plan. The Injunction provides a benefit to Non-Settling Insurers by prohibiting certain lawsuits against them, and the

Non-Settling Insurers did not object to issuance of this injunction. The Injunction limits the rights of asbestos claimants, but the unanimous vote of Class 4 in favor of the Plan indicates assent to the issuance of the Injunction.

151.    The Injunction will permit the Trust to properly manage the Declaratory Relief Action. By maintaining the Injunction in certain circumstances, the Trust will be in a position to avoid complications between any direct action litigation and the Declaratory Relief Action.

152.    The court finds that issuance of the Asbestos Insurer Injunction is warranted pursuant to section 105 of the Bankruptcy Code.

### K.    IMPACT OF PLAN ON INSURER RIGHTS GENERALLY – PREEMPTION AND NON-IMPAIRMENT

153.    The court has made findings of fact and conclusions of law necessary to determinations with respect to: (a) whether the Plan may be confirmed under sections 1129 and 524(g) of the Bankruptcy Code; and (b) related matters for which approval is sought by the Plan, such as relief under Bankruptcy Rule 9019 and approval of the Plan's exculpation provision.

154.    The Non-Settling Insurers assert that the court should include broad "non-impairment" language. This court acts properly in deciding factual matters necessary to confirmation. Whether factual findings may have legal consequences in other proceedings is not for this court to decide.

### L.    ALL OTHER NON-SETTLING INSURER OBJECTIONS ARE OVERRULED

155.    The Non-Settling Insurers filed approximately 275 pages of confirmation briefing in which they asserted myriad objections to confirmation of the Plan. The summary of Plan objections was itself approximately 55 pages in length. The court overrules each and every objection asserted by the Non-Settling Insurers that was not explicitly overruled above.

### M.    PLAN CONFIRMATION ORDER

156.    The Plan Proponents shall, after consulting opposing counsel, prepare a proposed form of order consistent with these findings and conclusions and the accompanying opinion. The court would prefer that the order not contain any findings, and that there be attached to the order an up-to-date version of the Plan incorporating the four amendments adopted by the Plan Proponents

1    and the additional amendment required by these findings and conclusions.

2

3            **\*\* END OF ADDITIONAL FINDINGS OF FACT**
       **AND CONCLUSIONS OF LAW RE PLAN CONFIRMATION \*\***