1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (SAN FRANCISCO DIVISION)

4

5    In re:

6    PLANT INSULATION COMPANY,              Case No. 09-31347-TC
     a California corporation,

7                                           Chapter 11

8                                           San Francisco,California
                                            January 28, 2014
9                                           9:30 a.m.
              Debtor.
10   _____/      **DAY TWO**

11
                   TRANSCRIPT OF TRIAL PROCEEDINGS
12
        MOTION TO MODIFY PLAN MOTION FOR AN ORDER (1) APPROVING
13   PLAN MODIFICATIONS CONSISTENT WITH NINTH CIRCUIT RULING,
     (2) ENTERING REVISED FINDINGS, AND (3) CONFIRMING MODIFIED
14    PLAN FILED BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15
              BEFORE THE HONORABLE THOMAS E. CARLSON
16                UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:

18
     Attorneys                  SHEPPARD, MULLIN, RICHTER &
19   for Creditors'             HAMPTON, LLP
     Committee:                 BY: MICHAEL H. AHRENS, ESQ.
20                                   STEVEN SACKS. ESQ.
                                     MICHAEL LAUTER, ESQ.
21                              Four Embarcadero Center, 17th Floor
                                San Francisco, California 94111
22

23   For the Hon. Charles       FERGUS LAW FIRM
     B. Renfrew, Futures        BY: GARY S. FERGUS, ESQ.
24   Representative:            595 Market Street, #2430
                                San Francisco, California 94105
25

1  APPEARANCES (CONTINUED):

2  For One Beacon            SNR DENTON US LLP
   Insurance Company:        BY: PHILIP A. O'CONNELL, ESQ.
3                            101 Federal Street, Suite 2750
                             Boston, Massachusetts 02110
4
                                      -and-
5
                             SNR DENTON US LLP
6                            BY: ROBERT B. MILLNER, ESQ.
                             233 S. Wacker Drive, Suite 7800
7                            Chicago, Illinois 60606

8                                     -and-

9                            SNR DENTON US LLP
                             BY: MEEGAN L. BUCKLEY, ESQ.
10                           525 Market Street, #2600
                             San Francisco, California 94105
11

12 For Safety National:      DUANE MORRIS LLP
                             BY: PHILIP R. MATTHEWS, ESQ.
13                           Spear Tower
                             One Market Plaza, Suite 2200
14                           San Francisco, California 94105

15
   For United States         TROUTMANM SANDERS LLP
16 Fire Insurance Company:   BY: CLINTON CAMERON ESQ.
                             55 West Monroe Street, Suite 3000
17                           Chicago, Illinois 60603

18                                    -and-

19                           MUSICK PEELER AND GARRETT LLP
                             BY: CHAD WESTFALL, ESQ.
20                           100 Montgomery Street #2525
                             San Francisco, California 94104
21                                    -and-

22                           MUSICK, PEELER & GARRETT, LLP
23                           BY: LAWRENCE A. TABB, ESQ.
                             One Wilshire Boulevard, Suite 2000
24                           Los Angeles, California 90017

25

1  APPEARANCES (CONTINUED):

2

   For USF&G:              SIMPSON, THACHER & BARTLETT LLP
3                          BY: ANDREW T. FRANKEL, ESQ.
                           425 Lexington Avenue
4                          New York, New York 10017

5

6  For Insurance Company   VALERIE MOORE, ESQ.
   of the West:

7

8  For American Home,      LAW OFFICES OF LYNBERG & WATKINS
   National Union, and     BY: JUDY MOROTTI, ESQ.
9  Insurance Company of the 888 South Figueroa St., 16th Floor
   State of Pennsylvania:  Los Angeles, California 90017

10                                 -and-

11                         ZEICHNER, ELLMAN and KRAUSE LLP
                           BY: MICHAEL S. DAVIS, ESQ.
12                         575 Lexington Avenue
                           New York, New York 10022

13

14                         (APPEARING TELEPHONICALLY)

15

16 For Bayside:            LAW OFFICES OF RONALD W. ISHIDA
                           BY: RONALD W. ISHIDA, ESQ.
17                         433 Montgomery Street, Suite 810
                           San Francisco, California 94104

18                                 -and-

19                         SCHNADER, HARRISON, SEGAL & LEWIS
                           BY: GEORGE H. KALIKMAN, ESQ.
20                         650 California Street, 19th Floor
                           San Francisco, California 94108

21

22

23

24

25

```
1    APPEARANCES (CONTINUED):

2
     Court Recorder:          JANE GALVANI
3                             UNITED STATES BANKRUPTCY COURT
                              235 Pine Street
4                             San Francisco, California 94104

5

6    Transcription Service:   Jo McCall
                              Electronic Court
7                             Recording/Transcribing
                              2868 E. Clifton Court
8                             Gilbert, Arizona 85295
                              Telephone: (480)361-3790
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

I N D E X

| Plan Proponents' Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Insurers' Witness:

Hall, Bradley Baker

    By Mr. Fergus                    12

    By Mr. O'Connell                        40

Beaton, Neil Joseph

    By Mr. Fergus                    48              90

    By Mr. Millner                          84

                                                      Page

All Exhibits Stipulated into Evidence                 8


Closing Argument:                                     Page

By Mr. Ahrens                                         95
                                                      145
By Mr. Millner                                       116

1      P R O C E E D I N G S

2  January 28, 2014                          9:30 A.M.

3                       --—oOo—--

4      (The recording machine is not functioning for a few

5  moments.)

6          MR. ISHIDA: Good morning, Your Honor, Ron Ishida

7  on behalf of Bayside Insulation and Construction, formerly

8  known as Plant Insulation Company.

9          MR. KALIKMAN: Good morning, Your Honor, George

10 Kalikman, Schnader, Harrison, Segal & Lewis for Bayside.

11         MR. MILLNER: Good morning, Your Honor, Robert

12 Millner and my partner Phil O'Connell for the One Beacon

13 Insurance Company.

14         MR. O'CONNELL: And also Meeghan Buckley of our

15 office, Your Honor.

16         THE COURT: Okay.  Good morning.

17         MR. MATTHEWS: Good morning, Your Honor, Phil

18 Matthews of Duane Morris for Safety National.

19         MR. CAMERON: Good morning, Your Honor, Clinton

20 Cameron on behalf of U.S. Fire.  I'm here with my co-

21 counsel, Larry Tabb and Chad Westfall.

22         MS. MOORE: Good morning, Valerie Moore for

23 Insurance Company of the West.

24         MR. FRANKEL: Good morning, Your Honor, Andy

25 Frankel for USF&G.

1          MS. MOROTTI: Good morning, Your Honor, Judy

2   Morotti of Lynberg and Watkins for American Home National

3   Union and Granite State Insurance Companies.

4          MR. DAVIS: And if I may, Your Honor, Michael

5   Davis on the telephone for the same.

6          THE COURT: Okay.  Is that everyone?

7          MR. LAUTER: One more, Your Honor, Michael Lauter

8   of Sheppard Mullin for the Committee.

9          THE COURT: Okay.

10          MR. LAUTER: And, Your Honor, we have one

11   housekeeping matter to start off with.

12          THE COURT: Okay.

13          MR. LAUTER: Counsel for the Plan Proponents and

14   counsel for the non-settling insurers have met and

15   conferred on admission of the various documents that are in

16   exhibit binders that you have at your table, and we have a

17   joint trial exhibit list on remand that we've marked as

18   Trial Exhibit 2000, and it is the same document that is

19   indexed in the binders.  I just wanted to present it –-

20   it's our stipulation as to the admissibility of the various

21   documents.  There are columns on the list indicating for

22   what purposes everything is –-

23          THE COURT: All right.  Are there any unresolved

24   matters?

25          MS. BUCKLEY: No, Your Honor.

1          MR. LAUTER: No unresolved.

2          THE COURT: Wonderful.

3          MS. BUCKLEY: There is one document that needs to

4  be subbed out that needs to be corrected, but there's no

5  dispute at to admissibility.

6          THE COURT: Okay.  That's great.  Thank you.

7          MR. LAUTER: I should probably hand up a copy

8  that's marked.  It is the same thing.

9          THE COURT: You can hand it up if you want, but I

10  don't think I'll need it.

11          MR. LAUTER: Okay.  All right.  Thank you.

12          MR. O'CONNELL: Your Honor, to the extent there's

13  any need, we hereby formally move all the documents into

14  evidence.

15          MR. AHRENS: So stipulated.

16          THE COURT: All right.  And the Court will admit

17  them as stipulated in that document.

18          MR. O'CONNELL: Thank you.

19                              (Whereupon, all documents as

20                              stipulated in the Joint Trial

21                              Exhibit binders, are admitted into

22                              evidence.)

23          THE COURT: Okay.  And I think we agreed that

24  there would be no opening statements, so we have some

25  witnesses to be cross-examined.  And the Plan Proponents

1 have the burden.  They're going first, so I think their

2 witnesses go first, correct?

3            MR. SACKS: That's right, Your Honor.

4            THE COURT: Isn't that what we decided?

5            MR. SACKS: We have one witness for you today,

6 Your Honor.  That's Curtis Kimball, who's our expert

7 witness, and we would move the admission of his declaration

8 into evidence at this time.

9            THE COURT: Any objection?

10            MR. O'CONNELL: No, Your Honor.

11            MR. SACKS: We'd call Mr. Kimball to the stand for

12 cross-examination.

13            THE COURT: All right.

14    CURTIS ROLLIN KIMBALL, PLAN PROPONENTS' WITNESS, SWORN

15            THE CLERK: Do you solemnly swear or affirm that

16 the testimony you are about to give will be the truth, the

17 whole truth, and nothing but the truth?

18            THE WITNESS: I do.

19            THE CLERK: Thank you.  Please be seated and state

20 your name for the record.

21            THE WITNESS: My full name is Curtis, C-u-r-t-i-s,

22 Rollin, R-o-l-l-i-n, Kimball, K-i-m-b-a-l-l.

23            THE COURT: All right.  Please go ahead.

24            MR. MILLNER: Your Honor, Robert Millner for One

25 Beacon.  We're going to waive cross-examination of the

1   witness, Your Honor.

2           THE COURT: Okay.  Then there's no redirect.

3           MR. SACKS: That's correct, Your Honor.  We would

4   note, however, that the insurers have submitted following

5   the submission of Mr. Kimball's declaration rebuttal

6   declarations by their witnesses, and so we --

7           THE COURT: So do you want to have him --

8           MR. SACKS:  -- we would like Mr. Kimball to

9   testify with respect to those rebuttal materials, and he

10  can do that following their testimony, if that's

11  appropriate.

12          MR. MILLNER: Your Honor, Robert Millner again.  I

13  actually object to this because we did submit a rebuttal

14  declaration one week ago of Mr. Beaton.  We filed it on

15  Tuesday morning, a week ago, the 21st.  We've had no notice

16  that the other side wished to present rebuttal to Mr.

17  Beaton's declaration.  You may recall, Your Honor, that the

18  Kimball declaration came in late, and although styled as a

19  rebuttal declaration, Your Honor had observed yourself that

20  it was really a late opening declaration.  The actual

21  scheduling order that Your Honor entered earlier, 11-26,

22  Docket No. 2646, said that the parties may submit expert

23  testimony by declaration, subject to cross-examination.  So

24  I think that if Mr. Sacks wished to present a rebuttal

25  declaration by Mr. Kimball, we should have been given

1  notice and some opportunity to deal with that.  Those were

2  simply not the rules of this game and because of that, if

3  Mr. Kimball were to now give his rebuttal declaration by

4  oral testimony, I would have to cross-examine him blind

5  with no deposition.

6  THE COURT: I'm going to resolve this after I hear

7  the testimony of the cross-examination of the insurers'

8  experts.  Okay?

9  MR. MILLNER: Okay.

10  THE COURT: You're not calling them now anyway.

11  MR. SACKS: So by not requesting to question Mr.

12  Kimball now, then we're not waiving the right to proceed as

13  the Court rules on --

14  THE COURT: There's really nothing to examine him

15  on at the moment.  I'll deal with the other matter.  Mr.

16  Kimball, you may step down, at least for the moment, and

17  when you come back, you'll still be under oath.

18  MR. SACKS: Thank you, Your Honor.

19  THE COURT: Thank you.  All right.

20  MR. O'CONNELL: Your Honor, the insurers call Brad

21  Hall to the stand.  Mr. Hall's declaration is already in

22  evidence as Exhibit 2024 in Your Honor's binder, and he's

23  submitted for cross-examination.

24  BRADLEY BAKER HALL, INSURERS' WITNESS, SWORN

25  THE CLERK: Do you solemnly swear or affirm that

1  the testimony you are about to give will be the truth, the

2  whole truth, and nothing but the truth?

3          THE WITNESS: I do.

4          THE CLERK: Thank you.  Please be seated and state

5  your name for the record, please.

6          THE WITNESS: Yes, my full name is Bradley Baker

7  Hall.

8          THE COURT: Good morning.

9          MR. FERGUS: May I approach, Your Honor?  I have a

10  certified transcript of Mr. Hall.

11          THE COURT: Yes.

12          MR. FERGUS: I'll provide Mr. Hall with a copy.

13                      CROSS-EXAMINATION

14  BY MR. FERGUS:

15  Q    Good morning, Mr. Hall.  How are you today?

16  A    I'm good, thank you.

17  Q    Mr. Hall, would you look at Exhibit 2024, which should

18  be in the binders next to you.  They're numbered, and 2024

19  is your declaration.  If you need assistance finding it,

20  let me know, and I'll help you.

21  A    I think I could use some assistance.

22          MR. FERGUS: May I approach the witness, Your

23  Honor?

24          THE COURT: Yes.

25          MR. FERGUS: And I'll just point out to the

 1  witness that in these binders, only the last two digits of

 2  the exhibit number appear on the tab.  So your declaration

 3  as 2024 is under Tab 24.  We'll be going to some other

 4  exhibits, and maybe that'll save us some time.

 5          THE WITNESS: Okay.

 6  BY MR. FERGUS:

 7  Q    Would you please take a moment to look at Exhibit 2024

 8  and confirm that it is in fact the declaration you had

 9  submitted and that is your signature at the end.

10  A    Yes, this is.

11  Q    As you sit here today, are there any corrections,

12  modifications, or additions that you believe are necessary

13  to be made?

14  A    There is one modification that I think is necessary,

15  and that is with regards to the opinion on if Bayside was

16  required to repay the two million dollars of equity

17  investment.  In that opinion, I stated that my assumption

18  was that Bayside would take advantage of its opportunity to

19  borrow on the revolving line of credit as provided by the

20  trust to be able to make such a payment.  My conclusion was

21  that it would leave them without further borrowing

22  capability and a deficit net worth -- deficit working

23  capital position and not viable going forward.  But

24  nevertheless, I suggested that they would have access to

25  that line.

1          Since my declaration and since my deposition,
2   there's been additional discovery provided that suggests
3   that the guaranty that Bayside has provided to Wells Fargo
4   Bank in support of the SAAB loan is in fact a secured
5   guaranty of Bayside, which would cause as a result of that
6   guaranty, there to be a lien on the assets of Bayside.  In
7   reviewing the trust revolving financing agreement, the
8   definition of "eligible accounts receivable," is such that
9   it requires that the receivables be free and clear of liens
10  for them to be eligible.  If in fact Wells Fargo has a lien
11  on those assets, then there would be no eligible
12  receivables and there would not be a capability to borrow
13  on that financing agreement.
14  Q    Does that complete the additions, modifications, or
15  changes you believe are necessary to Exhibit 2024?
16  A    Yes, sir.
17  Q    Now, you were referring, I believe, to your Opinion
18  No. 6, which starts on page 12 of Exhibit 2024 and carries
19  over onto pages 13 and 14; isn't that correct?
20  A    Yes, that's correct.
21  Q    And one of the things that you believe is true is that
22  a primary balance sheet metric to indicate the financial
23  strength of a company is net worth; isn't that right?
24  A    That is one of the indicators of financial strength,
25  yes.

1  Q    Okay.  And you have had an opportunity to review the

2  financial statements produced by Bayside for different

3  periods; is that correct?

4  A    I've reviewed several financial statements, so I'm not

5  sure which one specifically you're referring to.

6  Q    We'll get right to that.

7  A    Okay.

8  Q    And you've also reviewed an audited financial

9  statement from RINA, the accounting firm for Bayside; isn't

10 that right?

11 A    I have reviewed the RINA statement, yes.

12 Q    Okay.  So if you could look at Exhibit 21 in the

13 binder, 21 should be the statement by RINA of Bayside's

14 financial condition as of December 31, 2012.  Do you have

15 that before you?

16 A    I have Exhibit 21.  You indicated that it states the

17 financial condition of Bayside, and I would just note that

18 the financial statement actually says that it is the

19 operational activities of Bayside, and based on my review

20 of the statement and my declaration, I do not believe this

21 is the financial statement of the reorganized Debtor.

22 Q    Okay.  And so when you say that it is the financial

23 statement of the operational activities of Bayside

24 Insulation and Construction, Inc., you understand that to

25 be their construction activities; isn't that correct?

1    A    Yes.  I understand that that's how they have defined

2    it.  I would explain to you that in my 40 years of

3    reviewing financial statements, I have never seen an

4    audited financial statement with such a limitation of its

5    scope on the report itself.  All financial statements,

6    audited financial statements which I've seen in my 40 years

7    of looking at them, purport to be a financial statement of

8    a specific entity or group of entities, which are described

9    in the transaction, and this statement does not do that.

10    Q    You're not a licensed certified public accountant; are

11    you?

12    A    I am not.

13    Q    You're not trained as an accountant; is that correct?

14    A    I have no CPA and I have not been trained to be a CPA.

15    Q    Okay.  Now do you have any dispute after having looked

16    at the discovery and -- first of all, you read the

17    deposition of Brad Gai; did you not?

18    A    I did.

19    Q    Okay.  And I can't recall, did you attend Mr. Gai's

20    deposition?

21    A    No, sir, I did not.

22    Q    But you've read his deposition; is that correct?

23    A    That's correct.

24    Q    Okay.  And Brad Gai in his deposition testified that

25    he was --

1          THE COURT: Is he from the accounting firm?

2          MR. FERGUS: I'm sorry, Your Honor.

3          THE COURT: Is he from the accounting firm?

4          MR. FERGUS: Yes, he is.  He is the partner in

5    charge at RINA.  And, Your Honor, we've designated

6    testimony of Brad Gai.  He will not be appearing as a

7    witness.

8    BY MR. FERGUS:

9    Q    But Mr. Gai testified that in his opinion as a CPA, it

10   was important to focus on the construction activities of

11   Bayside for purposes of doing this financial audit as he

12   understands it related to bonding those activities.  Do you

13   recall that testimony?

14   A    I do recall the testimony.

15   Q    Okay.  All right.  And you don't have anything, as you

16   sit here today, to disagree with what Mr. Gai did in terms

17   of his description of the purpose for which he prepared

18   that report.

19   A    I have not heard a CPA in the past describe an audited

20   report for a singular purpose of providing it to a bonding

21   company.  So I understand his comment.  I would just tell

22   you that it is highly unusual that such a report would be

23   issued for that single purpose.

24   Q    Okay.  In your experience; is that right?

25   A    That's correct.

1  Q    And you are not a licensed appraiser; is that correct?

2  A    That's correct.

3  Q    And in fact, you're not a member of the Chartered

4  Financial Analysts; are you?

5  A    I am not.

6  Q    You have never been asked to give an opinion of the

7  value of equity securities; have you?

8  A    That's correct.

9  Q    And you've never been asked to give an opinion on the

10  value of a small business; isn't that correct?

11  A    That's correct.

12  Q    Okay.  Now in fact, you have in your experience never

13  dealt with a right of first offer agreement; isn't that

14  also true?

15  A    I have not been involved in a transaction where there

16  was a right of first offer in place; that's correct.

17  A    Okay.  And in fact, you have never been involved in a

18  transaction for a small company where the value of that

19  company was determined by two appraisals; isn't that right?

20  A    That is correct.

21  Q    Now you were concerned in Opinion 6 about a

22  hypothetical, what happens if Bayside is required to pay

23  back two million dollars; is that correct?

24  A    That's correct.

25  Q    And you have, as part of your assignment, reviewed the

1  original term sheet between Bayside and the Plan

2  Proponents, the beneficiaries of the trust regarding the

3  Bayside original transaction; isn't that correct?

4  A    You're speaking of the binding term sheet between the

5  two parties?

6  Q    Yes.

7  A    Yes, I have.

8  Q    And in fact, you've also reviewed the second amended

9  binding term sheet; isn't that correct?

10 A    I have, yes.

11 Q    Okay.  And under the original binding term sheet,

12 there was a provision for a put right for the trust.  Do

13 you understand what I mean by those terms?

14 A    I do.

15 Q    Okay.  And you're aware that under the original put

16 right, the trust could require under that original

17 agreement Bayside to pay back the two million dollars plus

18 other monies; isn't that right?

19 A    I don't recall the full terms of the put agreement.

20 So I don't know if that's correct or not.

21          MR. FERGUS: May I have one moment, Your Honor?

22          THE COURT: Yes.

23      (Pause.)

24          MR. FERGUS: Your Honor, may I approach the

25 witness?

1            THE COURT: Yes.

2            MR. FERGUS: I'm marking what's been marked as

3  Exhibit 2083, which is next in order.

4  BY MR. FERGUS:

5  Q    Would you please look at Exhibit 2083.  Have you had

6  an opportunity to look at it?

7  A    I've not read it, but I have the exhibit that you

8  provided me, yes.

9  Q    Have you ever seen this document before?

10  A    I don't recall if I've seen this specific document,

11  but I am aware that there was a put/call provision in the

12  original agreement.

13  Q    And if you would turn to page 2 of Exhibit 2083, under

14  paragraph 2, the put rights, there is a date; isn't there?

15  A    Yes.  It says "If by November 16th, 2017..."

16  Q    And is it your understanding based on the work you've

17  done in this case both for the first part of this

18  confirmation hearing and the work now, that what this means

19  is that the trust would not be able to ask that Bayside

20  repay the two million dollars until 2017 under this put

21  agreement; isn't that right?

22  A    I'd have to read the full agreement, but if you'd like

23  me to make that assumption, I'd be happy to do so.

24  Q    Okay.  So you don't know as you sit here today when

25  the trust under the original agreement could have asked

1  Bayside and required Bayside to repay the two million

2  dollars; isn't that right?

3  A    The timing of the repayment in terms of the question

4  that I addressed in my declaration, there was not an issue

5  as to when the timing was.  It was just simply to say, if

6  it was required, then that was the question that I was

7  responding to.

8  Q    Okay.  The second amended term sheet has modified the

9  provisions of the put and call agreement, Exhibit 2023;

10  isn't that right?

11  A    Yes.

12  Q    Okay.  And under the new arrangement that if the trust

13  desires to have Bayside purchase back its interest, there

14  will be a fair market value determination as described in

15  those documents; isn't that correct?

16  A    Again, I don't recall the full language of the amended

17  agreement.

18  Q    So as you sit here right now, you don't know whether

19  Bayside under the second amended term sheet could be asked

20  by the trust to pay back the two million dollars referred

21  to in your Opinion 6; isn't that right?

22  A    I'd have to look at the agreement to determine that.

23  I don't recall.

24  Q    Okay.  So for purposes of reaching your opinion, No.

25  6, you didn't consider whether or not Bayside would

1  actually ever have to pay back the two million dollars that

2  you're describing; isn't that true?

3  A    For purposes of the opinion, I simply was asked if

4  Bayside did pay it back, could they do so and what would be

5  the implications of that?

6  Q    Okay.  So going back to Exhibit 2021, if you would

7  turn to –- there's bates numbers at the bottom, 1579.  It's

8  the balance sheet for Bayside, December 31, 2012.  Do you

9  see that?

10 A    I do.

11 Q    And earlier when we talked about the primary metric of

12 the financial viability of a company, you referred to net

13 worth.  Net worth is the same as total equity in terms of

14 a metric as shown on page 1579 of Exhibit 2021; isn't that

15 correct?

16 A    That's correct.

17 Q    And so as of December 31st, 2012, Bayside's total

18 equity or net worth was, according to RINA, $1,291,364;

19 isn't that right?

20         MR. O'CONNELL: Objection to the form, Your Honor.

21         THE COURT: I'm sorry?

22         MR. O'CONNELL: Objection to the form, as to the

23 use of the word "Bayside."  The witness has already

24 testified that he doesn't believe these in fact are audited

25 financials of that legal entity.

1          MR. FERGUS: I believe that misstates what this

2     witness has said about these.  This was --

3          THE COURT: I think you should ask what the

4     statement says.

5     BY MR. FERGUS:

6     Q    What does the statement say about the net worth of

7     Bayside on page 1579?

8     A    The statement says that the total equity is

9     $1,291,364, which I take total equity to be equal to net

10    worth for purposes of definition of the terms.  So this

11    statement under the constraints that have been described in

12    this statement indicates that that's the net worth of this

13    theoretical entity which is provided by the operational

14    activities of these companies.

15    Q    Okay.  Would you look at Exhibit 2022.  That's Tab 22

16    in your binder.

17    A    Yes, sir.

18    Q    That is the balance sheet for Bayside.  It's an

19    internal company document; is that your understanding?

20    A    That's my understanding, yes.

21    Q    And Exhibit 2022 is for the first ten months of 2013;

22    isn't that correct?

23    A    Yes.  It's for the period ending October of 2013.

24    Q    Okay.  And on page 3 of Exhibit 2022, there is a total

25    equity line.  Do you see that?

1  A    Yes.

2  Q    And you would agree with me that that corresponds in

3  terms of definition to the net worth we were just talking

4  about a moment ago; isn't that right?

5  A    Total equity –- this says actually "total

6  equity/capital," would be equivalent to my definition of

7  net worth, yes.

8  Q    And at the end of October, what was the value listed

9  by Bayside for its total equity in capital?

10 A    $1,887,780.54.

11 Q    Now, if you would look at Exhibit 2043, Exhibit 2043

12 is also –- and it's Tab 43 in your binder –- that is the

13 financial statement for Bayside as of November 2013; is

14 that correct?

15 A    Yes.

16 Q    And on page 3, there is also a total equity capital;

17 is that correct?

18 A    Yes.

19 Q    And what is the total equity capital shown as of

20 November 2013 for Bayside on Exhibit 2043?

21 A    $1,954,152.48.

22 Q    Okay.  So you would agree with me that mathematically

23 there has been a progression in the statement of net equity

24 and capital by Bayside from December 31st, 2012 through the

25 end of November 2013 as reported by the company; is that

1  correct?

2  A    The interim financial statements as reported by the

3  company show profit resulting in an increase in net worth.

4  You will recall in my declaration, I noted several reasons

5  that I felt that these internal financial statements were

6  unreliable, dealing in large part due to the fact that

7  Bayside does not change its assets or liabilities related

8  to underbillings or overbillings during any interim period.

9  So whether or not the reported profitability and the

10  increase in the company's stated net worth is correct would

11  be subject to whatever ultimate adjustments get made by the

12  company, and those adjustments I understand from the

13  company's accounting procedures happen only at fiscal year-

14  end, which is December.

15  Q    And you've examined as part of your prior work in this

16  case the adjustments that were done each year by Bayside,

17  overbilling and underbilling, from 2007 through 2011; isn't

18  that correct?

19  A    I have reviewed their annual reports for every year.

20  I have not reviewed in every year internal reports provided

21  by the company.

22  Q    So as you sit here right now, you do not have an

23  opinion as to what kind of an adjustment in terms of

24  magnitude will be made by Bayside for its overbillings and

25  underbillings for year-end 2013; isn't that correct?

1  A    That's correct.  I don't know.

2  Q    And it's your understanding, however, that at the end

3  of 2012, the overbilling and underbilling adjustment was in

4  fact done and reflected in RINA's figure of $1,291,000 and

5  change; isn't that right?

6  A    I would assume that they had done that, yes.

7           THE COURT: I'm a little confused.  Did you study

8  the past adjustments?

9           THE WITNESS: As I recall in my original report,

10  Your Honor, we talked about annual results, which would

11  have reflected whatever adjustments were in fact made at

12  each fiscal year-end.  What I do not recall is for a period

13  such as October or November relative to the year-end, what

14  the magnitude of those individual adjustments were in each

15  year.

16           THE COURT: Did you testify in any way as to the

17  pattern of the normal annual -- the pattern and direction

18  of the normal annual adjustment?

19           THE WITNESS: I don't think that was -- I don't

20  think that pattern was part of any opinion that I had

21  previously offered, no.

22  BY MR. FERGUS:

23  Q    We talked about your experience before.  You have

24  rarely seen a transaction where there are contractual

25  obligations about how a price is set for purposes of sale

1  of shares of a small company; isn't that right?

2  A    That's correct.

3  Q    Now you had some criticisms of the right of first

4  offer; isn't that correct?

5  A    Yes.

6  Q    And one of your criticisms of the right of first offer

7  had to do with what you saw as uneven provisions relating

8  to the trust on the one hand and relating to Bayside and

9  Mr. Ameli and Mr. Badakhshan on the other side; isn't that

10  correct?

11  A    One of the criticisms, yes.

12  Q    And in fact another of the criticisms is identified in

13  paragraph -- excuse me -- Opinion 5 in Exhibit 2024 having

14  to do with the loan documentation, and that is on page 12,

15  lines 4 to 20 of your report.  Isn't that correct?

16  A    I'm sorry.  Please give me the page number.

17  Q    Page 4 -- excuse me, I misspoke --

18         THE COURT: Page 12.

19         MR. FERGUS:  page 12, lines 4 to 20, Opinion No.

20  5.

21         THE WITNESS: Opinion No. 5, yes.

22  BY MR. FERGUS:

23  Q    Okay.  And one of your criticisms relates to the fact

24  that the loan agreement seems to be unfair, in your view,

25  as between the trust and the Bayside and Mr. Badakhshan and

1 Mr. Ameli on the other side.  Isn't that right?

2 A    I don't know that I would say that it's unfair.  I'm

3 simply making the point in my Opinion No. 5 that the

4 modifications to the loan agreement as a result of this

5 amended Plan seem to benefit Bayside and do not seem to

6 provide a benefit to the trust in terms of its

7 relationship, that all of the benefits of those changes

8 appear to be for the benefit of the borrower and not the

9 lender.

10 Q    Okay.  And you focused on the loan agreement when you

11 read the second amendment to the binding term sheet; isn't

12 that correct?

13 A    Yes.

14 Q    Okay.  And that second amendment has a collection of

15 agreements between Bayside on the one hand and the trust on

16 the other; isn't that correct?

17 A    Yes.

18 Q    And one of those documents is a warrant that enables

19 the trust to purchase eleven percent of Bayside any time it

20 wants for a dollar; isn't that right?

21 A    Yes.

22 Q    Okay.  And you would agree with me that that is a

23 significant benefit for the trust; isn't that right?

24 A    I've not reviewed or analyzed the price of the warrant

25 relative to the total price of the shares that were

1 purchased for purposes of making a determination as to

2 whether the trust is getting good value for either the

3 stock that it acquired or the warrant position that it had

4 acquired.

5 Q   Okay.  So --

6 A   That's not been part of the scope of my involvement.

7 Q   So the scope of your involvement has not included

8 looking at all of the collection of the rights exchanged

9 between the parties in the second amendment of the binding

10 term sheet.  Isn't that right?

11 A   I am aware of the collection of changes in the amended

12 financing agreement.  Yes, I am aware of that.

13 Q   You're aware of that, but you have not focused on all

14 of the benefits and detriments provided to the parties

15 under the collection of documents in the second amended

16 limits to the binding term sheet.  Isn't that right?

17 A   I have focused for purposes of this opinion on the

18 changes to the revolving loan agreement and whether or not

19 those changes benefit the borrower or the lender or both in

20 my opinion.  As it's stated, it suggests that it benefits

21 the borrower, Bayside, without the benefit to the lender.

22 Q   So you've looked at in your Exhibit 2024 really two

23 aspects of the second amendment to the binding term sheet,

24 the loan documents you just talked about and the right of

25 first offer document; isn't that correct?

1  A    Are we still talking about for Item 5.

2  Q    I'm talking about for Exhibit 2024.

3  A    Yes.

4  Q    The two items that you looked at and have given

5  opinions on are limited to the right of first offer and the

6  loan documentation; isn't that correct?

7  A    I've given six opinions.  Two deal with the right of

8  first offer.  One deals with the relationship between the

9  minority shareholders and the company in terms of who

10 benefits from certain transactions, and two deal with the

11 impact of repayment of the two million dollar investment

12 and whether that could happen, and if it did happen, what

13 the impact of that would be.

14 Q    Okay.  So it's fair to say then, you have not given

15 any opinion in Exhibit 2024 on the warrant; that's a true

16 statement.

17 A    That is a true statement.

18 Q    You have not given any opinion on the amendments to

19 the trust agreement; is that correct?

20 A    To the amendments to the trust agreement.

21 Q    Yes.

22 A    To the amendments to the loan agreement, I have given

23 an opinion, but no further amendments.

24 Q    No further amendments, and my question was, you aren't

25 giving any opinion on the amendments to the trust agreement

1 contained in the second amendment to the binding term

2 sheet; isn't that correct?

3 A    That's correct.  Yes.

4 Q    And you've given no opinion with respect to the

5 modifications to the shareholders' agreement; is that

6 correct?

7 A    That's correct.

8 Q    All right.  Now I want to turn for a moment to your

9 Opinion No. 1 regarding the right of first offer, and this

10 is on page 5.  It starts at line 1 and continues to the

11 bottom of the page, line 27.  Let me know when you have

12 that handy.

13 A    I have it, yes.

14 Q    Okay.  One of the things that you were concerned about

15 in the second bullet point is that third-party bidders

16 would be reluctant to incur due diligence costs.  Do you

17 see that?

18 A    I do.

19 Q    I was reading from lines -- it's between 8 and 9.

20 A    I do see that, yes, sir.

21 Q    Okay.  And as a practical matter, though, you have

22 never been involved in a transaction where there were

23 third-party bidders involving a right of first offer; isn't

24 that correct?

25 A    Could you please repeat the question.

1  Q    Sure.  Do you have any experience with third-party

2  bidders being discouraged from incurring due diligence

3  costs because of the existence of a right of first offer?

4  A    Since we have spoken already of the fact that I've not

5  been involved in a transaction which included a right of

6  first offer, it would also be true that I have not had

7  experience with third-party bidders in such a case.

8  Q    Okay.  Now one of the things that you were concerned

9  about with respect to the right of first offer is what the

10 impact would be on third parties; isn't that correct?

11 A    That is correct.

12 Q    And when -- one of the things you were concerned

13 about, if we turn to the bullet point on page 5, it starts

14 between lines 18 and 19 and goes to lines between 23 and

15 24, it's fair to say that you were concerned that Mr.

16 Badakhshan and Mr. Ameli, as incumbent management, would

17 lowball the value of the company, to summarize it.  Is that

18 a fair characterization?

19 A    My concern is since they would be potential acquirers

20 who would be subject to the results of an appraisal to

21 determine the value at which they would get an asset, that

22 it would be logical that they would be interested in

23 acquiring the asset at the lowest possible cost.

24 Q    Okay.  But you're not offering any opinion that a

25 professional appraiser hired to value the company would be

1  unable to take that interest you just described into

2  account in reaching a valuation of the company; are you?

3  A    I have not offered an opinion as to how an appraiser

4  would judge the accuracy or the inaccuracy of projections

5  that were provided to them.

6  Q    Now, you were concerned, were you not, that in the

7  event that the parties exercised the baseball arbitration

8  rights that were under the right of first offer, that the

9  parties could go all the way through the process, and at

10 the end of it, if the arbitrator picked the trust's price,

11 Mr. Ameli and Mr. Badakhshan could simply say, not

12 interested.  That was your criticism; isn't that right?

13 A    It was an observation of the terms of the -- again, to

14 be clear, we're talking about the original ROFO agreement,

15 not the amended agreement, not any subsequent ROFO

16 provisions which may have been envisioned in Mr. Kimball's

17 report or otherwise.  So in the original ROFO agreement, I

18 made the observation that under the terms of the baseball

19 arbitration, that the trust could be forced to sell at

20 below the value that it determined to be the fair market

21 value.  But on the other hand, the offerors would not be

22 forced to purchase at a price that was above the value that

23 they felt was fair market value.  So that was my criticism.

24 Q    And in fact, the right of first offer agreement has

25 been modified, you're aware of that; is that correct?

1  A    I am, yes.

2  Q    And as a result of one of the modifications, the

3  observation that you made is no longer applicable; isn't

4  that right?

5  A    Well, the conclusion that the parties would differ in

6  terms of their risk of the purchase price relative to the

7  appraised value, that has changed.  It has not changed that

8  third parties who may be interested in looking at this

9  company or in otherwise having an interest in the value of

10 the company, that change would not impact a third party.

11 In fact, if anything, it could cause a third party to be

12 even less interested in providing work and energy towards

13 due diligence because as a result of the change, once an

14 offer has been made at any value, it is clear that there's

15 no opportunity for a third party to have an opportunity to

16 buy the company or to buy the trust's interest in the

17 company.

18 Q    And so the observation that you had that Mr. Ameli and

19 Mr. Badakhshan could walk away if they didn't like the

20 price, that's no longer applicable; isn't that right?

21 A    That is correct.

22 Q    You had another observation, which was that if Bayside

23 were to purchase the interest from the trust, that Mr.

24 Ameli and Mr. Badakhshan really didn't have any skin in the

25 game, isn't that a fair characterization?

1  A    What I said was that they would have a riskless

2  situation.

3  Q    And the amended ROFO has changed that, and they now

4  are required to personally guarantee in the event that

5  Bayside purchases the trust's interest in Bayside; isn't

6  that correct?

7  A    That is correct.

8  Q    Okay.  Now one of the things that you were concerned

9  about was the $865,000 note that Bayside had guaranteed

10 which was due within one year.  Is that correct?

11            THE COURT: This is the SAAB Real Estate?

12            MR. FERGUS: Yes.

13            THE WITNESS: Yes.  I think my concern was

14 expressed as a concern about the guaranty of the full

15 indebtedness which was 1.9 million dollars.  It included

16 the shorter-term note that you are referring to.

17 BY MR. FERGUS:

18 Q    So if you turn to page 11 of Exhibit 2024, line 8, you

19 included both amounts and you included -- of which $875,886

20 is due within the next year.  That was what you said in

21 Exhibit 2024; isn't that correct?

22 A    Yes, sir.

23 Q    And I asked you if you were to assume that Wells Fargo

24 were to extend the loan terms for the $875,000 as

25 identified in Exhibit 2030 -- that's the e-mail from Wells

1  Fargo -- do you recall that e-mail?

2  A    I do.

3  Q    And my question to you is, whether or not the fact

4  that the $875,000 loan, if it was no longer in default and

5  it was no longer due within one year, whether or not that

6  would change your evaluation of the risk of Bayside.  Do

7  you recall me asking that?

8  A    Right.  I do recall that.

9  Q    And your answer was, you reached the same conclusion

10 that there would be a substantial risk; isn't that right?

11 A    That is correct.

12 Q    Okay.  So the fact that the loan has been brought

13 current, Wells Fargo's e-mail exhibit on 2030 has extended

14 it to 2022 didn't impact your risk analysis and your risk

15 conclusion; isn't that right?

16 A    It did not impact a conclusion, which was based on the

17 fact that Bayside's obligation under its guaranty is an

18 obligation of 1.9 million dollars.  That amount has not

19 changed.  The bringing current of the short-term portion

20 helped address an issue in terms of the short-term maturity

21 and the defaults that existed, and the immediacy of the

22 risk that could have been in place, but it does not change

23 at all the financial obligation that Bayside has relative

24 to its guaranty of the Wells Fargo indebtedness.

25 Q    Do you remember we discussed some hypotheticals in

1  your deposition about what impact a third-party offer would

2  have on the baseball arbitration process.  Do you recall

3  that?

4  A    I do.

5  Q    And I asked you to assume that there was a ten million

6  dollar offer from a third party to purchase Bayside, and

7  that under the -- in this hypothetical, under the terms of

8  the baseball arbitration, each party, Bayside on the one

9  hand, and Badakhshan and Ameli together on one side, and

10  the trust would retain an appraiser.  Do you recall that

11  hypothetical?

12  A    Sure.

13  Q    And my question to you is, do you know what impact

14  the existence of a ten million dollar offer to purchase

15  Bayside would have on the appraisal done by the trust or

16  done for the trust as part of the baseball arbitration?

17  A    I think my answer to you during the deposition was

18  that I am not an appraiser, so I can't tell you the

19  specific impact that it would have to the appraiser's

20  valuation.

21  Q    And I asked you the same question about what impact

22  that information would have on Retired Judge Fern Smith

23  who's the designated arbitrator or someone appointed by

24  this Court, what effect that would have on their view, and

25  you gave me the same answer.  Didn't you?

1 A    I gave you the same answer, yes, in terms of not

2 knowing how it would impact their judgment.

3            MR. FERGUS: May I have a moment, Your Honor?

4            THE COURT: Yes.

5       (Pause.)

6 BY MR. FERGUS:

7 Q    Would you please turn to page 11 of Exhibit 2024, the

8 last bullet point, at lines 22 to 24.

9 A    Yes.

10 Q    One of the things that you examined as part of your --

11            THE COURT: What page?

12            MR. FERGUS: I'm sorry, Your Honor?

13            THE COURT: What page?

14            MR. FERGUS: Page 11, lines 22 to 24, which

15 carries over to the next page through line 3.  Let me know

16 when you've had a chance to read that.

17            THE WITNESS: Yes, sir, I have.

18 BY MR. FERGUS:

19 Q    One of your assignments or one of the things that you

20 did as part of your assignment in reaching Opinion No. 4

21 was to look at the cash flow for the SAAB lease between it

22 and Bayside; isn't that right?

23 A    Yes, that's correct.

24 Q    And you also looked at the documents as to what SAAB

25 is required to pay to service the loan; isn't that correct?

1  A    That's correct.

2  Q    And you concluded that there was positive cash flow

3  because Bayside is paying 12,000 a month and SAAB is

4  servicing the bank loan for $7,295; isn't that right?

5  A    Yes, sir.

6  Q    Now, if you could look at Exhibit 2017; that would be

7  Tab 17.

8  A    Okay.

9  Q    Page 3 of Exhibit 2017, is the statement of net equity

10  and capital, or in your terms, net worth for Bayside at the

11  end of 2011 after the overbilling and underbilling

12  adjustments had been made; isn't that correct?

13  A    Yes, it's a year-end internal financial statement.

14  So, yes.

15  Q    It shows that the equity of Bayside at the end of that

16  year, the net equity and capital, was a negative

17  $600,125.40; isn't that correct?

18  A    Yes.

19  Q    And if you cycle forward one year to Exhibit 2021,

20  which is RINA, for the same net equity position, it shows

21  $1,291,000 and change; isn't that correct?

22  A    Yes, that's what it shows.

23  Q    That's a net change, if you will, in net worth of

24  1.8 million dollars over a one-year period; isn't that

25  correct?

1  A    Yes.

2         MR. FERGUS: No further questions, Your Honor.

3         THE COURT: Okay.  Any redirect?

4         MR. O'CONNELL: Yes, Your Honor.

5                    REDIRECT EXAMINATION

6  BY MR. O'CONNELL:

7  Q    Mr. Hall, you were asked some questions about the SAAB

8  loan, and specifically about various developments that may

9  have diminished the risk associated with that loan.  Do you

10 remember that?

11 A    Yes, I do.

12 Q    All right.  In evaluating the risk of that loan going

13 forward for Bayside, can't we just look at the ability of

14 SAAB to service the debt on that property and essentially

15 resolve the issue just by examining that factor?

16 A    No, I don't think so.

17 Q    Why not?

18 A    Well, you get into sort of a circular argument here in

19 that all of the debt service, all of the money that is

20 available for debt service by Bayside to SAAB is a result

21 of Bayside's operations.  So since those are the two

22 parties that are involved in the lease, they could

23 arbitrarily set any monthly amount of payment, and on

24 paper, it would look as if there's plenty of cash flow to

25 service the obligation.  But the reality is that the actual

1  cash has to come from the working capital development of

2  Bayside, which regardless of its terms, is a company that

3  has a history of not being in a strong financial position.

4  Q   Over the course of your entire professional career,

5  which I take it has lasted 40 years at this point?

6  A   That's correct.

7  Q   Okay.  And I won't bore the Court; it's described in

8  your curriculum vitae, so we won't get into --

9  A   I'm sure it would not be boring to the Court.

10      (Laughter.)

11 Q   I know that.  We're not going to even hazard that

12 though.

13 A   Okay.  Good.

14 Q   Okay?  Can you tell the Court your best estimate, how

15 many different transactions you have been involved in in

16 one capacity or another over the course of that career?

17 A   Thousands.

18 Q   All right.  How many times have you been called upon

19 in the course of that career to review audited financial

20 statements as part of your work?

21 A   In every transaction where there were audited

22 statements, they have been a part of that review.

23 Q   All right.  Do you think -- I'll withdraw that and

24 restate it.

25      You were asked a number of questions about the

1  ROFO, and specifically you were asked some questions about

2  the right of first offer that were directed to whether you

3  in the course of your professional experience had

4  encountered rights of first offer.

5  A    That's correct.

6  Q    Do you remember that?

7  A    I do.

8  Q    And I believe you told the Court that you hadn't; is

9  that correct?

10  A    That's correct.

11  Q    Now, do you think that the Court, as a result of that

12  answer, should be discounting your testimony here today?

13  A    No.

14  Q    Why not?

15  A    Well, I think all the parties in this matter would

16  agree that the existence of a right of first offer is a

17  highly unusual document, and one which is rarely utilized,

18  and so it would not be uncommon for people who are actively

19  involved in this type of business not to have experience

20  with a transaction including one.

21  Q    All right.  I take it you listened carefully to all of

22  Mr. Fergus' questions?

23  A    I did.

24  Q    Did any of them cause you to change any of the

25  opinions you had expressed in your declaration?

1  A    No, sir.

2         MR. O'CONNELL: I have no further questions at

3  this time.

4         THE COURT: Any recross?

5         MR. FERGUS: If I could have one moment, Your

6  Honor?

7      (Pause.)

8         No questions, Your Honor.

9         THE COURT: Okay.  Thank you Mr. Hall.  You may

10  step down.

11         THE WITNESS: Thank you.

12         MR. MILLNER: We call, Your Honor, Mr. Beaton, Mr.

13  Neil Beaton as our next witness.

14         NEIL JOSEPH BEATON, INSURERS' WITNESS, SWORN

15         THE CLERK: Do you solemnly swear or affirm that

16  the testimony you are about to give will be the truth, the

17  whole truth, and nothing but the truth?

18         THE WITNESS: I do.

19         THE CLERK: Thank you.  Please be seated.

20         THE WITNESS: Thank you.

21         THE CLERK: State your name for the record,

22  please.

23         THE WITNESS: Neil Joseph Beaton, that's N-e-i-l,

24  regular spelling for Joseph, and B-e-a-t-o-n.

25         MR. MILLNER: I'd like to move into evidence Mr.

1  Beaton's declarations which are Exhibits 2026 and 2079, and

2  I want to -- I have a comment, Your Honor, if I may, which

3  I learned this morning talking with Mr. Beaton.  He noted a

4  correction to me on the second in 2079, page 8, line 15,

5  and it's --

6           THE COURT: Okay.  Let me get to it, please.

7           MR. MILLNER: Yes.

8           THE COURT: Yes.

9           MR. MILLNER: It's page -- we're in 2079, page 8,

10 line 15, the last eight words on that line which state:

11 "But there is no mention of a ROFO" should be stricken.

12 And with that change, Your Honor, we offer 2026 and 2079

13 into evidence.

14           THE COURT: Any objection?

15           MR. SACKS: Yes, Your Honor.  We had previously

16 understood that the rebuttal declaration of Mr. Beaton was

17 being offered in such a way that we would be able to

18 respond to it.  As Mr. Millner expressed, he did not get to

19 take the deposition of our expert after the rebuttal

20 declarations were offered, and we have not had the

21 opportunity to take the deposition of Mr. Beaton after he

22 offered his rebuttal declaration.  So if the rule is going

23 to be that you get a deposition before a witness testifies

24 on rebuttal, then the rebuttal declaration shouldn't come

25 in.  But if it's going to come in, then we think we should

1  be able to offer testimony and respond.

2        MR. MILLNER: Can I briefly respond?  We filed and

3  served the rebuttal declaration of Mr. Beaton one week ago

4  on the morning of January 21st, after we had received the

5  rebuttal declaration of Mr. Kimball.  I never heard from

6  Mr. Sacks that he wanted to take Mr. Beaton's deposition.

7  We would have made him available yesterday.  Mr. Beaton was

8  also in San Francisco at Mr. Kimball's deposition, which

9  was a three-hour deposition on last Thursday morning.  We

10  would have made him available that afternoon.  I never

11  heard a word from Mr. Sacks.  I can assure you that when

12  Mr. Beaton gave that rebuttal declaration, I told him he

13  would have to make himself available for a deposition if

14  Mr. Sacks asked for it, and Mr. Sacks never asked for it,

15  and that's -- so Mr. Sacks saying he had no opportunity is

16  not a fair statement.

17        THE COURT: I think that this process is not the

18  normal one of submitting all these things.  I direct them

19  in not allowing the experts to come under -- (inaudible.)

20  Pick a method, one or both.  I don't think that either of

21  these people necessarily had to be submitted to subsequent

22  methods --

23        MR. MILLNER: I want to draw a distinction, Your

24  Honor, between the situation with Mr. Beaton where Mr.

25  Sacks has had his deposition -- his rebuttal declaration

1  rather -- for a week to prepare, and the situation with Mr.

2  Kimball where I have not heard or seen or been given any

3  indication of what his rebuttal testimony might be, so I've

4  had no opportunity to prepare an examination, and I would

5  add -- I would add that when I took Mr. Kimball's

6  deposition last Thursday morning, I asked Mr. Kimball, do

7  you have any other opinions, and he said, no.  Are your

8  opinions all stated in this declaration?  Is this a

9  complete statement of your opinions?  Yes.  And Mr. Kimball

10  was well aware of the declaration, rebuttal declaration.

11  He made reference to it in the course of the deposition.

12  So I left the deposition believing Mr. Kimball had no

13  further opinions because that's what I was told.  And I

14  with regard to Mr. Kimball, unlike Mr. Sacks who's had the

15  Beaton rebuttal for a week to prepare, I've had -- I

16  haven't seen what to prepare, and I would add in dealing

17  with an expert, Your Honor, and these are high-level

18  experts, the idea of taking a cross-examination blind, I

19  don't think is going to be helpful to the Court.  It may be

20  nerve racking to me, but it will be sort of a very -- it'll

21  be a sloppy process.  So I just want the Judge to have --

22  the Court to have a full picture on this.  So I take it

23  you're permitting Mr. Beaton's both declarations to come

24  in?

25          THE COURT: Let me hear from the other side again.

1          MR. O'CONNELL: Your Honor, may I add one point

2    that Mr. Millner may not have been focused on, which I

3    think is an important one.  The trial lists have been

4    agreed upon.  I moved it in this morning without objection.

5    This is already in evidence.  Mr. Millner, I think as a

6    courtesy, is reminding everyone that it's coming in, but

7    it's already in evidence.  Any objections to it were

8    actually waived this morning and had never been voiced in

9    the course of protracted consultation between our office

10   and Plan Proponents about any potential objections to items

11   on that exhibit list.  So this is truly lying in the weeds.

12          THE COURT: Well, I think this is basically an

13   argument in favor of their own rebuttal declaration which

14   is on the list.  I think the declarations should be

15   admitted, and you can cross-examine him or not.

16          MR. SACKS: Your Honor, we're fine with that.  We

17   just understand that as part of the opinions that Mr.

18   Kimball offered, they include respondent's --

19          THE COURT: Let's deal with that later.  Your

20   cross-examination of this person -- let's do it.  Let's

21   keep moving.

22          MR. AHRENS: Your Honor, could I get some water,

23   please?

24          THE COURT: Yes.  Did you bring it today, or --

25   you bring everything, so we expect you to bring water.

1          MR. AHRENS: We found out it was available.

2          MR. FERGUS: Would it be possible, Your Honor, to

3    just take a very short five-minute break?

4          THE COURT: Yes.  How much longer do you think we

5    have?  I'm just trying to figure out -- are we doing

6    argument today or tomorrow?

7          MR. FERGUS: I believe we'll be doing arguments

8    this afternoon, Your Honor.

9          THE COURT: Yes.  Okay.

10          MR. FERGUS: Thank you.  Five minutes?

11          THE COURT: Yes, of course.  That's fine.

12       (Whereupon, a recess is taken at 10:39 a.m., and the

13    court is reconvened at 10:49 a.m.)

14          THE CLERK: The court is now in session.

15          THE COURT: Please be seated.  All right.

16          MR. FERGUS: Ready to proceed, Your Honor.

17     NEIL JOSEPH BEATON, PREVIOUSLY SWORN, TAKES THE STAND

18                    CROSS-EXAMINATION

19    BY MR. FERGUS:

20    Q    Good morning, Mr. Beaton.

21    A    Good morning.

22    Q    I believe before we started that you were already

23    sworn; is that correct?

24    A    I was, yes.

25    Q    Okay.  You have submitted two declarations in this

1 case; is that correct?

2 A    When you say "this case," the last two -- one was in

3 December 2013, December 20th, and one was recently in

4 January.

5 Q    Yes.  And would you please look at Exhibit 2026.

6 A    Yes.

7 Q    Is 2026 the declaration that you submitted in this

8 case in December of 2013?

9 A    Yes, it is.

10 Q    And it's your signature on page 8?

11 A    It is.

12 Q    If you turn to page 3 of Exhibit 2026, it sets forth

13 the assignment that you were given for the December 20th

14 declaration; isn't that correct?

15 A    It does.

16 Q    And you were asked to opine as to whether the right of

17 first offer -- that's what ROFO means, correct?

18 A    That's what I'm thinking of it as, yes.

19 Q    -- sets forth a reliable process to determine the fair

20 market value of a 100 percent equity interest in Bayside;

21 is that correct?

22 A    It does state that, yes.

23 Q    Okay.  And so one of the things that you did is you

24 did an examination described in paragraph 17 of Exhibit

25 2026 on page 7 at lines 19 to 23 about other companies.  Do

1  you see that testimony?

2  A    I do see paragraph 17, yes.

3  Q    Okay.  And the premise of paragraph 17 is that as

4  opposed to the right of first offer proposed by the parties

5  here, you believe that the most reliable way to determine

6  the fair market value of a closely-held company is to go

7  to -- offer the stock to the market in a public auction; is

8  that correct?

9  A    Or negotiated agreement, yes.

10  Q    And page 7, paragraph 17, you didn't happen to mention

11  a negotiated agreement there; did you?

12  A    No.  I state that earlier in the declaration.

13  Q    Okay.

14          MR. FERGUS: And, Your Honor, before I forget, may

15  I approach?  I have the certified court transcript.

16          THE COURT: Yes.

17          THE WITNESS: Thank you.

18  BY MR. FERGUS:

19  Q    And the premise of what you did in paragraph 17 is the

20  reason for looking at 50 companies, it describes to you the

21  marketing of companies that have certain characteristics;

22  is that correct?

23  A    I wasn't really specifically located on certain

24  characteristics.  I was looking at the number of companies

25  in the construction industry that were sold over the past

1  five years as an indication that there was a market for

2  companies like Bayside Insulation and Construction, Inc.

3          MR. FERGUS: Mark as Exhibit 2084, Your Honor.

4  May I approach the witness?

5          THE COURT: Yes.

6  BY MR. FERGUS:

7  Q    Exhibit 2084 -- first of all, I want to ask you if

8  you've ever seen it before.

9  A    Yes, I have.

10 Q    Okay.  This is a selection of companies based on a

11 search of Pratt's Stats; is that correct?

12 A    It is correct.

13 Q    And it is in fact the results of the search that you

14 describe in paragraph 17; is that right?

15 A    Correct.

16 Q    Okay.  Now Exhibit 2084 lists the descriptions of the

17 various companies.  Do you see that?

18 A    There is a section that says "Business Description,"

19 correct.

20 Q    Okay.  And one of the things that you see on Exhibit

21 2084, Item No. 2, the description of the business is heavy

22 construction.  Do you see that?

23 A    I do.  Yes.

24 Q    Okay.  And Item No. 4 is a tennis court and basketball

25 court construction and renovation company.  Do you see

1  that?

2  A    That's what it says.

3  Q    These are records of sales of companies in the last

4  five years in the construction industry; is that what you

5  said?

6  A    That's correct.

7  Q    And Item 6, it's the company did marine construction.

8  Do you see that?

9  A    I do see that.

10  Q    Item 7, river dredging and marine construction?

11  A    Correct.

12  Q    Okay.  And if you continue on to look at bates number

13  page 197, to just pick out another one, Item 39, that was a

14  parking lot contractor that was sold?

15  A    Yes.

16  Q    And then there was a fencing contractor right below

17  it, Item 40; isn't that right?

18  A    That's correct.

19  Q    Okay.  Now, Mr. Kimball criticized your selection of

20  these guideline companies identified in Pratt's Stats;

21  isn't that right?

22  A    I don't think he criticized my selection.  He

23  criticized the use of this as an indication that there was

24  a market indicating that he couldn't tell from my report

25  because he did not have this at the time of his deposition

1  to even opine as to whether or not these particular

2  companies in fact indicated that there was a market.  So he

3  was unaware of even half this information at his

4  deposition.

5  Q    Okay.  And now if we turn to your rebuttal

6  declaration, which is Exhibit 2079 or the 79 tab in your

7  binders --

8  A    Yes.

9  Q    -- and first of all, look at 2079 and make sure it's

10  yours and it's got your signature.

11  A    It is and it has my signature.

12  Q    And this is the declaration you submitted on January

13  21st in this case; is that correct?

14  A    That is correct.

15  Q    Okay.  Now if you look at paragraph 31, lines 1 to 9

16  on page 12, you point out the significance that Mr. Pratt,

17  who I guess is behind Pratt's Stats, was in fact at one

18  point in time a founding member of Mr. Kimball's firm;

19  isn't that correct?

20  A    Everything except it's Dr. Pratt, not Mr. Pratt.

21  Q    I'm sorry.  I apologize.  So at the end of the day,

22  you concluded in Exhibit 2079 at lines 6 to 9 that one of

23  the key questions that should be asked is, did the

24  underlying economics driving this comparable company match

25  those that drive our company.  Do you see that?  That's a

1  quote that you made from an article written by Daniel

2  Balinski; isn't that right?

3  A    That is correct.

4  Q    Okay.  And you believe that is -- was so important

5  that you quoted it for the Court as support for why you

6  should be using Exhibit 2084 in analyzing whether there is

7  a market for the Bayside Insulation Company; isn't that

8  right?

9  A    That's correct.

10 Q    And so it's your testimony that the underlying

11 economic drivers behind a tennis court and basketball

12 company, a fencing company, a parking lot contractor are

13 sufficiently similar for your purposes that they can be

14 used as guidelines for whether there's a market for

15 Bayside.  Isn't that correct?

16 A    That's not correct, no.

17 Q    Okay.

18 A    That's not my testimony.

19 Q    Fair enough.  So in your original assignment, you were

20 looking at the sale of a hundred percent interest in

21 Bayside; isn't that correct?

22 A    That is correct.

23 Q    And Exhibit 2084 is a listing of companies where 100

24 percent interest was sold; is that correct?

25 A    I believe most of these are hundred percent equity

1  interests in those sales, would be my understanding.

2  Q    Can you point out a single one on Exhibit 2084 that

3  would be the sale of a 51 percent interest in any of those

4  construction companies?

5  A    Not based on this.  There's additional information in

6  Pratt's Stats that allows for that criteria, but I believe

7  I looked at hundred percent equity interests.

8         THE COURT: This isn't identified here, right?

9         THE WITNESS: Correct, it is not.  And there's

10 additional information, Your Honor, in Pratt's Stats that

11 can identify if there's a hundred percent, fifty percent.

12        THE COURT: Okay.

13        THE WITNESS: I believe these were selected based

14 on hundred percent.

15        THE COURT: Okay.

16 BY MR. FERGUS:

17 Q    And you didn't include any information about sales

18 involving construction companies in Exhibit 2026 where

19 there was less than a 100 percent interest in the company

20 being sold; did you?  2026 is your declaration.

21 A    I did not.

22 Q    And turning to -- and just to make sure I got that

23 right -- yes, and in Exhibit 2079, which is your rebuttal

24 declaration, you did not include any companies that you

25 identified where in the construction industry where less

1  than 100 percent was sold.  Isn't that right?

2  A    That is not correct.  On paragraph 32, I indicate that

3  there are a number of fractional interests sold quite often

4  to private equity investors who are looking to retain

5  management and therefore buy fractional interests.  So I do

6  quote that in paragraph 32.

7  Q    Okay.  And we'll get to that, but in terms of -- you

8  testified a moment ago that Pratt's Stats has information

9  about the sale of fractional interests.  Did I hear you

10  correctly?

11  A    It does, yes.

12  Q    Okay.  And I just wanted to verify that in Exhibit

13  2079, you didn't point out any of those stats or companies

14  where fractional interests of construction companies were

15  sold.  Isn't that true?

16  A    That's correct.  I did not identify specific companies

17  that sold a fractional interest.

18  Q    Okay.  And so you mentioned Exhibit 32 -- excuse me,

19  paragraph 32 of Exhibit 2079, pages 10 to 14, you talk

20  about the routine purchase of fractional interests.  Is

21  that correct?

22  A    I'm not sure I used the word "routine."  But let me

23  see what I did say.  Yes, "routinely."

24          THE COURT: Is this the second declaration?

25          MR. FERGUS: Yes, 2079, page 12.

1  BY MR. FERGUS:

2  Q    And in particular lines 11 and 12, where you said:

3            "However, buyers of businesses including private

4            equity firms routinely acquire fractional

5            interests so that incumbent management can be

6            retained."

7  Did I read that correctly?

8  A    Yes, you did.

9  Q    And the reason that the equity -- sorry -- the private

10 equity firms only acquire a fractional interest is, they

11 want to leave ownership in the incumbent management that

12 they want to keep.  Isn't that correct?

13 A    That's often the case, not necessarily all the time,

14 but often.

15 Q    Okay.  All right.  So the --

16            MR. FERGUS: May I approach the witness, Your

17 Honor?

18            THE COURT: Yes.

19            MR. FERGUS: I'd like to hand you what's been

20 marked as Exhibit 2085.

21 BY MR. FERGUS:

22 Q    First of all, Exhibit 2085 is an extract of the 2013

23 Business Reference Guide, the essential guide to pricing

24 businesses and franchises, 23rd edition, put out by the

25 Business Brokerage Press.  Are you familiar with this

1  publication?

2  A    Yes.

3  Q    And it is a publication that is considered reliable by

4  those in your profession.

5  A    No, they're not.

6  Q    Okay.  And you do not consider it an authoritative

7  publication?

8  A    Not at all.

9  Q    Okay.  Fair enough.  If you turn to page 248 of

10  Exhibit 2085, and in particular, I want to call your

11  attention to the description under "Construction in

12  General, NAICS 23."  Do you see that, sort of mid page

13  on –- it looks like page 204 of that text.

14  A    I do see that.  Yes.

15  Q    Okay.  And I'm going to be asking you about 204

16  carrying over to 205.  If you want to take a moment to look

17  at what's called the "Pricing Tips," over to "Expert

18  Comments."  Let me know when you're done.

19     (Pause.)

20  A    Okay.

21  Q    On page 205, do you agree in determining the price of

22  a contracting business, it is important or the appraiser

23  must consider how dependent the business is on the ongoing

24  involvement of the owner, and it continues on talking about

25  the client base and repeat business and systematic sales

1 and marketing.  Do you see that?

2 A    Yeah, that's on bullet point 3, that you see that.

3 Q    Yes.  And do you agree with the statement that in

4 valuing a company like Bayside, it is important to consider

5 the ongoing involvement of the owner?

6 A    It is important to consider.

7 Q    Okay.  And going on to "Expert Comments," do you agree

8 with the statement that many of these businesses, again

9 referring to construction and service-related businesses,

10 are centered around the owner's reputation, and it

11 continues on, "and do not have a sales and marketing

12 program in place."  Do you agree with that statement?

13 A    Yes, I do.

14 Q    Okay.  Now you have given opinions of value in this

15 case originally, the opinion for value of Bayside, and in

16 your most recent declaration; isn't that correct?

17 A    I don't believe I gave you an opinion of value in my

18 most recent declaration, but perhaps you can show that to

19 me.

20 Q    Sure.  If you look at page -- page 5, paragraph 13,

21 and this would be in Exhibit 2079.

22 A    Paragraph 15, one-five?

23 Q    One-three.

24 A    One-three, okay.

25 Q    The -- oh, I misspoke.  It's one-four.  On page 5,

1  Exhibit 2079, paragraph 14, it describes what you testified

2  to in your deposition, but also what your opinion was on

3  the date that the original confirmation occurred.  Do you

4  see that?

5  A    I do.

6  Q    Okay.  And your opinion originally was that Bayside

7  had negligible value; isn't that right?

8  A    That is correct.

9  Q    And basically your opinion today is that Bayside has

10  negligible value; isn't that correct?

11  A    That's also correct.  I was referring to a number last

12  time, so I apologize.

13  Q    Does that refresh your recollection that you gave an

14  opinion of value in Exhibit 2079?

15  A    Yeah.  I didn't really give an opinion of value, but I

16  do say that it had negligible value.  To me an opinion of

17  value would be an actual number.  That's why I was not

18  clicking in my synapsis.  But correct, I do say that it is

19  of negligible value.

20  Q    And so in your opinion as you sit here today, you

21  believe the right of first offer is essentially

22  meaningless; isn't that correct?

23  A    That is correct.  Absolutely.

24  Q    And had there been a right of first offer in 2011,

25  with the same value, you would have believed that the right

1  of first offer then would have been essentially meaningless

2  as well; isn't that correct?

3  A    Yeah, and I'm stating that from an economic

4  standpoint, but absolutely it would be meaningless from an

5  economic standpoint.

6  Q    Okay.  And so if the value from an economic point of

7  view of Bayside going into the future remains negligible,

8  the ROFO in your opinion would continue to be essentially

9  meaningless.  Isn't that correct?

10  A    That would be a true statement, yes.

11  Q    Okay.  So in your opinion, the only time that the

12  right of first offer will make any difference is if there

13  is a material change in the value of Bayside; isn't that

14  correct?

15  A    No.  I used the word "any" there.  No, there could be

16  even on a negligible value, the ROFO's existence could have

17  a chilling effect on any kind of transaction whatsoever,

18  even though -- again, it becomes more relevant the more

19  valuable that Bayside becomes.

20  Q    Okay.  Now one of the things that changed between

21  your first assignment and your second assignment is that

22  instead of evaluating a 100 percent interest in Bayside,

23  instead you were asked to evaluate the impact of a right of

24  first offer for the trust's 40 percent share that it

25  currently owns and the eleven percent that under the second

1  amendment to the term sheet, the trust has the ability to

2  acquire the eleven percent.  Isn't that correct?

3  A    Correct.  If you read the two assignments, those would

4  be different words.  That's correct.

5  Q    Okay.  And the -- one of the things that you did in

6  your assignment was to look at the right of first offer as

7  one of the elements of the second amendment to the binding

8  term sheet; isn't that right?

9  A    Yes.

10  Q    And would you look at Exhibit 2002.  That is the

11  second amendment to the binding term sheet.

12  A    In which ROFO am I looking at here, because sometimes

13  it's changed.  Am I looking at the original or the amended?

14  Q    This is Tab 2.

15          THE COURT: It's in the exhibit book.

16          MR. FERGUS: It's in your exhibit book, 2002.

17          THE WITNESS: I have that, but I'm wondering if

18  this was the original one that I wrote my original

19  declaration on or is this the revised one that came out

20  January 10th?

21  BY MR. FERGUS:

22  Q    Well, let's start first of all and look at the title

23  of the document.

24  A    Yes.

25  Q    This is the Second Amendment to the Binding Term

1  Sheet.  Are you aware of any additional amendments to this
2  document, Exhibit 2002?

3       (Pause.)

4  A    Again, I'm not sure if this would be updated. It looks
5  like it was filed 11-20.  I know there were changes to the
6  right of first offer agreement that came later, or at least
7  proposed changes, and I'm not sure they made it into
8  this -- another amendment.  I just don't know that.

9  Q    And so my question was, are you aware of any changes
10 as you sit here today to Exhibit 2002 that you've seen?

11 A    I have not to 2002.

12 Q    Okay.  And 2002 identifies the number of different
13 documents that are part of this amendment; isn't that
14 correct?  And I want to call your attention on page 2,
15 paragraph 1.

16 A    Yes.

17 Q    You have not expressed any opinions in either of your
18 original report or your rebuttal report to the warrant
19 identified on paragraph 1 of Exhibit 2002; is that correct?

20 A    That's correct.

21 Q    You have not expressed any opinions with respect to
22 the changes in the put/call agreement set forth in
23 paragraph 2 of Exhibit 2002; isn't that correct?

24 A    Also correct.

25 Q    You have not expressed any opinions with respect to

1  paragraph 4 or the document referred to as the new "Put

2  Agreement," in favor of the trust as part of this second

3  amendment to the binding term sheet.  Isn't that correct?

4  A    That's correct.  I have not.

5  Q    And you've not expressed any opinions with respect to

6  the loan agreement identified in paragraph 5 of Exhibit

7  2002; isn't that correct?

8  A    Also correct.

9  Q    You have not expressed any opinions as to the

10  modifications to the trust agreement identified in

11  paragraph 6 of Exhibit 2002; isn't that correct?

12  A    Correct.

13  Q    And you've not identified any opinions with respect to

14  the shareholders' agreement identified in paragraph 7 of

15  Exhibit 2002; isn't that correct?

16  A    That's correct.  Those would already be included in

17  the others.

18  Q    I'm sorry.  I didn't hear your answer.

19  A    I said all the changes that are posited under 7 would

20  be included in the prior except for No. 3, right of first

21  offer agreement, which is I believe shown in 7(b).

22  Q    Yes.  All right.  Now, I'd like to call your attention

23  to Exhibit 2081, two-zero-eight-one.

24  A    Yes.

25  Q    First of all, have you ever seen Exhibit 2081 before?

1    A    Yes, I have.

2    Q    Okay.  Turning to page 2 of Exhibit 2081, and in

3    particular paragraphs 1 and 2, in paragraph 1, it provides

4    that the day-to-day management and control of the company

5    is reserved to Mr. Ameli and Mr. Badakhshan and the other

6    officers of the company subject to the authority of the

7    Board of Directors of the company under the California

8    corporation.  Did I read that correctly?

9    A    You did.

10   Q    Do you have an understanding that if the trust were to

11   exercise the warrant such that they owned 51 percent,

12   whether or not the trust could determine who in fact has

13   the operational day-to-day control of the company?

14   A    That would be a legal question, I'm not here to

15   testify to.

16   Q    You don't have any idea one way or the other.

17   A    Well, I do have an idea.  In my experience, a 51

18   percent owner would be able to dictate who has control, but

19   it's usually a legal issue, and I don't know what the

20   bylaws are for the company.  I don't know the California

21   Corporations Code that well to say from here, right now,

22   whether or not the trust could unilaterally remove Ameli

23   and Badakhshan as in this case, where it states, the day-

24   to-day management and control.

25   Q    Okay.  With respect to the Board of Directors under

1 2(a), it starts out with:

2           "During all periods in which Mr. Ameli and Mr.

3           Badakhshan together own or have the power to vote

4           the capital stock of the company representing a

5           majority of its voting power."

6 Did I read that correctly?

7 A    So far, yes.

8 Q    Yes.  And so if the trust owned 51 percent of Bayside,

9 we would be outside of the period described in that first

10 clause, wouldn't we?

11 A    I don't know.  Let me read the rest of it to make sure

12 we're not missing something.

13 Q    Sure.

14     (Pause.)

15 A    It is silent to what occurs when the 51 percent

16 changes, but again, one could read that into the agreement

17 that they would no longer have that ability, but again,

18 it's ambiguous, and I'm not here to opine on the legality

19 of the issue.

20 Q    For purposes of reaching your opinions in this case,

21 did you assume that Mr. Ameli and Mr. Badakhshan together

22 would be able to continue to control Bayside?

23 A    If the trust were to exercise the warrant, pay the

24 dollar, and receive 51 percent, my assumption would be that

25 they would have control at that point, although not

1  unilateral control.  Typically that's 66.67.  Again, I'd

2  have to read the bylaws to understand if a 51 percent

3  owner, what rights that entity or person would have, and

4  again, I don't have those documents in front of me.

5  Q    Okay.  Now, one of the things that you find as a flaw

6  in the right of first offer is that because they have the

7  effect of or insuring or a mechanism to continue control by

8  Mr. Ameli and Mr. Badakhshan; isn't that correct?

9  A    Yes, that's my interpretation of the ROFO.

10 Q    And you reached that opinion without getting any

11 understanding as to whether or not from a legal

12 perspective, Mr. Ameli or Mr. Badakhshan would in fact be

13 able to exercise control should the trust sell 51 percent,

14 all of its interest.  Isn't that right?

15 A    That's incorrect.  I looked at that just as it says in

16 the ROFO, that if the trust desires to sell that they have

17 first offer to the ROFO parties.  That says it right in the

18 ROFO.  They could –- again, the trust could possibly

19 violate that and then of course be subject to a lawsuit,

20 but the ROFO requires the trust to first offer it to Mr.

21 Ameli and Mr. Badakhshan and the company, which to me says

22 that they would retain control.  So I was looking at it

23 from that perspective and not necessarily through the

24 bylaws and the shareholder agreement that you pointed out.

25 Q    Okay.  So it's fair to say then that you've already

1  identified that certainly private equity companies will buy

2  a fractional interest in companies specifically to keep

3  incumbent management; isn't that correct?

4  A    There are companies that do that, absolutely.

5  Q    Right.  And so there's nothing wrong with selling a

6  fractional interest that enables incumbent management to

7  continue to be in control of the company; isn't that

8  correct?

9  A    That would be correct, depending on the circumstances,

10  but most often it's not wrong.

11  Q    Okay.  Now the -- you have looked at in your analysis

12  what would be the trust's motivation in pursuing a sale of

13  its business interest in Bayside; isn't that right?

14  A    There was one motivation, and that is if they wanted

15  to sell, they would want cash.  I believe I identified that

16  as a motivation.  I believe that's the only one that I've

17  identified.

18  Q    And if you look at page 6 of Exhibit 279, lines 1 to

19  6, it's paragraph 16.

20          MR. SACKS: You mean 2079, Mr. Fergus?

21          MR. FERGUS: I'm sorry?

22          MR. SACKS: Exhibit 2079.

23          MR. FERGUS: Yes.

24          THE COURT: All right.  I'm sorry.  What page?

25          MR. FERGUS: Exhibit 2079, it is page 6, lines 1

1  to 6.

2          THE COURT: Thank you.

3  BY MR. FERGUS:

4  Q    In your analysis, you have assumed, have you not, that

5  before the trust would engage any appraisers or other

6  professionals to assist the trust with a sales effort, the

7  trust would need to assess whether such an effort would be

8  adequate to realize a reasonable profit for its time, money

9  and effort.  Did I read that correctly?

10 A    Yes.

11 Q    Okay.  And so from your perspective, you were looking

12 at whether the trust could make a profit not whether or not

13 the trust could get fair market value or value for its

14 interest in Bayside; isn't that right?

15 A    That's incorrect.

16 Q    Okay.  So when you're referring to reasonable profit,

17 that's not what you meant; is that correct?

18 A    This isn't any effort of going out for value, so you

19 have to read it in the context of what I wrote it in.  It

20 wasn't in the context of receiving fair market value.  It

21 was in the context of assessing whether or not this should

22 even go out and attempt to find an intermediary and/or

23 business broker that could assist them in determining fair

24 market value.  So it's step one, should I expend this

25 energy, time and effort; step two, will I get a return on

1    that time, energy and effort; and then the next step is,

2    then can I receive fair market value.  But that's what 16

3    is.

4    Q    Now you see that as a first step, in other words.

5    A    Well, again, in the context of my declaration, which

6    is a rebuttal to Mr. Kimball's declaration, he's saying

7    that the trust should go out and do all this work before

8    they even make the solicitation notice to the ROFO parties.

9    And I'm saying, time out, wait a minute.  If the trust does

10   that, they're going to expend time; they're going to pay

11   someone like me or whoever else they get, and they have to

12   assess whether or not, is that money and time well spent

13   when I know I've got to go back to the ROFO parties and

14   make the solicitation notice.  That's what I considered a

15   rebuttal to Mr. Kimball, and that is a determination that

16   the trust will have to make prior to taking that step.

17   Q    And you would agree with me that if the trust were

18   able to find an entity or individual who was interested in

19   purchasing the company for a price, that could be useful

20   information for an appraiser to know in trying to evaluate

21   the value of the trust's interests in Bayside; isn't that

22   correct?

23   A    Yeah.  I mean you could construct a situation where

24   that would be true, sure.

25   Q    Okay.  Now one of the things that you and Mr. Kimball

1  disagree about is whether or not the language of the right

2  of first offer, Exhibit 2011, if you'd turn to that,

3  please.  Do you have Exhibit 2011 in front of you?

4  A    Yes.  Again, I apologize, which one is this?

5  Q    Exhibit 2011 is the revised right of first offer.

6  A    Thank you.

7  Q    And I want to call your attention to paragraph 1,

8  "Restrictions on the Trust."  You quoted in paragraph 24 of

9  Exhibit 2079 a portion of paragraph 1; didn't you?

10  A    I believe I did.  Let me find it though.

11  Q    In fact, you quoted I believe the first sentence.

12  A    That's correct.

13  Q    But you didn't quote the second sentence; did you?

14  A    I don't believe I did.

15  Q    Okay.  What the second sentence says -- and this is

16  under "Restrictions on the Trust," you would agree with me

17  that there is a restriction before the trust may sell;

18  isn't that the language of the restriction?

19  A    That's what it says.

20  Q    So there's nothing in paragraph 1 that restricts the

21  trust from hiring someone like yourself to go out and find

22  out if there are individuals who are interested in

23  purchasing the 51 percent; isn't that correct?

24  A    I agree.  Sure.

25  Q    Okay.  Now --

1    A    Not that they would, but I agree that they could.

2    Q    That's your view, right?

3    A    Correct.

4    Q    You have been an appraiser for a number of years;

5    isn't that correct?

6    A    I have, yes.

7    Q    And you have listed the various appraisal departments

8    that you've headed and various entities that you've been

9    employed by; isn't that correct, or been a member of?

10   A    Partner/member, yes.

11   Q    So it's fair to say then that you have had experience

12   in transactions where appraisers are used by shareholders

13   to determine the value of shares in a transaction; isn't

14   that correct?

15   A    That is correct.

16   Q    Okay.  And in your deposition, you described a number

17   of difference processes that you could recall that you had

18   personal experience with, which were used to set the value

19   of a company in transactions.  Do you recall that?

20   A    I do.

21   Q    Okay.  So one of those descriptions that you gave me

22   is that the parties could set up a process where each party

23   hires their own appraiser, and in the event the parties

24   cannot agree, and the appraisers cannot agree, the

25   agreement calls for a third appraiser to come in and give

1  an opinion as to the value, and sometimes, there are

2  restrictions.  It's got to be between the first appraiser,

3  the high appraiser and the low appraiser.  Do you recall

4  that?

5  A    I do recall that, yes.

6  Q    And you have served in the capacity of both one of the

7  appraisers in such an arrangement, as well as the third

8  appraiser, the so-called tiebreaker, in my words.  Is that

9  right?

10 A    That is correct.

11 Q    Okay.  And you have also been involved in transactions

12 where the price is set by appraisal, but it's got to be

13 within a certain percentage of a number; isn't that

14 correct?

15 A    Not quite the way you said it, but there is a

16 situation where if the two appraisals are within a

17 percentage of each other, then they go with that average.

18 I believe that's what I stated in my deposition.

19 Q    The Debtor stated it.  I apologize for misquoting you.

20 But one of the other things that you've done is in fact you

21 have personally participated in 30 or 40 baseball

22 arbitrations in the employment context; isn't that correct?

23 A    That is correct.

24 Q    Okay.  And you told me – and let me just ask the

25 question -- in terms of baseball arbitrations, where you've

1  done it in employment contracts, the purpose of that is to

2  determine the value of the employee to the company; is that

3  correct?

4  A    No.  I corrected you on that, if you recall my

5  deposition testimony.

6  Q    Right.  You corrected me, and you said, that would be

7  a very difficult analysis to perform; isn't that right?

8  A    That's what I stated.

9  Q    But what you said is, what is the fair market

10  compensation for that individual for the services that he

11  or she may provide.  Is that correct?

12  A    I believe those are my exact words.

13  Q    Okay.  Now, you would agree with me that the purpose

14  of each of these permutations, the percentage that we

15  talked about using the average where you corrected me, the

16  two appraisals where a third-party arbitrator such as

17  yourself is brought in and asked to reach a valuation

18  between the other two valuations, all of these are methods

19  that are used to determine the value of a business; isn't

20  that correct?

21  A    Except for the baseball arbitration, that's correct.

22  Q    And that's because your experience is, in the baseball

23  arbitration, you've done that in the employment context; is

24  that correct?

25  A    That is correct.

1  Q    Okay.  All right.  One of your criticisms of the right

2  of first offer is that you believe that the financing that

3  is being proposed is under market; is that correct?

4  A    Oh, I don't believe it is; it states that it is.

5  Q    Okay.  And you believe whether that financing is

6  offered to Bayside, Mr. Ameli or Mr. Badakhshan on the one

7  hand, or whether it be offered to a third party, in either

8  of those events, the under market financing has an adverse

9  effect on turning the maximum value for the company; isn't

10 that your view?

11 A    Absolutely.

12 Q    Okay.

13 A    That's just pure math.

14 Q    All right.  And you would agree with me that what

15 would be necessary in order for you to make that

16 determination would be a net present value calculation;

17 isn't that right?

18 A    Well, you can determine the differential by utilizing

19 a net present value, comparing the market rate versus the

20 offered rate, absolutely.  That's just -- again, it's just

21 math.

22 Q    And also it would be math to look at the transaction

23 price as affected by that financing; isn't that right?

24 A    I'm not sure exactly what you mean by that question.

25 Q    Well, let's just take a simple example.  Let's just

1  take an automobile.  If the price of the automobile is

2  higher when you are going to finance it, it is possible

3  that the net present value of having financed the

4  transaction or having negotiated for a cash price could be

5  the same; isn't that right?

6  A    I suppose you could look at a car.  I haven't dealt

7  with car sales that often, but I suppose you could.

8  Q    Well, the same thing for a business.  In other words,

9  what you need to know is you actually need to know what is

10 the transaction price and what is the financing and with

11 those two figures, you would be able to determine the net

12 present value, whether in fact, from the seller's point of

13 view, you're better off or worse off, depending on whether

14 they gave financing.  Isn't that right?

15 A    I don't think it's that simple, because typically what

16 happens is the transaction price, it depends upon the type

17 of financing and terms.  So I could set the price at a

18 billion dollars and the terms are a dollar a day, what's

19 the real value of that for, you know, the billion days that

20 I'd have to pay this thing out.  It certainly isn't a

21 billion dollars, but that's the transaction price.  So you

22 can't just -- you can't separate the two and then say one

23 will be a separate transaction price and then look at the

24 terms of this below market financing.  You have to look at

25 it together as a whole.

1  Q    Right.  And in your opinion, when you're describing

2  the under market financing, you're not looking at the

3  price, are you, because you don't have it yet.

4  A    Well, I'm not looking at anything.  Again, I'm looking

5  at the ROFO.

6  Q    All you're looking at --

7  A    That's what I'm here for.

8  Q    Yeah.  All you're looking at is -- you're here just

9  for the ROFO, right?  Is that what you just said?

10 A    Well, I'm here answering your questions regarding my

11 two declarations of December 20th, 2013 and January 21st of

12 2014.

13 Q    Okay.

14       THE COURT: I think what he's getting at is this.

15 If the trust offered its shares -- it can't sell them until

16 it finishes the ROFO -- but if it offered its shares to an

17 outside third party with the same financing terms as it's

18 providing to the insider shareholders, that might affect

19 the offer price that the third party might make.

20       THE WITNESS: It could very well.  Yes.

21       MR. FERGUS: Your Honor, may I approach the

22 witness?

23       THE COURT: Yes.

24 BY MR. FERGUS:

25 Q    I'm handing you an excerpt of Exhibit 2080.  Exhibit

1  2080 included a number of documents, but one of the things

2  that was included was a book by Mr. Mercer. You are

3  familiar with Mr. Mercer's book; isn't that correct?

4  A   Yes.

5  Q   Okay. And if you look at the first page of what I've

6  handed you, it starts with the bates number WILL 00257, and

7  it runs, hopefully sequentially, all the way through 510,

8  the last page, and I point out this is double-sided. Now,

9  the -- Mr. Mercer, if you turn to -- well, first of all,

10  let me ask you, do you consider the excerpt of Exhibit

11  2080, which constitutes buy/sell agreements for closely

12  held and family business owners written by Mercer to be a

13  text that is relied upon by professionals in your field?

14  A   When you say "relied upon," I know it's referenced. I

15  can't tell you if they rely upon it or not, but it

16  certainly is referenced.

17  Q   Do you consider it an authoritative source?

18  A   Not at all.

19  Q   All right. If you look at what's been marked as page

20  282 at the bottom, and I'm just referencing the numbers,

21  not the full bates stamp.

22  A   Thank you. Yes.

23  Q   Mr. Mercer identifies what he calls "Valuation Process

24  Agreements." Do you see that?

25  A   Yes.

1    THE COURT: What page are we in?

2    MR. FERGUS: It's bates stamp 282, Your Honor.  In

3  the text itself, it looks like it's Roman IX.

4    THE COURT: Okay.

5  BY MR. FERGUS:

6  Q    And if you turn back to 280, what Mr. Mercer

7  identifies are several different types of agreements,

8  forms, in order to determine the price of a company for

9  transferring closely-held interests.  Is that a fair

10  description?

11  A    I believe that's his primary purpose is to maintain

12  the ownership within the company or privately-held family

13  business.

14  Q    All right.  And so one type of agreement is a fixed

15  price agreement.  You're familiar with those types of

16  agreements?

17  A    I am.

18  Q    There's no process to determine the price that's

19  written in the agreement.  The parties have agreed in

20  advance; is that right?

21  A    That's what I'm looking at right now.

22  Q    Okay.  No. 2 is a formula price agreement.  That's on

23  page 281.

24  A    Yes.

25  Q    And have you worked with formula price agreements?

1  A    Not very often, but they do exist.

2  Q    Okay.  And basically, this is, for example, interest

3  is determined based on a formula depending on a Federal

4  Reserve interest rate, for example.

5  A    That would be rare, but you could construct one based

6  upon changes in the Federal interest rate, but it would be

7  rare.

8  Q    But the point is, is that there is some agreed-upon

9  methodology that involves a formula.  That's another

10 alternative.

11 A    Typically, it's an EBITDA number, earnings before

12 interest, taxes, depreciation, and amortization, fixed

13 rate, for example 8X.

14 Q    Okay.  And then on page 282 where I started, there are

15 the valuation process agreements.  That's another form of

16 how to set the transfer price for closely-held companies;

17 isn't that correct?

18 A    According to Mr. Mercer.

19 Q    Yes.  And do you disagree with him that valuation

20 process agreements are a third form?

21 A    I do not disagree with him at all.

22 Q    Okay.  And in your experience, there's been a wide

23 variety of valuation processes that you've looked at in

24 various agreements; isn't that correct?

25 A    That is correct.

1  Q    Okay.  And in fact, one of those different types of

2  agreements is what's called "Multiple Appraiser

3  Agreements," if you'd turn to page 442 of the excerpt of

4  Exhibit 2080.  And basically Multiple Appraiser Agreements,

5  several of the forms that you and I talked about earlier,

6  the percentage of multiple appraisers with a third

7  tiebreaker or other formats are also common ways to value a

8  business; isn't that correct?

9  A    Yes.

10 Q    And one of the options on page 449 that Mercer reports

11 is having that third appraiser be a judge; isn't that

12 correct?

13 A    Yes.

14 Q    Now the -- and finally, if you look at page 452, there

15 is a flow chart talking about a third appraiser as a

16 reconciler, and that gives an example of a process to

17 determine valuation using a third appraiser.

18 A    That's correct.  It does.

19 Q    And Mr. Mercer lists on page 453 a number of

20 advantages with respect to having a process, and one of

21 them he identifies is, a defined structure or process for

22 determining the price helps the parties, because it gets

23 rid of -- especially if it's well defined and the parties

24 at least generally know what the process will entail.

25 Isn't that right?

1  A    That's what he states here.

2  Q    Do you disagree with that?

3  A    I don't.

4  Q    Okay.  Now there are certain potential disadvantages

5  to having appraisers involved in determining the value of a

6  small business; isn't that right?

7  A    It states here on 454, 455, 456, 457 –- it looks like

8  a whole lot more disadvantages than there are advantages.

9  Q    Yes.  And as a practical matter, though, you still see

10  in your practice many, many companies that have engaged in

11  an appraiser or multiple appraiser methodology written into

12  their agreements in the event of a transfer of ownership of

13  some of the company; isn't that right?

14  A    Primarily closely-held family businesses, but yes.

15  Q    Okay.  Now one of the things that you pointed out is

16  that the ROFO doesn't deal with death, and so you found

17  that to not meet a definition of a buy/sell agreement;

18  isn't that correct?

19  A    According to Mr. Mercer's definition that was provided

20  in Mr. Kimball's work papers, it does not meet that

21  definition, correct.

22  A    But if you look on page 431 of Mercer's book, at the

23  top, he indicates that death is the least likely triggering

24  event; isn't that correct?

25  A    That's what it states there, yes.

1    Q    Do you disagree with that?

2    A    I don't.

3    Q    Okay.

4            MR. FERGUS: If I could have a moment, Your Honor?

5            THE COURT: Yes.

6        (Pause.)

7    BY MR. FERGUS:

8    Q    Do you know as you sit here now in Exhibit 2081, which

9    is the shareholders' agreement, whether that addresses the

10   potential demise of Mr. Amile or Mr. Badakhshan?

11   A    The exhibit number please, again?

12   Q    2081.

13       (Pause.)

14   Without looking, do you know?

15   A    I don't.  I don't have that kind of memory.

16   Q    Okay.

17           MR. FERGUS: I have no further questions, Your

18   Honor.

19           THE COURT: Okay.  Do you want to do your redirect

20   now or do you want a break?  What do you want to do?  We

21   can break for lunch.

22           MR. MILLNER: We can do that.

23           THE COURT: I have a discovery conference at 1:30.

24   Having asked the question, I'm not sure it really makes

25   sense to break now, because I'm going to have to take that,

1  at least 15 minutes, at 1:30.  So maybe we should go a

2  little longer and you should take a longer lunch break, I

3  suppose.

4              MR. MILLNER: Whatever the Court's preference.

5              THE COURT: Let's try that.

6                     REDIRECT EXAMINATION

7  BY MR. MILLNER:

8  Q    Mr. Beaton, Mr. Fergus spent a great deal of your

9  examination going through with you various transactions,

10 or your testimony on transactions that you had participated

11 in or knew of where transaction values were determined by

12 processes using appraisers.  Do you recall that testimony?

13 A    I do.

14 Q    And you read in that book by Mr. Mercer about those

15 processes, also, just now.

16 A    Parts of it, yes.

17 Q    Parts of it.  And with regard to all the transactions

18 that you were talking about, where you were familiar or had

19 participated, were any of them designed to maximize value

20 to the seller?

21 A    No.

22 Q    And could you explain so that the Judge can understand

23 it, why those processes are not designed to maximize value

24 to the seller?

25 A    Your Honor, primarily a buy/sell agreement is really

1  structured to maintain the closely held nature of a
2  business.  So when a number of shareholders enter into an
3  agreement and it's like a marriage -- I always like to say
4  it's like a marriage because I've seen them break up all
5  the time -- everything goes -- they go in, eyes open,
6  thinking everything is wonderful, and then a few years
7  later, things are just not so wonderful and one wants to
8  leave.  Having the interest of that individual in the hands
9  of someone that the current owners don't know or not
10 related to is oftentimes an uncertainty that most
11 shareholders don't want to get involved with.  So they put
12 together these buy/sell agreements to say, listen, if you
13 leave – there's also situations -- I deal with a lot of
14 divorces where if you get divorced, those interests will
15 not fall into the hands of an out spouse, will not fall
16 into the hands of an individual.  So in my estimation, and
17 I would say in 99 percent of the time, a buy/sell agreement
18 is designed to keep the ownership interest very closely
19 held within the business and not to maximize the sale of
20 that interest to an outside party.
21 Q    Thank you.  Does the ROFO agreement, either the
22 original or the revised or what Mr. Kimball describes, do
23 they fall within Mr. Mercer's definition of a buy/sell
24 agreement.
25 A    It does not.  No.

1 Q    Mr. Fergus mentioned death as a trigger for a

2 buy/sell.  What are the other points that could be a

3 trigger of a buy/sell?

4 A    Divorce.

5 Q    Divorce.

6 A    Loss of employment.  A bad act by one of the owners

7 that has a detrimental impact on the brand or business

8 itself.

9 Q    Okay.  Mr. Fergus spoke to you about baseball

10 arbitration.  Do you recall that?

11 A    I do.

12 Q    And he elicited from you that you had been involved

13 in a baseball arbitration in connection with employment

14 contracts.  Do you recall that?

15 A    Yes, I do.

16 Q    And is baseball arbitration used with regard to sale

17 of businesses in your experience?

18 A    I've never been involved in a single transaction where

19 baseball arbitration was the determining factor in the sale

20 of a business interest or transaction in a business

21 interest.

22 Q    Can you explain why baseball arbitration is not used

23 in the sale of businesses or interest in businesses,

24 please?

25 A    Well, the contracts that I make is that for, you know,

1   it's called baseball arbitration because that was the

2   original purpose, was to arbitrate the salaries of baseball

3   players.  One baseball player thought they should be making

4   more than another and so they'd enter into this arbitration

5   and boom, the arbitrator would pick a number.  In my

6   employment arbitrations where I do have baseball

7   arbitration clauses, there's a lot of information as to the

8   fair market compensation of these individuals.  So I do a

9   lot of engineering firms here in the valley, so I can call

10  up a lot of the recruiters that I know.  I can look on line

11  at salary.com.  There's monster.com; there's a lot of

12  individual companies that provide salary data within a very

13  specific range.

14          So it's much easier to identify the fair market

15  compensation of an individual.  You can't do that with a

16  business.  Businesses are too complex.  There's too many

17  moving parts.  There's not enough information although

18  again, if you look at Exhibit 2084, that we have here

19  today, you can see there are transactions, but those

20  guidelines, it doesn't necessarily dictate that the value

21  of the business is going to be "X".  It just says they'll

22  want to sell within, like I said, between eight times

23  EBITDA or ten times EBITDA, so that's when you need some

24  negotiation.  So you rarely -- like I said, I've never seen

25  baseball arbitration in a business transaction where an

1  interest is being adjudicated either by an arbitrator or in

2  a court setting.

3  Q    You spent some time with Mr. Fergus with the exhibit

4  you just mentioned, the Pratt's Stats.

5  A    Yes.

6  Q    And that's something you use to help you understand

7  that there would be a market for a company like Bayside to

8  be sold.  Correct?

9  A    That's correct.

10  Q    And then Mr. Fergus spent some time with you talking

11  about paragraph 32 of your rebuttal declaration.  It's

12  Exhibit 2079 where you say that -- the sentence was:

13           "However, buyers of businesses including private

14           equity firms routinely acquire fractional

15           interests so that incumbent management can be

16           retained."

17  Do you recall that discussion?

18  A    I do.  Yes.

19  Q    Okay.  And in fact, do you have a view as to whether

20  there's a market for a fractional or control interest of

21  Bayside or a company like Bayside?

22  A    Yeah.  I can't speak specifically to Bayside, but

23  absolutely, there are companies -- and I get involved in

24  sales of fractional interests with a lot of my private

25  equity clients who are looking to acquire fractional

1   interests in construction companies.  It happens all the

2   time.

3           MR. MILLNER: Let me just check my notes.  It'll

4   take one minute, Your Honor, to make sure I didn't miss

5   anything.

6           THE COURT: Yes.

7           MR. MILLNER: And then I'll be done.

8       (Pause.)

9   BY MR. MILLNER:

10  Q    Are you aware -- you had a discussion about Mr. Ameli

11  and Mr. Badakhshan and their role in the company.  Do you

12  recall that discussion?

13  A    He was pointing me to the shareholder agreement, I

14  believe 1 and 2, yes.

15  Q    Okay.  And do you know whether Mr. Ameli and Mr.

16  Badakhshan have employment agreements?

17  A    I do know that they do.  Yes.

18  Q    Are they long-term agreements, can you speak to that?

19  A    I believe they're five-year agreements.  I'd have to

20  look, but they're in the discovery here.

21  Q    And do they have automatic renewal provisions?

22  A    I don't have that kind of memory.

23  Q    Okay.

24  A    It may, but I don't remember that, sitting here.

25  Q    Okay.  Well, I'm not here to test your memory because

1  the documents are what they are, and I think that'll finish

2  my redirect.

3          THE COURT: Okay.  Any recross?

4                      RECROSS-EXAMINATION

5  BY MR. FERGUS:

6  Q    Would you look at Exhibit 2084.  This is the Pratt's

7  Stats.  Mr. Millner just asked you some questions about

8  that or at least you referred to it in your answer.  Do you

9  recall that?

10 A    I do.

11 Q    Okay.  Are any of the Pratt's Stats companies

12 identified here?  Do you know whether or not those

13 transactions were conducted as a result of a buy/sell

14 agreement within those companies?

15 A    It would be highly unlikely that a hundred percent

16 interest would be subject to a buy/sell.

17 Q    Okay.  And what about, do you know whether or not any

18 of these companies that are identified here have

19 stockholder agreements that would govern the sale of the

20 companies?

21 A    Most stockholder agreements don't govern the sale of a

22 company.  It governs the sale of interests, the ones I'm

23 familiar with.

24 Q    Okay.  And do you know whether any of these companies

25 identified in Exhibit 2084 had any stockholder agreements

1   that covered the sale of any portion of an interest in

2   those companies?

3   A    I do not know that specifically, no.

4   Q    That's not something that's reported in Pratt's; is

5   it?

6   A    Not to my recollection.  I haven't seen it.

7            MR. FERGUS: No further questions, Your Honor.

8            THE COURT: I have one question.  How common would

9   a shareholder buy/sell agreement be in a company of this

10  size as it was before the reorganization, where it's owned

11  by two -- now, they owned all the shares before the

12  reorganization, right?

13           MR. FERGUS: That's correct, Your Honor.

14           THE COURT: How common would a shareholder

15  buy/sell agreement be in a company of this size and nature

16  before the reorganization where these two individuals owned

17  all the shares?

18           THE WITNESS: In most -- I'm going to say more

19  than 50 percent, Your Honor.  In my experience, a closely-

20  held business typically wants to maintain that closely-held

21  nature, and as Mr. Mercer points out, it's always nice to

22  have an agreement ahead of time, otherwise it can become

23  quite litigious and costly if there's no agreement in

24  place.  So I would say more than 50 percent of the time.

25           THE COURT: Thank you.  Okay.  Any more questions?

1          MR. MILLNER: No, Your Honor.

2          THE COURT: Mr. Fergus, any more questions?

3          MR. SACKS: I'm sorry?

4          THE COURT: Any more questions?

5          MR. SACKS: No questions for this witness.

6          MR. FERGUS: No further questions.

7          THE COURT: I asked something, so it's --

8          MR. FERGUS: No further questions of this witness,

9   Your Honor.

10          THE COURT: Mr. Beaton, thank you very much.  You

11   are excused.

12          THE WITNESS: Thank you.

13          THE COURT: Are we done with the witnesses?

14          MR. FERGUS: Yes.

15          THE COURT: Okay.  So I'm going to have to do a

16   little preparation and deal with this motion at 1:30.  Can

17   we start at 2:00?  Is that too inconvenient for you?

18          MR. AHRENS: That's fine, Your Honor.

19          MR. MILLNER: Can I ask -- may the witnesses of

20   this morning be excused?

21          THE COURT: Yeah.  Are we done?

22          MR. MILLNER: I think so.

23          MR. SACKS: Well, Your Honor, the only question is

24   whether you're going to allow us to call Mr. Kimball as a

25   witness in rebuttal.

1                    THE COURT: No.

2                    MR. SACKS: Then we're done, and I think we're

3    ready for closing.

4                    THE COURT: For one thing, I don't think he's

5    going to be helpful.  I think I know everything I need to

6    know about all these issues.

7                    MR. MILLNER: So my question is, whether the

8    witnesses could be excused, and I'm asking that only

9    because Mr. Beaton is from out of town and --

10                   THE COURT: Yes.  We're done with the testimony.

11   We just have closing arguments.

12                   MR. SACKS: I believe the testimony is now

13   submitted then, Your Honor, based on that ruling, and we're

14   reading for closings at 2:00 o'clock?

15                   THE COURT: That's correct.  All right.  They may

16   all go.  Good travels to you all.

17                   MR. AHRENS: Your Honor, I might ask, is there

18   going to be any time limit on oral argument.  I assume we

19   go first; they go second; and we have the final --

20                   THE COURT: There ought to be.  What do you

21   suggest?

22       (Laughter.)

23                   MR. AHRENS: Your Honor, I think we can easily

24   finish in two hours, but I think there should be no time

25   limit.  I think we've come this far, and if the Court has

1    questions, so I think there should be no time limit.

2              THE COURT: Two hours apiece?

3              MR. AHRENS: No, no, no.  I think it should be one

4    hour apiece, but I don't think the Court should impose any

5    time limit, but I just want to know before we come back at

6    2:00.

7              THE COURT: I don't think we're going to need that

8    much time.  What's your proposal?

9              MR. AHRENS: Nor do I, Your Honor.

10             MR. MILLNER: I don't expect to be more than an

11   hour; I can tell you that, Your Honor.

12             THE COURT: Why is -- if I say 40 minutes then

13   each enough?

14             MR. AHRENS: That's fine, Your Honor.

15             MR. MILLNER: Fine.

16             MR. AHRENS: That's total for us, so we get -- I

17   would have to reserve some for rebuttal.

18             THE COURT: Yes.

19             MR. AHRENS: Thank you, Your Honor.

20             THE COURT: I don't think this is all that

21   complicated, and I think that will be adequate.  One more

22   thing is -- just while I remember -- I wanted you at some

23   point to give me proposed findings and conclusions

24   regarding this.

25             MR. AHRENS: Your Honor, we have copies in court.

1  We have already uploaded them.  Mr. Lauter, have we --

2          THE COURT: I don't need them today.  You might

3  want to wait til after the argument.  I would just like

4  them soon.  Again, I intend to write my own.  But you're

5  very thorough, all of your, and it would be helpful to me.

6          ALL COUNSEL: Thank you, Your Honor.

7          THE COURT: All right.  I'll see you at 2:00.

8      (Whereupon, the luncheon recess is taken at 12:05

9  p.m., and this matter is recalled at 1:58 p.m.)

10          THE COURT: Are you ready?

11          MR. AHRENS: Ready, Your Honor.

12          THE COURT: All right.  Let's begin.

13                  CLOSING ARGUMENT

14  BY MR. AHRENS:

15          Good afternoon, Your Honor, Michael Ahrens for

16  the Committee and the Plan Proponents.

17          Your Honor, on October 28th, the Ninth Circuit

18  entered its decision in this case, saying that we got it

19  right on virtually all issues except one, and that one --

20  I'm only going to say it once because it's a long Code

21  section -- it's 524(g)(2)(B)(i) three little (i).  We've

22  called that the ownership requirement, so for the rest of

23  my argument, I'll just call it the ownership requirement.

24  Now, we are going to later in the argument be

25  distinguishing it from the one that immediately precedes

1  that, and that's 524(g)(2)(B)(i) two capital (i's) and

2  that's the funding requirement.  As you may recall, the

3  court said we got it right on that, with respect to the 40

4  percent and the price paid for it.

5       So I'll start off this opening, Your Honor, by

6  just summarizing what we did -- it's obvious from the

7  record what we did -- after the court gave us a roadmap.

8  It's obvious that somebody got together and negotiated, and

9  that's in my declaration in this case that eventually by

10 November 15th we had a deal.  That deal is termed "The

11 Second Amendment to Binding Term Sheet."  That's the only

12 signed document since the Ninth Circuit came down.  And

13 we're going to be going through that document a little bit

14 later, Your Honor, but that's what we agreed to.  Make no

15 mistake, Bayside gave up a lot.  We didn't want to have to

16 require them to do that, but make no mistake, they gave up

17 a lot in that agreement in order to get what we all felt

18 was the fix.  We would be the last one standing before you

19 asking for a fix that didn't work.  We spent a lot of time

20 and effort in that second amendment doing a deal that we

21 think will work; we know will work, both before you -- we

22 hope it will work before you -- and the Ninth Circuit.

23       Your Honor, we now feel -- we felt when we did it

24 that there might be some problems with the insurers.  There

25 have been before.  It seems like whatever we do, there's

1  objections from the insurers, but we thought the only

2  objection would be that we didn't get it right as to the

3  roadmap given to us in Footnote 9. But they raised two

4  other objections. One was that when you look at the

5  ownership requirement, you have to also consider the value

6  paid for the stock, that is the 40 percent. So that was an

7  objection. Another objection they, of course, as we

8  expected, they objected to the right of first refusal,

9  isolating themselves only on the right of first refusal,

10 not on the buy/sell agreement. They said we didn't get it

11 right. And the last --

12           THE COURT: First offer.

13           MR. AHRENS: Beg your pardon?

14           THE COURT: The right of first offer.

15           MR. AHRENS: Yes, the right of first offer. They

16 isolated on, I call it the ROFO, but they call it the right

17 of first offer. Isolating on that, they said we didn't get

18 it right. And their last complaint has been throughout

19 that this Debtor is likely to go into liquidation or it

20 cannot be reorganized -- feasibility we call it.

21           On each of these three objections, Your Honor, we

22 will demonstrate that the evidence has shown, on the issue

23 with respect to whether you have to pay or you've taken

24 into consideration the 40 percent, that's really a legal

25 issue. That's really not a factual issue, whether it's one

1  dollar or a two million-one dollar.

2        So, Your Honor, I'd like to first address their

3  first objection, and that is, that we didn't get it right

4  on the ROFO, or we didn't get it right on really the second

5  amendment, which is a buy/sell agreement.  The ownership

6  requirement requires that:

7              "The trust must be entitled to own 51 percent of

8              the voting stock of the reorganized Debtor or be

9              entitled to do so under realistic contingencies."

10  And the Ninth Circuit, I think, added a requirement to

11  that, that required the trust to pay something less than

12  fair market value for the stock.  Your Honor, we think we

13  need to go no further; we don't have to look at the ROFO,

14  because we think all we have to do is look at the warrant.

15  We changed the warrant from an exercised price of well

16  over -- of over a million dollars to one dollar.  And we

17  think that's all that's required to satisfy the

18  requirements of the Ninth Circuit in the roadmap that they

19  developed for us.

20        Your Honor, there already were in place -- in the

21  nine days of trial, you saw a lot of documents, and there

22  already were in place Exhibits Nos. 2051 and 2052 at this

23  trial, and that were employment contracts, employment

24  contracts that provided restrictions on what the employees

25  can own.  Obviously for a very good purpose, you don't want

1  employees to take out all of the money from the company,
2  especially if you're still in control on the Board of
3  Directors.  Therefore, this means that there can be
4  meaningful dividends.  I'm sure the Court is well aware of
5  the decision of the Ninth Circuit in the <u>Plant</u> case, 734
6  F3d at 906, where they said that the trust has an evergreen
7  source of value for future asbestos claimants, and they
8  cited <u>Combustion Engineering.</u>  And in <u>Combustion</u>
9  <u>Engineering</u>, at the page they cited, the court stated there
10 that, quote:

11         "The implication of this requirement is that the
12         reorganized debtor must be a going concern, so
13         that it is able to make future payments into the
14         trust to provide an evergreen funding source for
15         future asbestos claimants."
16 That's 391 F3d at 248.  And then later in the <u>Plant</u>
17 decision, the Ninth Circuit said at page 914, quote:
18         "The underlying company funds the trust with
19         securities and the company remains viable.  Thus
20         the company continues to generate assets to pay
21         claims today and into the future.  In essence,
22         the reorganized company becomes the goose that
23         lays the golden egg by remaining a viable
24         operation and maximizing the trust assets to pay
25         claims."

1        So, Your Honor, this goes back –- that's

2    legislative history as I'm sure Your Honor recalls from the

3    first trial, where that was stated in the legislative

4    history about the goose that lays the golden egg.  But what

5    this is all about is dividends, and about having an

6    opportunity to get 51 percent of the company, not so that

7    you can sell it, but so that you can realize the increased

8    value through dividends.  Your Honor, in Footnote 9, the

9    court talked about a buyout right that must enable the

10   court to claim value.  So, Your Honor, it is our feeling

11   that you don't even need to go to the ROFO or to the second

12   amendment to the binding trust agreement.  All you have to

13   look at is the warrant, and with that warrant, they can

14   claim the 51 percent and satisfy the conditions of the

15   ownership requirement.

16       Your Honor, if we do go to the ROFO, though,

17   let's figure out what it really is.  The insurers have

18   attempted to isolate it and look only at the ROFO.  I would

19   like the Court to turn to Exhibit 2002.  Your Honor, this

20   is the second amendment to the binding term sheet.  This is

21   the only agreement that has been negotiated by Bayside and

22   by the trust beneficiaries, the trust beneficiaries being

23   the Committee and the Futures Rep.  This is the deal.  This

24   deal provides for a lot of things, including the ROFO.  If

25   you would look at paragraph 1 on page 2, it has a provision

1    for a warrant.  We already know that the consideration has

2    immensely changed, benefitting the trust.  Now Mr. Hall

3    testified -- I haven't reviewed it -- today he testified

4    that way.  Mr. Beaton said, I was not asked to give any

5    opinion on the warrant.

6            The second is the put/call agreement.  It's

7    canceled, Your Honor.  And we read the Ninth Circuit

8    opinion.  We saw that they talked about something being

9    illusory, and therefore we felt we could not meet the

10   requirements of the Ninth Circuit if the call remained

11   around.  So it was eliminated, and it's obvious why we did

12   it, because the Ninth Circuit would not allow it.

13           The third is the right of first offer agreement.

14   Mr. Kimball has testified that this provides value to the

15   trust, because of a certainty.  But it also admittedly

16   provides value to Bayside and to their individuals, but

17   it's only part of a deal; it's only part of a complete

18   second amendment to the binding term sheet.  It is part of

19   what is in essence a buy/sell agreement, because you have

20   an elimination of the call; you have the right of first

21   offer; and then in the very important next paragraph 4, you

22   have the put agreement.  This is very valuable to the

23   trust.  We had it before, and we kept it.  Under the old

24   deal, they gave up the call; we kept the put.  What that

25   means, Your Honor, is that at any time within the

1  parameters of that put agreement, the trust can decide we

2  don't want dividends anymore; we want to give it back.  And

3  instead of the old agreement -- if you compare this

4  agreement to the old agreement which is in evidence at the

5  first trial -- we don't have preferred stock anymore.  We

6  were able to negotiate this time to get cash or a note from

7  the company or the individuals.

8        So, Your Honor, this is very much of an

9  advantage, and what did Mr. Hall say about it?  I haven't

10 reviewed it.  What did Mr. Beaton say about it?  I don't

11 have any opinion on it.  Then, Your Honor, there's the

12 trust agreement.  That's Item No. 6 of this agreement.  It

13 says that:

14        "The trust agreement shall be allowed, amended,

15         to allow the trust to sell any of its shares at

16         any time to any party."

17 Your Honor, if they -- the trust agreement previously had

18 certain restrictions.  So this allows sort of the buy/sell

19 agreement that had been negotiated to go forward.  And once

20 again, both of the expert witnesses either, I didn't review

21 or I have no opinion.

22        Now, the shareholders' agreement, Your Honor,

23 that was amended.  That was amended because it took out the

24 reference to the call.  Now, I would like you to, if you

25 could, Your Honor, turn to that shareholder agreement.

1  That shareholder agreement is Exhibit No. 2081.  And I

2  think there are important things in 2081, if the Court

3  could find it.

4          THE COURT: I can.

5          MR. AHRENS: Thank you, Your Honor.  Your Honor,

6  at page 4 of 2081, there is a further aspect of this

7  buy/sell agreement.  There's a provision with respect to

8  the purchase of Ameli and Badakhshan's common stock upon

9  termination of employment.  That's either death or they

10 resign.  This was in place in 2011.  It was in place on

11 November 16th when we merged and closed the deal, and it's

12 in place today.  And yet neither Mr. Hall nor Mr. Beaton

13 recalled it.  You will recall Mr. Fergus asked Mr. Beaton

14 what about the shareholders' agreement, and while he was --

15 and then he gave him a cite and he was looking for it, and

16 he says he really didn't recall reviewing this.  This is

17 important, Your Honor.  This is part of the buy/sell

18 agreement.  And then on further questioning, you may recall

19 today Mr. Beaton said all I am looking at is the ROFO.

20 That's what I'm here for.

21          Your Honor, I submit you can't just look at one

22 aspect of an agreement.  If I sell you my house and you pay

23 $100,000 for it, I don't look just at what you paid; I look

24 at what you got.  And so the bottom line is, this is a

25 comprehensive agreement, the only agreement the parties

1   signed after the Ninth Circuit came down, and it provides

2   for a lot of documents to be implemented.  When are they

3   implemented?  On the effective date, according to the

4   second amendment.  And that's on the 15th day after entry of

5   an order confirming the Plan by the District Court or

6   affirming.

7           So, Your Honor, I submit that there are things in

8   this that are advantageous to us, that we negotiated.  Mr.

9   Kimball reported in his declaration that a baseball clause

10  is good.  That's K-59.  He also testified at paragraph 64

11  of his declaration that a right of first refusal has many,

12  many restrictions, and a right of first offer is basically

13  better.  So what did we negotiate for?  We negotiated for

14  and got something Mr. Kimball has testified in his

15  declaration is very advantageous because it drives parties

16  to the middle.  If we do have the trust buying this, we're

17  tired of litigation.  We want to end litigation.  So we

18  actually, as the evidence shows, negotiated something that

19  is not usual.  It's not a custom.  But it's better.

20          We also negotiated for the right of first offer.

21  We didn't want -- it's obvious, according to Mr. Kimball,

22  it's better to have a right of first offer.  So what's

23  criticized and nitpicked in the ROFO, it is obvious from

24  the evidence before you that it is better than the

25  alternatives and it meets the criticisms of the experts,

1 experts who -- of course, Mr. Hall testified that he was

2 not a valuation expert either.

3 THE COURT: Before the merger, did the

4 shareholders have a buy/sell agreement between them?

5 MR. AHRENS: Your Honor, before the merger, yes.

6 It's just different now.  Before the merger, the buy/sell

7 agreement was the call, the put/call agreement, and so the

8 shareholders had the right to force us, the trust itself.

9 THE COURT: Before they got involved with Plant,

10 did -- when you had Bayside Insulation sailing along, did

11 they have a buy/sell agreement, the shareholders?

12 MR. AHRENS: Since it's not in evidence, I'm not

13 aware of one.

14 THE COURT: Okay.

15 MR. AHRENS: Your Honor, you also my recall at the

16 November 21st hearing, you warned us, and you said, if I

17 find some problems in these agreements -- and one of the

18 things you were questioning was the right of first

19 refusal -- and you have to make changes, I'm going to

20 expect you to make them.  Well, we wanted -- we took that

21 to heart, and when our appraiser reviewed Mr. Hall's

22 testimony, he said there are two things that cause -- that

23 Mr. Hall is right about, and that was one, that you go

24 through the whole ROFO procedure and there's no obligation

25 on the ROFO parties, and the ROFO parties being Ameli and

1  Badakhshan and Bayside --

2          THE COURT: I understand what you're getting at.
3  Save your time.

4          MR. AHRENS: Okay.  Thank you.  So it was changed.
5  Your Honor, the other thing is that --

6          THE COURT: Let me ask you a question about this.

7          MR. AHRENS: Yes.

8          THE COURT: I've been thinking about this a lot,
9  you know, and I don't -- it might be more efficient if I
10  ask you questions than have you just go through your list.
11  To what extent do you believe it's relevant that this is a
12  closely-held company, and are you relying at all on the
13  idea that it may be customary in companies of this size to
14  have restrictions of this sort?

15          MR. AHRENS: Absolutely, Your Honor.  Mr. Kimball
16  has testified in his testimony that it's a reasonable and
17  reliable method in which trusts can achieve reasonable fair
18  market value, and it's customary in this industry of small
19  companies, and it's customary to incentivize people like
20  Ameli and Badakhshan because the evidence as shown in the
21  first trial, they're in their mid fifties, and they're only
22  going to stay around probably until 65, and so they want to
23  know that they do have an upside with respect to this
24  company, but if somehow there's going to be a stranger
25  coming in, that they're going to have some rights.  And

1  that's very customary.  In fact, Mr. Beaton admitted upon

2  Your Honor's questioning that it's --

3          THE COURT: You know, you can stop.  I'm just

4  wondering, you know, if you're relying on that at all.

5          MR. AHRENS: Yes, Your Honor.

6          THE COURT: In terms -- if I were to take that

7  approach, I would want to look and see, I assume, what sort

8  of restrictions are customary, that they exist and they're

9  customary and however it needs to be in the ballpark of the

10 kinds of things that are normally done and upheld by the

11 California Courts --

12         MR. AHRENS: Yes, Your Honor, and I think if you

13 read Mr. Kimball's declaration, he says this is reasonable

14 and a reliable method, and it's something he's seen every

15 time.  Of course, he wasn't cross-examined, but you have a

16 basis to say this is reasonable for small companies, and

17 that it's done.  Even Mr. Mercer was encouraging buy/sell

18 agreements like that.  You heard that today from Mr.

19 Beaton.

20         THE COURT: M-hm.

21         MR. AHRENS: And so what we're saying is, this is

22 a better -- a business decision was made by the trust

23 beneficiaries.  What's better, none of this or going into

24 the open market?  The open market is unreliable according

25 to Mr. Kimball.  And so we'd rather have a method which we

1   could either put or force the hand, force the hand of these

2   individuals, because that's what it does.  And the

3   testimony at paragraphs 40 to 57 of Mr. Kimball's

4   declaration shows how this process would work.  You can go

5   out into the public market without selling and find other

6   buyers and while Mr. Beaton at first questioned that

7   process, when Mr. Fergus examined him on the language of

8   the ROFO, he conceded that while the second -- the first

9   sentence had questions; the second sentence didn't, and we

10  did have that right.  So this has been calculated by us to

11  give value to the trust, and the open market, as Mr.

12  Kimball has stated, is not reliable, and we would rather

13  have this, and it's our business decision that this is

14  better than going to the open market, for the trust.

15          Your Honor, do you have any other questions about

16  the ROFO, because I'm ready to move on to the --

17          THE COURT: No.  No, I don't.

18          MR. AHRENS: Okay, thank you.  Your Honor --

19          THE COURT: I do have one question.  Is it

20  necessary for me to determine that this -- if it is

21  customary in corporations of this size, do I have to

22  determine that the clause is intended to get the maximum

23  value?

24          MR. AHRENS: No, Your Honor, because all you have

25  to determine is that the warrant satisfies the requirements

1  of the Ninth Circuit.  The warrant gives us eleven percent

2  for one dollar, as I said at the beginning --

3         THE COURT: Yeah, I understand that.

4         MR. AHRENS: Okay.  Your Honor, may I approach,

5  and unless the Court has the *West Law* reporting of the

6  <u>Plant</u> decision, I'd like to --

7         THE COURT: That's fine.  (Laughing) Okay.

8         MR. AHRENS: I have a number of copies for others

9  who would like it.

10         THE COURT: Okay.

11         MR. AHRENS:  Your Honor, I'm just going to be

12  very brief on this, but I want to -- this is a legal issue,

13  and I think that it's clear, if you go to page 15, which is

14  really at the Fed cite 913, it's under subsection (c) and

15  the Ninth Circuit has done us a favor, Your Honor.  They

16  have in their decision given us headings, C-1 and C-2.  But

17  just before C-1 and C-2, on page 15 in the upper right-hand

18  corner, they talk about the argument of the insurers.  And

19  they say that the argument of the insurers, they said:

20         "The Court erred in finding that the trust met

21         these conditions with regard to one, the

22         requirement that it be funded..."

23  I call that the funding requirement.

24         "And two, it requires that the trust be entitled

25         to own a majority of the voting shares."

And I call that the ownership requirement, under two separate sections. So then they talked -- they really made it easy for us, because they talked about the funding requirement, under one, and then you go to the next page, and you'll see under two, they talked about the ownership requirement. So here, under headnote 12, at page 15 of the document under "one," they start off by saying:

> "As part of the Plan in this case, the trust will acquire approximately $500,000 worth of equity, 40 percent of Bayside, in the Debtor for two million dollars."

So they then go on and talk about this and the arguments of the insurers that this 40 percent, that they underpaid. And at the end, the very last paragraph of Section 1, they say:

> "We are satisfied that the trust's purchase of these securities in the reorganized Debtor meets the requirements of the funding requirement."

So therefore, they discussed fully the contention, as this Court did, looked at the value in the insurance proceeds that are being put in, and they said it's just not in our place to question that value. They then go on into Section 2, and they talk about the ownership. And there on the top of page 17 at 915 in the Federal Reporter, they talk about the Bankruptcy Court found that this requirement was met

because the trust can gain 51 percent ownership of Bayside
in two different ways.  And they talk about the two
different ways.  Paragraph 1, they talk about the trust
could use its outstanding warrant.  So they're definitely
talking in this section about the warrant.

Then they go on under sub 2 and they say, they
talk about if Bayside defaults on the $250,000 note, they
can get the stock basically, paraphrasing it.  So they made
clear in the introduction to this whole section that this
is all about the warrant and the note default provision and
whether that was satisfactory.  Now key is going over to
the next page 18 in this report, and that's at the Federal
Reporter, that's at 916.  The court there then talks about
this in the headnote, the portion of it that begins at
headnote 16, and it says:

"The contingencies currently in the Plan clearly
do not meet the standard."

They have to be talking about only two things, because
there are only two things in the Plan.  The first is the
warrant as they said in the prior paragraph, and the second
is the -- what they call "note default condition."  So they
then go on in the next sentence and say:

"A mere right of the Plan to purchase shares
ordinarily will not suffice.  A trust that is
struggling to pay claims cannot be expected to

1        purchase control of the reorganized Debtor."

2  "To purchase control," they're talking about the warrant.

3  It's even clearer in the last sentence of this paragraph:

4            "This is especially true where, as here, the

5            price that would have to be paid..." (would, I

6            stress, would, in the future) is fixed at roughly

7            four times the current value of the equity."

8            THE COURT: Right.

9            MR. AHRENS: So therefore, Your Honor, we think

10 the argument -- and then in the next sentence, they talk

11 about the note default condition.  We think it is clear --

12 and I'm about ready to move on to feasibility, because I'm

13 running out of time, but we think it's clear from a

14 reading, a legal reading, as a matter of law; there's no

15 facts required, that the warrant satisfied that condition,

16 and that you don't look at the funding requirement.

17            Your Honor, with respect to feasibility, I'll be

18 brief.  The standard of proof requires --

19            THE COURT: Let me stop you and ask this.  I know

20 the standard of proof; I dealt with it last time.  I am

21 inclined -- I guess I'm inclined not to try to apply law of

22 the case here, because it's uncertain -- this is a forward

23 looking decision.  It seems to me that I might be better

24 off to just -- everybody has agreed that the evidence in

25 the first hearing is admissible for purposes of looking

1   forward –- I have the evidence in this hearing.

2            MR. AHRENS: I would agree with that, Your Honor.

3            THE COURT: I think we should look at it that way,

4   otherwise I'm applying a problematic legal standard.

5            MR. AHRENS: Okay.  I'll skip over all what

6   happened previously, because I agree with the Court.  I

7   think the real key here is, has anything changed, as His

8   Honor said at the last hearing, and I think things have

9   gotten better.  And Mr. Beaton, in his own declaration,

10  quotes the source material that, quote:

11            "Industry consolidation, the insulation industry

12            is alive and well and expected to continue as the

13            economy is recovering."

14  That's the Beaton declaration, paragraph 27.  Your Honor,

15  all of the evidence that we put in points to the continued

16  success of Bayside, and since I'm running out of time, I'll

17  just be quick with the cites to the record.  Would His

18  Honor like cites to the record?

19            THE COURT: Okay.

20            MR. AHRENS: It is obvious that –- is in the

21  record, gross profit margins have gone from 18 to 24

22  percent.  The A.P.'s are better than I've ever seen, in

23  this Court, at least.  The A.P.'s, accounts payable, are

24  just perfect, the Ameli declaration.  The working capital

25  has gone from a negative net worth to 1.2 to 1.8, and in

1   the last financial statement to 1.9.  Mr. Hall had little

2   nits and complaints about them, but when asked, did you

3   ever look at them by the Court, he says, no, I never really

4   compared the adjustments.  The fact of the matter is, the

5   values are going up.  Competition has been reduced by the

6   bankruptcy of F. Rogers.  Bayside's unions continue to be

7   strong.  Bayside timely made its first payment when

8   required to the trust.  Wells Fargo Bank, first is a big

9   issue in the case because the note was overdue by a few

10  days, and Wells Fargo Bank appears to be supporting, Your

11  Honor, because they just granted an extension on the loan

12  for eight years, and the testimony is that that property

13  debt services.  Mr. Ameli testified that he's got bonding

14  on a number of jobs.  But the most important thing, Your

15  Honor, is Mr. Gai.  Mr. Gai is the CPA, the outside CPA,

16  and I would suggest the Court read, which is in evidence,

17  at pages 97 and 98 of his testimony.  He's an independent

18  person who's done the first audit.  And what he said is,

19  here's the question by Mr. Cameron:

20              "Do you have a current view about whether Bayside

21              is likely to remain a going concern through the

22              end of 2014"?

23  And after saying, well, I haven't done an audit, you know,

24  what auditors normally say, but it's all in there; you can

25  read it for yourself.

1          "All of the signs seem to be very positive in

2              terms of how things were going for 2013."

3   And then he said after a few more statements of, you know,

4   I haven't done the audit yet.

5          "But everything that I've heard from the company

6              and what I've seen seems to be positive.  I think

7              they're going to have a good year."

8   When accountants say that, that's something, when they

9   still haven't done an audit.

10         Your Honor, I have a lot of other arguments and

11  rebuttals but I want to reserve some time, so I'll just say

12  one thing, and that is, we had three experts on their side,

13  but nobody has given an opinion that they haven't done

14  better.  We've put in solid evidence that they've done

15  better.  Nobody has given an opinion that they're likely to

16  be liquidated or that there is a need for further

17  reorganization, when this Debtor doesn't even really

18  require that proof, in my mind, because they never were in

19  bankruptcy.  But the bottom line is, we have submitted

20  concrete evidence that they've improved since the last --

21  the last finding of the Court.  We will concede that the

22  law of the case is not something we will rely upon.  We

23  think that you've made your findings, which we think are

24  solid and should stand, and that the finding under

25  1129(a)(11) is easy.

1                    THE COURT: Okay.

2                    MR. AHRENS: Thank you, Your Honor.

3                    THE COURT: You have ten minutes left.  Okay?

4                              CLOSING ARGUMENT

5    BY MR. MILLNER:

6                    If I may approach, Your Honor.  We prepared --

7    instead of my handing out pieces of paper separately, I've

8    prepared a little book.

9                    THE COURT: Okay.  You're given it to the other

10   side, I assume.

11                   MR. MILLNER: What is that?

12                   THE COURT: You've given it to the other side?

13                   MR. MILLNER: Yes, everybody.

14                   The second point I just want to say is that we

15   will have our proposed findings here by the end of the

16   afternoon so we can deliver a copy to Your Honor today.

17                   THE COURT: Tomorrow is fine.

18                   MR. MILLNER: Tomorrow is fine?

19                   THE COURT: Don't sweat that.

20                   MR. MILLNER: I won't sweat it, but we'll still

21   try.

22                   I want to address -- I'm Robert Millner, by the

23   way, for One Beacon.

24                   THE COURT: Yes, I remember you.

25        (Laughter.)

1          MR. MILLNER: A few points that Mr. Ahrens made,
2    one of the points that Mr. Ahrens made is that we shouldn't
3    just look at -- in looking at control issues, we shouldn't
4    just look at the ROFO because it's also a put/call
5    agreement, and there's a shareholder agreement, and then
6    there's a provision that the old put agreement was done
7    away with, and so forth, and this is in the second
8    amendment.  But if you actually look at the shareholder
9    agreement, which is tabbed in your book; it's Trial Exhibit
10   2008, what you'll see is that in paragraph 8 at page 4, the
11   purchase of shares upon termination of Ameli or Badakhshan,
12   what you'll see is that the first right there of either one
13   of what happens to those shares is that if Ameli terminates
14   employment, Badakhshan gets the right to buy, or if
15   Badakhshan terminates, Ameli gets to right to buy.  The
16   actual document is designed to keep control in those two
17   people.  And indeed, if you would look at the beginning,
18   the first page of the document, the second recital of fact
19   in the first page, that's under the tab, it begins as
20   follows:

21              "Ameli and Badakhshan agreed to the merger in
22              reliance on the representation that they would
23              continue to manage and control the company as the
24              surviving entity and that company would receive a
25              capital infusion of two million dollars and a

1          revolving loan of at least a million from the

2          trust."

3          So the actual recital is that -- and this is a

4    document that the trust signed -- that's the expectation

5    that they would remain in control, and if you look later in

6    the agreement on the termination of this agreement, it

7    doesn't terminate until the trust owns no stock.  And my

8    submission to Your Honor on this is, is that the ROFO and

9    all this conduct is designed to accomplish what they state

10   in the recital on the very first page is the object of the

11   agreement, and indeed, there's an amendment to the

12   shareholders' agreement that would be entered into in

13   connection with this transaction.  That amendment doesn't

14   touch what I read about the intent of the agreement to keep

15   control.

16         THE COURT: You can trust that I will assume that

17   Mr. Ameli and Mr. Badakhshan want to remain in control, and

18   they will do what they can to do so.

19         MR. MILLNER: Okay.  And that the trust at least

20   has acknowledged that in writing, and it's a recital of

21   this shareholder agreement.

22         THE COURT: But I don't know that -- is it this --

23   you have an unusual case here, because it's somewhat

24   unusual, at least in my mind, to have this passive

25   investor -- at least now a passive investor -- in an

1  otherwise closely-held company.

2         MR. MILLNER: Now you're cooking; you're right.

3         THE COURT: And so the people that manage this and

4  whose energies the success of the company depends, they

5  would like to remain in control.

6         MR. MILLNER: Correct.

7         THE COURT: And they, you know, they certainly

8  don't want a new third party that is not of their choosing,

9  a new individual, not the trust, coming in and doing that,

10 but these things are governed by their own terms.

11        MR. MILLNER: They are.  And -- but you're on the

12 right track, because --

13        THE COURT: Yeah.  So the question then is, does

14 524(g) say you can't have a confirmation of a Plan with a

15 closely-held company, because I think it's inherent in the

16 nature of the company.

17        MR. MILLNER: There we disagree.  There we

18 disagree, because first of all, this is not your typical

19 buy/sell.  It is not a buy/sell situation, and when we were

20 talking with Mr. Beaton today, about death or divorce being

21 a trigger for a buy/sell, if you actually look at the

22 elements in that Mercer article, the buy/sell is between

23 two active partners; it's between two people like that.

24 This is an odd and different situation because you have the

25 passive trust in this situation, and that's the entity that

1   has to get the 51 percent control. I don't think there's

2   anything inherent in the concept that the trust could get

3   the ability to sell the stock if the Court would confirm a

4   Plan which put no restrictions on that process. In other

5   words, if the Court would confirm a Plan which did not have

6   excessive employment agreements, which these are -- they

7   take out huge salaries and have provisions for bonuses and

8   have provisions for automatic renewals, et cetera and which

9   had provisions in it which we could discuss for a sale of

10   the business if the trust got control by doing things on a

11   no-name basis, dealing with information, et cetera, it

12   could be done. It's not my burden to invent how to do it,

13   but I'm telling you that this ROFO is designed to keep

14   control in Ameli and Badakhshan, and it will do that

15   because no active investor, no active third party will ever

16   get a shot at getting control under this. So I just want

17   to make that point. I also want to say --

18         THE COURT: Well, it doesn't keep them from

19   getting control, the trust. It just means that like

20   another owner in a closely-held company, they are not

21   unfettered in their ability to transfer those shares.

22         MR. MILLNER: True, in that regard, but what I

23   want to say on that score and we'll go through the opinion

24   in a minute, in the view of the Ninth Circuit, the control

25   requirement equals a requirement to claim value, recognize

1 value from the control. That's why, for example, pledging

2 the stock for a note, to back a note, which can be enforced

3 if there's a default, and if it's a nominal note, the court

4 recognizes at that point the stock would be worthless.

5 Value would not be gotten, and the court, in a number of

6 places, says there has to be advantage value gotten, and I

7 can show you the exact words of the court, and therefore --

8        THE COURT: I remember the words.

9        MR. MILLNER: Okay. The mere ability of the court

10 nominally -- of the trust nominally to get stock if it

11 cannot realize value in it, is not what the court

12 envisioned. I would also say that Mr. Ahrens saying this

13 is just about dividends is not so. If you look at

14 companies like Manville, Federal Mogul, you can name

15 others, Armstrong, the trusts sell off that stock and given

16 the employment contracts in this case, which are so rich

17 and have these provisions for bonuses and things, one would

18 want to be in a position -- if he wanted to realize value

19 and the company became valuable, to sell the stock.

20       One more word on the put agreement, which Mr.

21 Ahrens mentioned, that was one of these other things, the

22 put agreement by its terms only becomes active if the

23 warrant is not exercised by a date in 2017. It doesn't

24 deal with the control at all. When you read that

25 agreement, you'll see it. So I just wanted to hit those

1  few points.

2          The argument that's being made is largely the

3  argument about the 40 percent, and the control is largely a

4  legal argument, but Your Honor asked for argument on that.

5  We disagree with Mr. Ahrens' approach; Mr. Ahrens takes one

6  sentence which is at page 17 he gave you in which the court

7  actually is saying the Bankruptcy Court found that this

8  requirement was met because the trust can gain 51 percent

9  ownership in two ways, the warrant or the note, as saying

10 because the Court recited what Your Honor ruled, which you

11 did, that therefore the court is only talking about the

12 warrant or the note in any of the language that follows in

13 the opinion.  And that's not so, and I think that we have

14 made a copy of a few pages of the opinion.  We put some

15 things in yellow, and it's after your first tab, and I'm

16 using the Slip opinion, but if you actually look at page 12

17 of the Slip, you'll see where the court sets up what it

18 thinks it's talking about in a notable deviation from the

19 traditional Johns Manville style, 524(g) reorganization.

20 The equity interest in the reorganized Debtor that the

21 trust would own is not granted to the trust as part of the

22 Plan.  The trust must purchase the interest.

23          The material terms of the transaction are as

24 follows, and the court, Item 1, is the 40 percent for two

25 million.  Item 2 is the eleven percent by the warrant.

1   Item 3 is the promissory note and so on.  The court lays

2   out the entire transaction when it says what this control

3   transaction is.  And it starts there and the court also

4   gives directions as to how this requirement which Mr.

5   Ahrens calls the ownership requirement, but the court

6   itself always talks in terms of control, and at page 32 in

7   the Slip, the court says the history of 524(g) also

8   suggests that this subsection -- this is the control

9   requirement -- is not to be lightly discarded.

10         In the next paragraph, the court says the Plan

11   can still specify what contingencies suffice, but those

12   contingencies cannot be shams that allow control facially

13   but not in practice.  Again, the court always talks about

14   control, not ownership.  And then it says, just a few lines

15   down:

16         "The overarching goal that asbestos claimants get

17         paid to the full possible extent forms the

18         exception."

19   That's part of the language about realizing value from

20   this.

21         On the next page, which is actually very

22   important, and Mr. Ahrens did refer to it, where the court

23   says that the contingencies do not meet the standard, the

24   court there says:

25         "And your right in the Plan to purchase shares

1       ordinarily will not suffice."
2  It doesn't talk about a warrant at all.
3       "A trust that has struggled to pay claims cannot
4       be expected to purchase control..."
5  Control is what it talks about.
6       "... of the reorganized Debtor and such a right
7       leaves the trust in scarcely a better position
8       than a third party."
9  And then it goes on to say:
10      "This is especially true where as here, the price
11      the trust would have to pay is fixed at roughly
12      four times the current value of the equity."
13 It merely talks about control of the equity.  It doesn't
14 say eleven percent; it doesn't say warrant.  And I want to
15 say one more thing, because Mr. Ahrens said, well, the
16 court said it won't inquire into value, about the 40
17 percent.  That's an argument saying that 40 percent is
18 water under the bridge; it doesn't matter, that sort of
19 thing.  But in the control section, in the control section
20 of the brief, they say:
21      "This is especially true where as here, the price
22      the trust would have to pay is fixed at roughly
23      four times the current value of the equity."
24 In the control section, they are concerned because they're
25 concerned about the trust realizing value, and here, they

1 talk about the price. And so --

2         THE COURT: Now, if you were to use their

3 calculation of the exercised price being four times equity,

4 if you kind of went backwards, they're not talking --

5 they're calculating the price of the eleven percent, not

6 including the 40 in that calculation.

7         MR. MILLNER: Why do you say that? It's not what

8 it says. It says:

9         "This is especially true where, as here, the

10         price the trust would have to pay is fixed at

11         roughly four times the current value..."

12         THE COURT: And wasn't that two million versus

13 about 500,000?

14         MR. MILLNER: Right.

15         THE COURT: The two million dollars is the

16 exercised price, right?

17         MR. MILLNER: The two million was not -- the two

18 million was the price of the 40 percent.

19         THE COURT: Okay. Let's go through this again.

20         MR. MILLNER: The two million was the price of the

21 40 percent.

22         THE COURT: Yeah, okay. What's the exercised

23 price for the warrant?

24         MR. MILLNER: The old warrant or --

25         THE COURT: The old warrant.

1            MR. MILLNER: The old warrant would have been at a

2    calculated number that would have been at the same price as

3    the 40 percent purchase.

4            THE COURT: The same total -- the same share

5    price.

6            MR. MILLNER: The same share price, right.

7            THE COURT: Okay.  So the shares of the exercised

8    price would have been about a fourth; it would have been --

9    if the 40 percent cost two million?

10           MR. MILLNER: Right.

11           THE COURT: Is that what it cost?

12           MR. MILLNER: It did.

13           THE COURT: So about 550,000 or something?

14           MR. MILLNER: Might be.  I haven't done the

15   calculation.

16           THE COURT: Okay.

17           MR. MILLNER: It could be, but what I am saying is

18   the court is not -- the words here are simply that:

19               "This is especially true where as here, the price

20               the trust would have to pay is fixed at roughly

21               four times the current value of the equity."

22   You can look in this opinion, every other time that they

23   talk about four times the price, they're talking about the

24   two million, by the way, Your Honor, every other time, and

25   they give no indication that they're talking differently

1    here.  That's what I would say to you on that.

2              The footnote which the brief of my opponents say

3    is -- says that the Ninth Circuit in essence held that

4    they, the movants, could add to the Plan a buyout right for

5    eleven percent, that his footnote somehow is blessing that.

6    It's not.  The footnote simply says that a buyout right

7    could be satisfactory.  It doesn't say buyout right for

8    eleven percent.  It just says buyout right.  Again, they

9    don't limit it the way that the movants here would like.

10   Okay?  Buyout right could be satisfactory if that right

11   placed the trust at an advantage such that it could use

12   that right to claim value.  That's the theme, to claim

13   value.

14             The last line of this opinion says:

15             "Because the present Plan does not call for the

16             trust to control the reorganized Debtor, either

17             after confirmation or at any point where control

18             would meaningfully benefit the trust."

19   Again, that's that same concept.  So anyway, I think that

20   one can fairly say, there's nothing written in that

21   opinion, not a word, that says that the court is accepting

22   that the 40 percent is blessed by it, and that they're only

23   talking about the eleven percent.  And indeed, if you look

24   at the amendment to the Plan, the actual amendment document

25   that was filed back in November, it's simply a document to

1   amend the Plan, to a certain amendment to the trust, and to

2   include the second amended term sheet, and that second

3   amended term sheet has the terms for the ROFO and the put,

4   et cetera, and then other than that, it accepts the

5   original term sheet.  So the confirmation order will bless,

6   as it must for them to win, the gaining of control by

7   purchasing 40 percent and then having a -- for two million

8   dollars, and then having a warrant for eleven.  How Your

9   Honor could go back to his chambers and read this opinion

10  and say, this is what the Ninth Circuit intended to happen

11  here, I don't know.  So that's really what I want to say on

12  control.

13          How much time do I have left?  I've lost track.

14          MR. AHRENS: You started at 2:28.

15          MR. MILLNER: 2:28, so I've used --

16          THE COURT: I have you starting at 2:30, but Mr.

17  Ahrens just gave you two minutes.

18      (Laughter.)

19          MR. MILLNER: Okay.  Well, I've used 14 minutes.

20          THE COURT: You've used 20 minutes.

21          MR. MILLNER: What was that?

22          THE COURT: You've used 20 minutes.

23          MR. O'CONNELL: You've used 20 minutes.

24          MR. MILLNER: I've used how many minutes?

25          THE COURT: Twenty.

1              MR. MILLNER: So I have 20 minutes more.

2              THE COURT: Right.

3              MR. MILLNER: But I don't want to leave this area.

4              THE COURT: I don't think you should leave this

5      area.

6              MR. MILLNER: Okay, so let's stay with it.

7              THE COURT: Let's go through Footnote 9 again.

8              MR. MILLNER: Let's go through it.

9              THE COURT: "Most straightforwardly, a contingency

10                  that promised to transfer control to the trust in

11                  the event that it proved insufficient would

12                  clearly comply."

13     Now that means among other things, you know, we think we're

14     having a bad time now; give us the eleven percent.

15             MR. MILLNER: It says:

16                  "Most straightforwardly, a contingency..."

17             THE COURT: That doesn't suggest that they have to

18     refund anything else.  It just says that the eleven percent

19     would turn over when requested.

20             MR. MILLNER: Wait, wait, wait.

21             THE COURT: Is the dollar really anything other

22     than nominal consideration here?  Isn't this more -- at

23     least equally part of the first sufficient contingency?

24             MR. MILLNER: What I would say is this.  You're

25     reading this sentence which says:

1            "Most straightforwardly, a contingency that

2            promised to transfer control to the trust in the

3            event that it proved insufficient...(i.e., it

4            doesn't have enough money to pay claims) would

5            clearly comply with this provision."

6  That's an abstract statement.  It doesn't say that we're

7  just talking about eleven percent.  This court was

8  vacating -- they did not affirm in part or reverse in part;

9  they reversed in full, and they vacated Your Honor's order.

10 There is no status quo with my opponents having 40 percent,

11 except through Your Honor's status quo order which the

12 Ninth Circuit could not have known about, and is a nearly

13 unprecedented order.  So there's nothing --

14            THE COURT: But they decided certain things.

15            MR. MILLNER: They did.

16            THE COURT: And there's no change in the

17 circumstances; there's no facts on the ground that have

18 changed with respect to the funding requirement and how the

19 trust got the 40 percent, even though they said the Court

20 doesn't have to get into that, and there was value anyway.

21            MR. MILLNER: Had Your Honor not entered the

22 status quo order, because the movants moved very quickly,

23 we would have been here to unwind the transaction.  Now,

24 initially, initially, in the briefing in the Ninth Circuit,

25 we made stay orders because we believed that the other

side, the Plan Proponents, would raise equitable mootness, i.e., the argument that the transaction could not be unwound, should we win. But they stipulated not to raise equitable mootness at the Ninth Circuit level. That's an actual stipulation. We can get that to your Court. So we would have been in here to unwind this merger instantly, but they came in first with their status quo motion. Your Honor created a status quo. The Ninth Circuit did not create a status quo, nor did they urge to the Ninth Circuit that this merger could not be unwound. They stipulated not to raise that. Okay? And that's what that said. So you're reading things into this, okay, and I will say one more thing, Your Honor. This particular court, this Ninth Circuit, could have had no idea whether it would be easy or hard to unwind this transaction, whether this company could give us -- could pay back the two million or not, because we did not raise feasibility to the Ninth Circuit, and we didn't go into all of these issues regarding the finances of Bayside and what their cash position was, et cetera. So what I would say, you're reading things into this opinion that do not exist in it.

Do you have more questions?

THE COURT: (Negative sound.)

MR. MILLNER: Okay. Well, let me talk quickly -- how many minutes have I used?

1           MR. O'CONNELL: You've now used about 25.

2           MR. MILLNER: 25. So I have 15 left.

3  Feasibility, I think the most -- we can come back to this

4  if another question comes into Your Honor's mind, okay?

5           THE COURT: Oh yeah. No, you just go ahead.

6           MR. MILLNER: Okay. We can come back. But I'll

7  just go forward. On the feasibility, first of all, the

8  issue of return of the two million, if that were to be Your

9  Honor's ruling, that that has to happen, or that the 40

10  percent could not be paid for, that would have some effect.

11  That is not addressed at all by the movants, but I think

12  we've addressed the fact in Mr. Hall's declaration that

13  there's at least no known source from which this Debtor

14  would repay the money. I would say the same auditor, Mr.

15  Gai, at page 97, lines 12 through 24, of the designation of

16  his deposition, did say that it would be difficult for them

17  to return the money, and he didn't know really how they

18  would do it. But he did know it would be difficult.

19           Other than that, on the feasibility point, we

20  don't have any projections; we don't have any business

21  plans; we don't have any forecasts; we don't have any

22  budgets; we don't have any reliable report of backlog. We

23  have one audited statement which shows a $92,000 loss. We

24  have the 2013 statements which have not had year-end

25  adjustments. They're not reliable for determining

feasibility, although we have had arguments about the fact

that there was a $300,000 and change credit, which was a

payment, a non-recurring credit for the legal fees that the

trust reimbursed Bayside for. Cash flow from operations

was negative in 2012, the year that we have. It was minus

1.698 million, and even if we eliminate or take into

account that a million of that was to pay off the tax lien,

it's still a strong negative cash flow from operations.

It's not -- we can go through all the detail. It's not a

rich --

THE COURT: Didn't they pay off a lot of payables?

MR. MILLNER: They improved their payables

position, absolutely. The money --

THE COURT: Is that a bad thing?

MR. MILLNER: What was that?

THE COURT: Is that a bad thing for them?

MR. MILLNER: Not at all. Not at all. But they

had a negative drain of money in that 2012; they did

improve their payables. They got two million dollars of

new money in, a million and change was used to pay the IRS.

The others I assume actually were used to improve their

payables position. All I'm saying is that even with all

that, it's not a picture of a healthy company, and there's

not really enough here -- and that's really the opinion of

Mr. Fuchs and Mr. Hall for you -- for anybody to determine

1  the future viability of this company.

2            I know the Court takes comfort in the audited

3  2012 financial.  It does not have a going concern

4  qualification, and I would suggest that you look at page 77

5  of the auditor's deposition, Mr. Gai, lines 7 through 25,

6  because he points out something very interesting.  He was

7  asked about this, and he pointed out -- he didn't get his

8  audit report out for '12 until November 13.  A going

9  concern qualification looks at the ability of the company

10 to continue for 12 months after the balance sheet date, and

11 he points out that since they were already in month eleven,

12 and he didn't see any immediate failure on the horizon, it

13 wasn't much of an issue, just because of the timing of

14 this.

15           I'd also point out what Mr. Hall said this

16 morning, that these financial statements are not financial

17 statements of Bayside Insulation and Construction, Inc.,

18 the reorganized Debtor; they're statements which purport to

19 deal with the operational activities of Bayside, whatever

20 that means.  But a normal audit verifies that the books and

21 records, that those internal balance sheets, how they're

22 reporting, that sort of thing, it verifies that.  That's

23 what they're auditing, and so in this instance, a normal

24 audit would look at the merger, at the consolidating

25 entries, consolidating information, all that, that is in

1  their internals in one way or another and see how that

2  picture looks.  So it's an odd --

3          THE COURT: That's a little confusing for me.  I

4  mean it was this flea swallowed an elephant and the Plan

5  has enormous liabilities and things like that, but what

6  does have to do with whether Bayside will continue to

7  operate, whether their liabilities and assets should be

8  included.

9          MR. MILLNER: The answer is, I don't know, okay?

10  And we can't figure it out exactly, but the auditor said

11  that what he decided to do was look at something called the

12  "Operational Activities."  It's not a well-defined term at

13  all, and all I'm saying is that it's not an audit of

14  Bayside Insulation and Construction, Inc.; it's an audit of

15  some construct thereof.  That's not well defined, and Your

16  Honor can look at Footnote 1 of the audit opinion and the

17  first paragraph of the audit opinion where this notion of

18  auditing just the operational aspects is stated, and you'll

19  not see a clear explanation, and I think you'll see it in

20  the whole deposition.  I'm not saying that the auditor did

21  anything wrong; I am saying that this is an unusual audit

22  report on the going concern issue for two reasons.  One is

23  the entity definition, and number two is it's issued in

24  November of the following year when the auditor says the

25  company had already survived almost a year.  I didn't

1   really have to look at that, and that's my two points, that

2   the weight that Your Honor may be giving to it should be

3   lessened, okay?

4          On the ROFO -- how much time do I have left now?

5          THE COURT: You now have ten minutes.

6          MR. MILLNER: Ten minutes, which may be too much

7   for the ROFO because my suspicion is that the Court has

8   made up its mind already because you've read everything.

9          THE COURT: Well, let me ask you this.

10         MR. MILLNER: Yeah.

11         THE COURT: Is there anything in the statute that

12   says that -- that talks about the right of disposition of

13   the shares?

14         MR. MILLNER: No.  The statute does not.  The

15   notion of claim value is from the Ninth Circuit.

16         THE COURT: All right.  I think that it would

17   be -- I don't need to decide in the abstract whether you

18   could put restrictions on the shares of GM, but we have a

19   closely-held company.  Is there any case law that suggests

20   that this -- that I shouldn't -- that I should look at this

21   closely-held company in one way or another for this

22   purpose?  I haven't found anything.

23         MR. MILLNER: I don't know.  I haven't -- a) I

24   haven't researched this particularly, but offhand -- and

25   I'm a person who reads a lot of cases in this area; I don't

1  know offhand of a case which answers your question.  What I

2  did is laser in on the Ninth Circuit's own analysis,

3  although -- although on the issue of the pledge and the

4  stock, the court here is citing <u>Congoleum.</u>  Judge Ferguson

5  there, like the Ninth Circuit, was concerned that the stock

6  had to have value in the hands of the trust when the trust

7  got it, which is a variant of this same concern about being

8  able to claim value.

9       THE COURT: You mean in the warrant.

10      MR. MILLNER: Yeah.

11      THE COURT: The contingencies.

12      MR. MILLNER: Correct, but it's the same type of

13  thinking that getting the stock at the time that you can't

14  get value for it doesn't count.

15      THE COURT: One thing that occurs to me, just

16  listening to you folks talk about this, the contingency

17  question versus the funding question.  You can talk about

18  it as a 40 percent versus the eleven percent in terms of

19  the number of shares, the price of the shares, but it also

20  seems to me that what the court is talking about is now and

21  the future, that the funding requirement is something

22  that's been decided upon, you know, the trust has been

23  funded with a certain number of shares, and that these

24  contingencies where they have to have control have to do

25  with events that haven't happened yet.

1          MR. MILLNER: But it's not the way that the

2 opinion is written. The court simply has a section on

3 funding, and then it has a section on control. It doesn't

4 say now that we've decided the funding and gotten over the

5 40 percent; that's water under the bridge. Were going to

6 go on. The true way that this opinion parses out, if you

7 were to look at by analogy to just Manville, 80 percent of

8 the stock goes into that trust. Okay? The way this

9 opinion parses out, is that for 51 percent, for the 51

10 percent, the trust cannot be made to pay anything other

11 than nominal, whether it goes into the trust outright on

12 day one or on the happening of a contingency. Above 51

13 percent, if the reorganized -- if the trust is going to be

14 funded by additional over 51 percent, at that level, the

15 court will not inquire into the adequacy of the

16 consideration. That is the true way this opinion parses

17 out.

18          And give it a re-read yourself, the way I'm

19 looking -- the way I'm saying, you'll see that there's

20 nothing in there that says that having met the funding

21 requirement, the 40 percent is water under the bridge, and

22 that it's not going to be required that for purposes of

23 control, the 40 percent doesn't count. I don't think

24 you'll find that in there. So that's how I read it.

25          THE COURT: Well, as a judge, trying to figure out

1   what the instructions are from the Ninth Circuit, I don't

2   sense that they've told me that I shouldn't have let the

3   trust pay for the 40 percent in any way.

4           MR. MILLNER: Well, we disagree on that.

5           THE COURT: So I'm trying to figure out what

6   they're telling me and --

7           MR. MILLNER: And to confirm this Plan because of

8   the way the amendment is set up, you will bless -- you

9   would have to bless, they're getting control by paying for

10  40 percent because they're asking you to bless the original

11  term sheet and the amendment, and I don't think that the

12  Ninth Circuit had in mind that you would bless the idea

13  that this Debtor will get control by paying two million

14  dollars for 40 percent and then a nominal amount for eleven

15  percent.  You know, we'll read your opinion and see how you

16  can explain how you think you get there.  There's no status

17  quo order in the Ninth Circuit opinion.  There's only a

18  vacation of Your Honor's confirmation order and vacation of

19  it in full.  Nothing was left of it by this court.  Now you

20  have to read the opinion for guidance.  Anyway --

21          THE COURT: Okay.  I don't want to take any more

22  of your dwindling time.

23          MR. MILLNER: Okay.  My dwindling time on the

24  ROFO, I'll just say one or two things, which is this.  Even

25  if we didn't have Mr. Beaton, Mr. Kimball, Mr. Hall, all

1 these people, okay, and even if we read Mr. Kimball's

2 declaration and he gives all these ten different ways,

3 things to do, under his Heading E, his reasonable open and

4 active market mechanism, et cetera, the potential buyer

5 under this mechanism would either be told –- I'm talking

6 about the outside buyers that they go to –- would either be

7 told of the existence of the ROFO because I would think

8 that any honorable person before they asked an outside

9 buyer to invest in diligence, hire appraisers, which you

10 can tell by the way we have this thing, or since the ROFO

11 would be part of the confirmation order, any reasonable

12 person doing any diligence on Bayside would look for the

13 confirmation order to try to see if they would find out;

14 it's a public thing.  Okay?

15        So the first issue is, any buyer would know that

16 what the trust is trying to do is use the buyer to leverage

17 its position vis-a-vis Ameli and Badakhshan, and it would

18 know that if Ameli and Badakhshan made any offer, that

19 buyer is out of the box.  And if you read Mr. Kimball's

20 declaration, because under the ROFO, if Ameli and

21 Badakhshan make any offer, nobody else can.  Mr. Kimball

22 himself says that buyers don't want to be used as stalking

23 horses without a break-up fee, and even Mr. Kimball has not

24 yet proposed a break-up fee.  But any outside buyer would

25 see that he's being used in essence as a stalking horse.

He's being used to generate an offer which would either be given to an appraiser or told to Ameli and Badakhshan. However, the trust offered to leverage it. So that's number one. We don't need a great expert to see that.

Number two, this concept of offering the below market financing to the outside buyers, what that means, the below market financing is not a -- is a problematic thing. But what it means is that if Ameli and Badakhshan, for some reason, were to decide not to buy, not to exercise their right, then the outside buyer has 100 percent, 3.75 percent financing. All the trust gets is a note, not cash, not a combination of cash and money, et cetera. The only thing that Ameli and Badakhshan need to do to knock the outside buyer out is to simply make an offer in any amount, and since they have a hundred percent financing, notwithstanding the state of their personal balance sheets, it's easy to do. This is all designed to make sure that control of this entity never goes to an outside party, other than -- you know, it may end up -- could in a passive owner like the trust, but it'll never get beyond that. That's what this whole thing is designed for.

The last point which I'll make is that -- and this is a theme of Mr. Ahrens, is the notion that, well, there's an advantage to the trust having this mechanism because if nobody wants to buy an interest in the Debtor,

1  the trust may be able to use this to trigger some offer

2  from Ameli and Badakhshan, and I would simply refer you to

3  Mr. Beaton's analysis which is that you analyze this not

4  with regard to a company with negligible value that nobody

5  wants to buy, which is basically this company today,

6  Bayside, you analyze it with regard to what would happen if

7  it actually became a valuable company, a company which

8  competitors, outside entrants, others actually do want to

9  buy.  In that instance, this ROFO serves no positive

10 benefit to the trust.  It is simply a method to degrade the

11 price and to make sure control doesn't leave Ameli and

12 Badakhshan's hands, and that's contrary to the Ninth

13 Circuit's opinion, for reasons that I showed Your Honor, in

14 the language of the court, and that's my --

15          THE COURT: Let me just ask one question about

16 that.

17          MR. MILLNER: Yeah.

18          THE COURT: And this is, you know, your time is

19 up, so I'm not wasting your time now.

20          MR. MILLNER: Okay.  My time is up.  You haven't

21 wasted my time at all.

22          THE COURT: Well, I used some of it on making you

23 answer questions.

24          MR. MILLNER: That's okay.

25          THE COURT: Isn't one of the theories of these

buy/sell agreements that you are making it possible for the company to continue to function, these small companies that depend on the personal efforts of the managers/owners shareholders, employee, shareholders, and that the company didn't have much value without their input and may need to have some assurances to put in their best efforts and to stay with company at all?

MR. MILLNER: It's possible. I'd have to consult with --

THE COURT: But isn't that the theory of it all?

MR. MILLNER: I'm not sure, but I simply want to say again that the -- one has to look at this as a Bayside, not with 18 million dollars in revenue today, but a Bayside with, you know, 50 or 60, a much larger company, which is not the simple, little company with negligible value. We're sort of in a time -- looking at it like that. And I cannot answer the theory on buy/sells, because --

THE COURT: I guess what I'm getting at is, you seem to separate the question of what do you do when the company has achieved some value by success versus the kind of inter-shareholder agreements you had to have to get to that success.

MR. MILLNER: I come back to this. A price of Bayside merging and the Debtor using Bayside as their merger vehicle to make a going concern, must be a set of

1  provisions dealing with the control, such that the trust

2  can sell Bayside if it becomes valuable, you know, and I

3  discussed with Mr. Beaton, and it's not in the record, so

4  you can move to strike this if you like, you know, how you

5  would attract buyers when Mr. Ameli and Mr. Badakhshan say,

6  letting out their proprietary information, is bad for the

7  company, and he described to me processes whereby you sell

8  on a no-name basis.  Some information you keep -- you don't

9  let out.  Probably most of the people already know who

10  their customers are because they bid against them, and you

11  devise something that would work.  What sits here is far

12  from it and should not be approved by the Court.  The only

13  explanation -- this ROFO is something that is a bizarre

14  document, the likes of which Mr. Beaton has not seen.  We

15  didn't cross-examine Mr. Kimball, but he hasn't had a

16  transaction, you know, in his deposition -- you can move to

17  strike this too -- with a ROFO with the elements of this

18  particular -- what we're dealing with.  I mean it's a

19  bizarre document, and it's designed to keep control with

20  Ameli and Badakhshan and it's designed -- and it has the

21  effect of not letting the trust get value out of this

22  thing, and that's just contrary to what the Ninth Circuit

23  said.

24          THE COURT: Okay.  Thank you.

25          MR. FERGUS: To the extent it's necessary, Your

1  Honor, on behalf of the Futures Representative, I move to

2  strike the comments that are outside of the record on Mr.

3  Millner's invitation.

4       (Laughter.)

5            THE COURT: They're not evidence.  That's all I

6  needed to know, is they're not evidence.

7            MR. AHRENS: May I begin, Your Honor.

8            THE COURT: Of course.

9                     FURTHER CLOSING ARGUMENT

10 BY MR. AHRENS:

11           Mr. Millner said a number of times, the ROFO

12 keeps them in control.  Your Honor, the right of first

13 offer has nothing to do about control.  Control means you

14 control a corporation.  ROFO has to do with the sale of

15 stock.  Now, on three places in his declaration, Mr. Beaton

16 testified exactly the same way.  They want to get that word

17 "control" into the record for some reason, but the bottom

18 line is, even Mr. Beaton when confronted with Trial Exhibit

19 2081, on cross-examination from Mr. Fergus, he was shown

20 paragraph 2 of that agreement where it does have a

21 restriction on who you can vote for, for the Board of

22 Directors, as long as Ameli and Badakhshan have more than

23 50 percent of the corporation.

24           So therefore, when the trust, if it exercised --

25 if it decides to exercise it, it will have control and the

1  fact that they are now -- have a ROFO means nothing.  It

2  means nothing.  It only has to do with the sale of stock.

3      The other issue he brought up is, oh, they might

4  try to undo the merger.  Your Honor, you may remember and

5  we even briefed this, I believe, in the status quo order,

6  in <u>Thorpe Insulation</u>, the Ninth Circuit reversed an

7  asbestos case and sent it back to the Bankruptcy Court, and

8  said, you can do what you can do, but you may not be able

9  to undo a lot of things.  We stood ready because they

10  failed to get a stay pending appeal.  They went all the way

11  to Justice Kennedy, and they did not get a stay pending

12  appeal, and we implemented the merger.  And while we agreed

13  that we would not seek to dismiss that appeal because we

14  wanted to get on with it, that does not mean that the

15  merger hasn't happened.  I really don't know how you can

16  undo a merger that's already happened.  A certain matter

17  has been remanded to this Court.  The matter relates to the

18  ownership clause, and we submit that that has nothing to do

19  with the merger.

20      Your Honor, they had a certain question about the

21  financial statement.  The footnotes themselves explain it

22  all.  On 2021, Bayside 01583, it says:

23          "This financial statement report presents the

24          operations of Bayside (Old) through November

25          2012, and the operations of Bayside (New) to

 1          December 31st, 2012.  None of the activity is

 2          associated with Plant's bankruptcy case is

 3          reflected in these financial statements.  These

 4          financial statements reflect the operational

 5          activities of the merged companies only."

 6   And then on cross-examination, and I think the Court

 7   recalled it because you asked a question about it, cross-

 8   examination of Mr. Fuchs, Mr. Ferguson examined him and he

 9   said, you recall -- and you should recall, Your Honor, that

10   he admitted that the differences between the RINA reporting

11   and what the company reported are attributable to the fact

12   that they were measuring different time periods and

13   different entities.  That's page 49 of the trial

14   transcript, line 21 to page 50, line 4.  He also admitted

15   that the audit did not include in it the trust accounting

16   for all the settlements and payments that Plant did before

17   the merger.  That's trial transcript page 48, line 24.

18          Your Honor, he went on to admit on final cross-

19   examination that when you get down to it and compare the

20   two financial statements, there's a $10,000 difference.

21          Your Honor, I have nothing really further to

22   respond to unless the Court has any questions.

23          THE COURT: I don't.

24          MR. AHRENS: Thank you, Your Honor.

25          THE COURT: So I'll get proposed findings and

1   conclusions from you some time soon.

2           MR. SACKS: Ours are on file, Your Honor.

3           THE COURT: And I will get a decision our more

4   quickly this time than last time.  It's not as much to do.

5   It could be only a couple weeks or so.

6           MR. AHRENS: Your Honor, I would just like to ask

7   the Court if we are considering treating this -- we think

8   we should just do it as a normal appeal.  The report and

9   recommendation that we were talking about earlier might

10  have been okay, but I think Judge Seeborg probably had

11  something to say about all this too, so I assume --

12          THE COURT: I'm going to deal with this in the

13  normal way.

14          MR. AHRENS: Thank you.

15          THE COURT: What I'm concerned about is that if

16  Judge Seeborg thinks something needs to be done to make

17  this Plan confirmable, that, you know, he not remand the

18  matter, but I think that the best way to do that, if he

19  thinks that there's something that needs to be changed, is

20  to vacate the order of this Court if he thinks -- then he

21  can withdraw the reference and deal with it directly.  That

22  would be the most efficient way for him to take account of

23  anything he thinks needs to be done, you know.  Again, I'm

24  concerned that we get this right.  I'm concerned that he

25  have a ready means to do whatever needs to be done to get

1  the matter right.  But I don't think I need to do a report

2  and recommendation where the matter is still open.  I think

3  he can reverse, withdraw the reference and enter his own

4  order.  I mean the statute clearly contemplates that he can

5  act on his own.

6          MR. AHRENS: Thank you, Your Honor.  We agree with

7  the Court.

8          THE COURT: So I'm going to handle it in the

9  normal way.  Okay.  It's a pleasure to see you as always.

10 I have a funny feeling I'll see you again somehow.

11     (Laughter.)

12         But I always enjoy your presentations because

13 they're so well done and you're good people who are good to

14 each other as well as to me.  Thank you.

15         ALL COUNSEL: Thank you, Your Honor.

16    (Whereupon, the proceedings are concluded at 3:18

17 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6            I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10   DATED: January 31, 2014

11

12                        By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25